UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————— )
                                                            )
JOHN A. HIRSCH AND RONALD W. ZOLLA,      )
Individually and as officers, directors, and                )
shareholders of ZHL, Inc. and ZHL, Inc.                    )
                                                            )
                                    Plaintiffs,             )
                                                            )          Civil Action
v.                                                          )          No. 05-10902-DPW
                                                            )
MICHAEL LAMENSDORF and                                     )
KATHY LAMENSDORF, Individually and                         )
as shareholders of ZHL, INC.,                              )
                                                            )
                                    Defendants.             )
———————————————————————— )

## AFFIDAVIT OF JOHN A. HIRSCH

1.      I, John A. Hirsch, am one of the plaintiffs in this lawsuit. I am also the

President and Chief Executive Officer of ZHL, Inc., which is another plaintiff in the

litigation. I make this affidavit in support of the Plaintiffs' Motion for Remand with the

specific purpose of informing the Court about ZHL's business operations as they relate to

ZHL's contacts with Massachusetts and Florida.

2.      To summarize, ZHL's corporate office is now and always have been

located in Marblehead, Massachusetts. By contrast, ZHL's business operations have all

been located in Florida.

3.      ZHL was formed in 1998 or thereabouts for the purpose for constructing

and owning an ambulatory surgery center ("ASC") in Sarasota, Florida. ZHL's principal

shareholders are Dr. Michael Lamensdorf, a Florida ophthalmologist; Kathy Lamensdorf,

his wife; Ronald W. Zolla, a Massachusetts resident, and me. At present, Mr. Zolla and I own something in excess of 85% (eighty-five percent) of the outstanding shares of ZHL.

4.    ZHL was formed for the specific purpose of constructing an ASC to accommodate Dr. Lamensdorf's surgeries. Mr. Zolla and I were in 1998 (and we have been for more than 20 years) management consultants who specialize exclusively in ophthalmology practices. We work primary through a Massachusetts-based company called Ophnet, Inc.

5.    In 1995, Ophnet began providing management services to Dr. Lamensdorf's medical practice. As the number of surgeries that Dr. Lamensdorf performed grew, it became clear that an ASC would be economically viable. Generally, surgery is the most lucrative aspect of an ophthalmologist's practice. An ophthalmologist's qualification to perform surgery is what sets him and her apart from other eye-care professionals, and third-party payors compensate the surgeon accordingly. A significant portion of third-party payments for surgery, however, is allocated to the facility in which the surgery is performed. Federal and State statutes and regulations governing fee splitting and kickbacks generally forbid physicians from any direct sharing in facility fees, but applicable regulations allow physicians to have an ownership interest in an ASC and they may share in the facility's profits as any other owner.

6.    After the decision to build an ASC was made, Mr. Zolla and I spent a significant amount of time in Florida locating the property on which the ASC would be constructed. That facility was constructed on Proctor Road in Sarasota.

7.    Massachusetts was chosen as the State of ZHL's incorporation, because Mr. Zolla and I are the majority shareholders in ZHL, and the financial and business

2

affairs of the corporation have generally been run from Mr. Zolla's office in Topsfield and my office in Marblehead. ZHL also has a contract with Ophnet whereby Ophnet manages much of the ASC's business affairs. A true and accurate copy of that contract is attached hereto as Exhibit A.

8.    At all times, however, all of the corporation's revenue-generating operations have taken place in the State of Florida. All of ZHL's paid employees (at its busiest, ZHL had in the vicinity of 10-12 full and part-time employees) are situated in Florida. Since Dr. Lamensdorf in February 2002 exercised the limited power of termination that the Ophnet-ZHL Management Agreement conferred upon him, the ASC's day-to-day business affairs have primarily been managed by a ZHL employee who primarily worked on site in Sarasota. ZHL has never had any paid employees in Massachusetts or in any place other than Florida.

9.    Moreover, all the surgeries which generated ZHL's revenues took place in Florida, and all payments from third parties initially went to ZHL's Florida bank account. Although Ophnet had significant responsibilities for managing ZHL, the primary business of the ASC (providing a facility for surgeons) has always been in Sarasota. Significantly, Ophnet has no clinical responsibilities and never did. Those responsibilities have always been solely in the hands of ZHL's medical directors and the physicians who operate there. All of those doctors are Florida residents who performed their work in Florida.

10.    At present, there are no surgeries being performed on a regular basis at the ASC. Until a few weeks ago, however, ZHL continued to have a full-time employee, Kasia Rossi, who worked at the ASC in Sarasota. It now has one part-time employee

who works there. The facility remains open to satisfy state, federal, and third party payor

requirements concerning certification and accreditation: Periodically, Mr. Zolla or I

continue to travel to the ASC to conduct compliance meetings that are required by the

various private and governmental entities that certify or accredit the ASC.


SIGNED AND SWORN UNDER THE PAINS AND PENALTIES OF

PERJURY THIS ___*23*___ DAY OF MAY, 2005.

John A. Hirsch

4

# MANAGEMENT AGREEMENT FOR ZHL, INCORPORATED AMBULATORY SURGERY CENTER PROJECT

THIS AGREEMENT is effective as of the 15th day of January, 1999, by and between ZHL, INCORPORATED, a Massachusetts corporation (the "Owner"), and OPHNET, INC., a Massachusetts corporation ("Project Manager").

## WITNESSETH:

A.    Owner desires to employ the Project Manager to perform certain management services in connection with the design, planning, permitting and construction of an ambulatory surgical center (the "ASC") to be situated on a tract of land in Sarasota, Florida (the "Site"):

B.    The Project Manager agrees to perform such management services for Owner, subject to the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual covenants and benefits contained herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the Project Manager and Owner hereby agree as follows:

1.    RECITALS. The foregoing recitals are true and correct and the recitals and instruments referred to therein are hereby incorporated herein by reference.

2.    DEFINITIONS.

(a)    Architect. "Architect" means the Architect who is responsible for the design of the ASC and any other vertical structures constructed on the Site.

(b)    Construction Manager. "Construction Manager" means any person or entity retained by Owner to coordinate and manage the construction of the ASC and any other improvements which may be constructed on the Site.

(c)    Contractor. "Contractor" means any person or entity who enters into an agreement with Owner, Construction Manager or another Contractor for the purpose of improving the Site in any respect.

(d)    Ambulatory Surgical Center. "Ambulatory Surgical Center" means a facility licensed as an ambulatory surgical center pursuant to Section 395.003, *Florida Statutes*.

(e)    Engineer. "Engineer" means any person or entity who provides engineering services to the Project.

(f)    Project. "Project" means the design, construction and operation of the ASC.

(g)    Project Consultant. "Project Consultant" means any person or entity rendering professional and/or development consulting services to the Project and shall include, without limitation, the Architect, Construction Manager, attorneys, environmental consultants, and transportation consultants.

3.    ENGAGEMENT. Owner hereby retains and engages the Project Manager to provide certain business administration and management services described herein and to assist the Owner in completing the Project. In consideration of the services to be provided by the Project Manager, Owner shall pay the Project Manager in accordance with Paragraph 7 below.

-2-

4.    **PROJECT MANAGER'S SERVICES AND RESPONSIBILITY.** The Project Manager covenants with the Owner to further the interest of the Owner by furnishing the Project Manager's skills and judgment in furtherance of completion of the Project. The Project Manager agrees to furnish business administration and management services and to perform in an expeditious and economical manner consistent with the interests of the Owner. The Project Manager's basic services consist of the three phases described below:

(a)    Pre-Construction Phase.

(i)    Assist the Owner in achieving a mutually agreed upon program for completing the Project and identifying the Project budget requirements and other design parameters;

(ii)    Assist the Owner in acquiring a suitable parcel of land for the Site of the ASC,

(iii)    Review the ASC master plan and construction drawings and other design documents prepared by the Architect and provide recommendations to Owner concerning among other things, governmental requirements, aesthetics, and maintenance practicality viewpoint;

(iv)    Provide recommendations on feasibility of construction methods and availability of materials and labor, time requirements for procurement, installation and construction and factors relating to cost including, but not limited to, costs of alternative designs or materials, preliminary budgets and possible economics;

-3-

(v)  Prepare and periodically update progress schedules that coordinate and integrate the services of the project team and the Owner's responsibilities with anticipated construction schedules;

(vi)  Make recommendations to the Owner and Architect regarding safety precautions and programs;

(vii)  In consultation with the Architect, coordinate the contract documents regarding drawings and specifications as they are being prepared and advise on separation of the Project;

(viii)  Prepare contracts for the various categories of work necessary to complete the Project;

(ix)  Advise on the method to be used for selecting contractors and awarding contracts and make recommendations, as required, to provide that work of separate contractors is coordinated, and the likelihood of jurisdictional disputes has been minimized;

(x)  Periodically update cost evaluations and the Project Budget;

(xi)  Prepare a project construction schedule providing for all major elements such as phasing of construction and times of commencement and completion required of each separate contractor;

-4-

(xii)  Recommend a schedule for the Owner's purchase of medical equipment, machinery and other items requiring long lead time procurement and expedite and coordinate delivery of such purchases;

(xiii)  Provide an analysis of the types and quantities of labor required for the Project and review the availability of appropriate categories of labor for critical phases;

(xiv)  Assist the Owner in preparing construction contracts, and advise the Owner on the acceptability of subcontractors, materials and supplies proposed by contractors;

(xv)  Prepare for the Owner's approval a more detailed estimate of Construction Cost developed by using estimating techniques which anticipate the various elements of the Project, and based on Schematic Design Documents prepared by the Architect. Update and refine this estimate periodically as the Architect prepares Design Development and Construction Documents;

(xvi)  Make recommendations for pre-qualification criteria for bidders and develop bidders' interest in the Project. Establish bidding schedules. Assist the Architect in issuing bidding documents to bidders.  Conduct pre-bid conferences to familiarize bidders with the bidding documents and management techniques and with any special systems, materials or methods; and

-5-

(xvii) With the Architect's assistance, receive bids, prepare bid analyses and make recommendations to the Owner for award of Contracts or rejection of bids.

(b)    Construction Phase.

(i)    Administer in cooperation with the Architect each of the contracts;

(ii)    Provide administrative, management and related services as required to coordinate the work of the contractors with each other and with the activities and responsibilities of the Project Manager, the Owner and the Architect to complete the Project in accordance with the Owner's objectives for cost, time and quality. Provide sufficient organization, personnel and management to carry out the requirements of this Agreement;

(iii) Update cost estimates, maintain cost accounting records, identify variances between actual and estimated costs and advise the Owner and the Architect whenever projected costs exceed such estimates;

(iv) Update and revise the construction schedule, as required, to show current conditions and revisions required by actual experience;

(v)    Endeavor to achieve satisfactory performance by contractors and recommend courses of action to Owner when contract requirements are not being met and the non-performing contractor will not take corrective actions;

-6-

(vi)   Review and coordinate the safety programs developed by each contractor;

(vii)  Assist Owner in obtaining, in a timely fashion, all licenses, certificates, accreditations, permits and other governmental approvals necessary for the construction and operation of the Project;

(viii) Determine, in general, if the work is being performed by the contractors in accordance with the requirements of the contract documents and endeavor to guard the Owner against defects or deficiencies in the work;

(ix)   Receive and review contractor's insurance certificates and forward them to Owner;

(x)    Receive the contractors' shop drawings, review them to ascertain if they are properly coordinated with related documents and forward them to the Architect for its approval;

(xi)   Review the progress of the work and submit progress reports to the Owner showing percentages of completion;

(xii)  Develop and implement procedures for processing the contractors' requisitions and make recommendations to the Architects for certifications for payments;

(xiii) Maintain records;

(xiv)  Schedule and conduct meetings;

-7-

(xv)  Arrange for delivery and storage of materials pre-purchased by the Owner;

(xvi)  Observe the contractors' check-out of the operational system and equipment and assist in their initial start-up and testing;

(xvii)  When a given contractor's work reaches the stage of substantial completion, prepare for the Architect's review a punchlist of incomplete or unsatisfactory work, as well as a schedule for their completion and assist the Architect in conducting inspections to determine if the work has reached substantial and final completion;

(xviii)  Assist the Owner and Architect in the close-out of the Project by securing and transmitting to the Owner guarantees, affidavits, waivers of lien and other similar documents;

(xix)  Schedule and conduct pre-construction, construction and progress meetings to discuss such matters as procedures, progress, problems and scheduling. Prepare and promptly distribute minutes;

(xx)  Revise and refine the approved estimate of construction cost, incorporate approved changes as they occur, and develop cash flow reports and forecasts as needed;

(xxi)  Provide regular monitoring of the approved estimate of Construction Cost, showing actual costs for activities in progress and estimates for uncompleted tasks. Identify variances between actual and budgeted or

-8-

estimated costs, and advise the Owner and the Architect whenever projected costs exceed budgets or estimates;

(xxii) Recommend necessary or desirable changes to the Architect and the Owner, review requests for changes, assist in negotiating contractors' proposals, submit recommendations to the Architect and the Owner, and if they are accepted, prepare and sign Change Orders for the Architect's signature and the Owner's authorization;

(xxiii) Develop and implement procedures for the review and processing of applications by contractors for progress and final payments;

(xxiv) Record the progress of the Project. Submit written progress reports to the Owner and the Architect including information on each contractor and each contractor's work, as well as the entire Project, showing percentages of completion and the number and amounts of change orders; and

(xxv) Maintain at the Project site, on a current basis, a record copy of all contracts, drawings, specifications, addenda, change orders and other modifications, in good order and marked to record all changes made during construction.

(c)     Strategic Management and Marketing Services.

    (i)     Ensure that John A. Hirsch and Ronald W. Zolla are personally involved in the strategic management and marketing phase;

(ii)  Assist the Owner in devising and completing a marketing plan for the Project;

(iii)  Assist the Owner in pursuing eye surgeons and other surgeons who have the ability to use the ASC;

(iv)  Pursue managed care contracts for the ASC;

(v)  Provide annual financial performance assessments;

(vi)  In consultation with the Owner, create sales brochures, advertising materials and promotional materials; and

(vii)  Assist the Owner in preparing and formulating the ASC structure and its policies and procedures.

(d)     Operational Phase.

(i)  Ensure that the ASC is properly and efficiently staffed by an on-site manager and by other non-physician and administrative support staff;

(ii)  Monitor the day to day operation of the ASC;

(iii)  Ensure that the ASC has appropriate and sufficient supplies and equipment;

(iv)  Ensure that all regulatory requirements for the operation of the ASC are met on an on-going basis;

(v)  Ensure that appropriate accreditation standards are met;

-10-

(vi)  Ensure that the ASC operates in a cost-effective and efficient manner;

(vii)  Oversee the management of the non-physician and administrative staff of the ASC;

(viii)  Assist the Owner in meeting all federal, state, and local medical waste laws, rules, and regulations; and

(ix)  Ensure that billings and collections for services provided by the ASC are performed in a timely, efficient, and cost-effective manner.

5.    **TERM.**    Project Manager will provide services to the Owner for a period commencing on the effective date of this Agreement and terminating one (1) year after the effective date of this Agreement; provided, however, that the Agreement shall automatically be renewed for successive one (1) year terms thereafter, unless either party gives the other notice to terminate the Agreement at the expiration of the initial term or any one (1) year renewal term.

6.    **BEST EFFORTS.**    Project Manager agrees that he shall devote his best efforts, energies and skills to the discharge of his duties and responsibilities hereunder.

-11-

7.     <u>**COMPENSATION TO THE PROJECT MANAGER.**</u>

      (a)    <u>Fee.</u>   As compensation for the services to be provided by the Project Manager to Owner hereunder, Owner shall pay the Project Manager as follows:

             (i)     For services performed during the Pre-Construction Phase and the Construction Phase, the Project Manager shall receive Fifty Dollars and No/100 ($50) per hour of service; provided, however, that the maximum total amount that the Project Manager shall receive for such services shall be Fifty Thousand Dollars and No/100 ($50,000.00). Owner agrees to promptly pay the compensation one month in arrears by the fifth (5th) day of the following month.

             (ii)    For services performed during the Operational Phase, the Project Manager shall receive Seventy-five Dollars and No/100 ($75) per hour of service; provided, however, that the maximum annual amount that the Project Manager shall receive for such services shall be Fifty Thousand Dollars and No/100 ($50,000.00) per year. The hourly rate and the maximum annual amount shall be adjusted at the beginning of each year by an amount equal to the change in the Consumer Price Index.

             (iii)  For services performed during the Strategic Management and Marketing Phase, the Project Manager shall receive Thirty-Thousand and No/i 00 ($30,000.00) per year, payable in quarterly installments; provided, however, that such payments are authorized to be paid by the Owner only if, and to the extent that, the Owner's profits are available. Otherwise such payment obligations will

-12-

be maintained as an Owner liability to be paid when profits become available to cover the liability.

(b)    Out-of-Pocket Expenses.  Owner also agrees to reimburse Project Manager for all "Reimbursable Expenses" incurred in fulfillment of Project Manager's services. "Reimbursable Expenses" shall mean costs necessarily incurred in the proper performance of services and paid by the Construction Manager. Such costs shall be at rates not higher than the standard paid in the locality of the Project. The Project Manager shall submit an application for payment each month for all such Reimbursable Expenses incurred by the Project Manager during the prior month and said payment shall be due within ten (10) days of said application for payment. Notwithstanding anything to the contrary herein, Project Manager must obtain Owner's consent before incurring any Reimbursable Expenses exceeding $1,000.00.

8.    **RESPONSIBILITIES OF OWNER.**

(a)    Cooperation.  Owner shall work with the Project Manager in an expeditious and consistent manner in order to insure the continued progress and completion of the work, and promptly perform all obligations of Owner set forth in this Agreement. Further, the Owner shall render decisions in a timely manner pertaining to all documents and plans submitted by the Project Manager in order to avoid unreasonable delay in the orderly and sequential progress of the Project Manager's service.

(b)    Availability. Owner shall be available to meet or consult with the Project Manager upon reasonable notice on all matters pertaining to the management services provided and performed by the Project Manager under this Agreement.

-13-

9.   **LIABILITY.** Each party agrees to indemnify and save harmless the other party against and from any and all claims, liabilities, losses, costs, expenses, or damages arising in relation to the indemnifying party's (and its employees, agents and representatives) actions or omissions, including without limitation any legal fees or expenses incurred in connection therewith. In any case in which indemnification is sought hereunder, the party seeking indemnification shall promptly notify the other of any claim or litigation to which the indemnification relates and the party seeking indemnification shall afford the other the opportunity to participate and at the other party's option, fully control any compromise, settlement, litigation or other resolution or disposition of such claim or litigation.

10.   **TERMINATION BY THE PROJECT MANAGER.** The Project Manager's obligation or duty to perform the services under the Operational Phase set forth in Section 4(d) of this Agreement may be terminated without cause by the Project Manager upon one hundred eighty (180) days written notice by Project Manager to Owner. Upon such termination by the Project Manager as set forth above, the Project Manager shall be paid, or if already paid, shall retain, the portion of the fee set forth in Paragraph 7(a) above through the stage of the work which is then being performed by the Project Manager and Owner shall retain the exclusive right to all work product produced by the Project Manager prior to such termination. Thereafter neither the Project Manager nor Owner shall have any further rights or obligations under this Agreement, except that the indemnity provisions of Paragraph 9 hereof shall remain in full force and effect.

11.   **TERMINATION BY OWNER.** The services to be performed by the Project Manager under the Pre-Construction Phase and the Construction Phase set forth in Sections 4(a) and (b) of this Agreement may be terminated by Owner for good cause and the continuation

-14-

thereof for thirty (30) days after written notice from Owner to the Project Manager and its failure to so cure within the thirty (30) day cure period. The Owner may terminate the Project Manager's obligation or duty to perform the services under the Operational Phase set forth in Section 4(d) of this Agreement, without cause, upon one hundred twenty (120) days written notice by Owner to Project Manager, or, with good cause and the continuation thereof for thirty (30) days after written notice from Owner to Project Manager and its failure to so cure within the thirty (30) day cure period. The decision by Owner to terminate the above services shall be made in the sole discretion of Michael Lamensdor{ M.D. However, the services to be performed by Project Manager under the Strategic Management and Marketing Phase set forth in Section 4(c) may only be terminated by Owner upon a majority vote of its shareholders and one hundred twenty (120) days written notice from Owner to Project Manager. Upon termination of any section of this Agreement by Owner as set forth above, Owner shall pay to the Project Manager the portion of its fee set forth in Paragraph 7(a) above for all services provided through the stage of the work which is then being performed by the Project Manager and Owner shall retain the exclusive right to all work product produced by the Project Manager prior to such termination. Thereafter, neither Owner nor the Project Manager shall have any further rights or obligations under this Agreement, except that the indemnity provisions of Paragraph 9 shall remain in full force and effect.

12.     **CONSTRUCTION MANAGER.**

Notwithstanding anything herein to the contrary, the Owner reserves the right to hire an actual construction manager to oversee the Project at any time and in its sole and absolute discretion.

-15-

13., **MISCELLANEOUS.**

(a)  <u>Entire Agreement</u>. This Agreement represents the entire integrated agreement between the Project Manager and Owner and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument executed by both the Project Manager and Owner.

(b)  <u>Assignment</u>. This Agreement may not be assigned by either party without the prior written consent of the other party and any assignment made without such prior consent shall be deemed null and void.

(c)  <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the laws of Florida.

(d)  <u>Time of the Essence</u>. Time is of the essence of this Agreement.

(e)  <u>Notice</u>. Any notice required or permitted to be delivered hereunder shall be in writing and shall be deemed to have been duly given on receipt, if delivered personally, or sent by Air Mail, postage prepaid, and at the time of such mailing, a copy of the notice or demand to be sent by facsimile to the parties at their address and facsimile number as set forth below:

<u>To the Owner:</u>

ZHL, Incorporated
17 Hawkes Street
Marblehead, MA 01945
Attention: John A. Hirsch

Telephone: 781-631-8278

Facsimile: 781-639-1271

-16-

To the Project Manager:

Ophnet, Inc.
17 Hawkes Street
Marblehead, MA  01945
Attention:  Ronald W. Zolla, Ph.D.

Telephone:  781-631-8278

Facsimile:  781-639-1271

(f)    Authority. The Project Manager and Owner represent and warrant to each other that the other party has full right, power and authority t~ enter into this Agreement and fully perform hereunder, and the persons executing this Agreement on behalf of the Project Manager or Owner have the full power and authority to bind such party to this contract.

(g)    Waiver of Breach. Waiver by either party of a breach of any provision of this Agreement shall not be deemed to be a waiver of any other breach and shall not be construed to be a modification of the terms of this Agreement.

(h)    No Partnership. The parties acknowledge and agree that they do not intend to create a partnership, joint venture, co-tenancy or agency relationship by virtue of this Agreement.

(i)    Interpretation. The terms of this Agreement shall be construed in accordance with the meaning of the language used and shall not be construed for or against either party by reason of the authorship of this Agreement or rules of construction which might otherwise apply.

j)    Integration. It is understood that there are no oral agreements between the parties hereto affecting this Agreement.

-17-

(k)    Severability. In the event that any part of this Agreement is construed as illegal or unenforceable by valid judgment or decree by a court of competent jurisdiction, the remaining part of this Agreement will be in full force and effect as though any illegal or unenforceable part or parts are not written into this Agreement.

(l)    Captions. Headings used herein are for convenience only and shall not be construed as controlling the scope of any provision hereof.

(m)    Binding on Parties. This Agreement shall inure to the benefit of and shall be fully, unconditionally, jointly and severally binding on the parties and their respective successors, heirs and assigns.

IN WITNESS WHEREOF, the Project Manager and Owner execute this Agreement the day and year first above written.

Date: 8/24/99

OWNER:

ZHL, INCORPORATED, a Massachusetts corporation

By:

Name: Michael Lamensdorf

Michael Lamensdorf, M.D.

Title:   Chairman of the Board

Date: 2/1/99

PROJECT MANAGER:

OPHNET, INC., a Massachusetts corporation

By:

Name: John A. Hirsch

John A. Hirsch

Title:  President

-18-