UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN A. HIRSCH and RONALD W.
ZOLLA, Individually and as officers,
directors, and shareholders of ZHL, Inc., and
ZHL, Inc.

        Plaintiffs,

    v.

MICHAEL LAMENSDORF and KATHY
LAMENSDORF, Individually and as
shareholders of ZHL, Inc.,

        Defendants.

Civil Action No. 05-10902-DPW

## **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO REMAND**

Plaintiffs John A. Hirsch, Ronald W. Zolla and ZHL, Inc. (collectively "Plaintiffs") have moved to remand this case for lack of diversity jurisdiction, but do not contest that the jurisdictional amount in controversy requirement has been met, nor do they contest that Zolla and Hirsch are Massachusetts residents, nor that ZHL is incorporated under the laws of the Commonwealth of Massachusetts. Rather, Plaintiffs contend that diversity jurisdiction is lacking because, in their view, ZHL's principal place of business is in Florida. Plaintiffs go so far as to demand attorneys' fees in light of their belief that it is "crystal clear" that ZHL's principal place of business is in Florida. Plaintiffs make this claim and demand fees notwithstanding that they have, on multiple occasions, represented to this Court and to the state court that ZHL's principal place of business is in Massachusetts. For all of their bluster and suggestions of impropriety on the part of Defendants in removing this case, Plaintiffs fail to reconcile their assertion that it is "crystal clear" that ZHL's principal place of business is in Florida with their prior representations to federal and state court that ZHL's principal place of business is in Massachusetts.

Furthermore, even ignoring Plaintiffs' own allegations as to ZHL's residence, it is clear from Plaintiffs' discussion of ZHL's "business activities" that ZHL no longer conducts any business in Florida.  In fact, Plaintiffs' Consolidated Memorandum in Support of Their (i) Motion to Remand and (ii) Motion for Attorneys' Fees Pursuant to 28 U.S.C. § 1447 ("Plaintiffs' Memorandum") demonstrates that while ZHL may have conducted some business in Florida years ago, at the time this action was filed and removed, ZHL conducted no day-to-day activities in Florida, generated no revenue from activities in Florida, and employed no full time personnel in Florida.  In short, ZHL presently conducts no business other than to manage its sole asset from its office in Marblehead, Massachusetts.

In their request that this Court apply one of three jurisdictional tests based on what they consider to be a favorable outcome, Plaintiffs ignore the principle that residence for purposes of diversity jurisdiction is determined at the time of removal.  At the time this case was removed ZHL conducted no business in Florida.  As the Affidavit of John A. Hirsch filed in support of the Motion to Remand makes clear, ZHL currently conducts no day to day operations in Florida, and the business and financial affairs of ZHL are, and always have been, managed and conducted in Massachusetts.  Additionally, Plaintiffs are now seeking through the present action to sever ZHL's one remaining connection to Florida via their intended sale of the ambulatory surgery center, in which no surgeries are currently performed.  Under any of the jurisdictional tests Plaintiffs discuss, their Motion to Remand must be denied.

**ARGUMENT**

I. **According to Plaintiffs' Own Allegations and Representations to This Court and the Massachusetts State Court, ZHL's Principal Place of Business is Massachusetts**

Plaintiffs do not contest the fact that ZHL is a Massachusetts corporation, and do not offer any objection as to the Court's diversity jurisdiction other than to assert that ZHL's principal place of business is located in Florida. For purposes of diversity jurisdiction, a corporation's residence is determined by both the state of incorporation and its "principal place of business." See 28 U.S.C. § 1332(c)(1). Plaintiffs dutifully note to this Court that the First Circuit has employed three different tests to determine a corporation's principal place of business. See Plaintiffs' Memorandum at 6. While Plaintiffs' concede that alternatively applying each test "yields results that in this case are somewhat less clear" than the other (Plaintiffs' Memorandum at 7), they boldly and incorrectly claim that "it was or should have been crystal clear to the defendants from the outset" that ZHL's principal place of business was in Florida. See Plaintiffs' Memorandum at 1-2. Plaintiffs' rhetoric aside, one fact that is indeed "crystal clear" is that Plaintiffs have previously alleged and represented to this Court and to the Massachusetts Superior Court that ZHL's principal place of business is located in Massachusetts.

The present case concerns the same facts and circumstances as an action originally filed by Hirsch, Zolla and Ophnet, Inc., a company owned by Hirsch and Zolla, against Dr. Lamensdorf and his medical practice, Michael Lamensdorf, M.D., P.A., in Massachusetts Superior Court, Essex County in 2002 (the "Ophnet Action"). As all plaintiffs in the Ophnet Action were Massachusetts residents, and both defendants resided in Florida, defendants timely removed the case to the United States District Court for the District of Massachusetts based on the Court's diversity jurisdiction. See Ophnet et al. v. Lamensdorf et al., Civ. A. No. 02-10570-RCL. In response to the removal, Hirsch, Zolla and Ophnet sought to amend their complaint and

add ZHL as a defendant in order to defeat diversity jurisdiction and require a remand to state court. On May 22, 2002, Hirsch, Zolla and Ophnet filed a Motion to Amend Complaint, attaching their Second Amended Complaint naming ZHL as a defendant. In their Second Amended Complaint, plaintiffs allege that "ZHL is a Massachusetts business corporation duly formed and registered under the laws of the Commonwealth, *and maintains its principal place of business at 17 Hawkes Street, Marblehead, Massachusetts*." <u>See</u> Second Amended Complaint at ¶10, attached hereto at Ex. A (emphasis added).[1] Due to Hirsch's, Zolla's and Ophnet's representations regarding ZHL's citizenship, this Court remanded for lack of complete diversity as one defendant and all plaintiffs were citizens of Massachusetts. Upon remand, plaintiffs filed their Second Amended Complaint in state court on July 31, 2002.[2]

In order to once again avoid federal court, and now that Hirsch and Zolla seek to bring an action with ZHL *as plaintiff*, Plaintiffs claim that ZHL's principal place of business is in Florida, not Massachusetts as they previously alleged. Plaintiffs do not address their prior allegations as to ZHL's principal place of business, much less offer any explanation reconciling their

---

[1] The signature of the attorney on this pleading constitutes a sworn averment that the documents attached hereto are true and accurate copies of what they purport to be on their face.

[2] Defendants have again removed the Ophnet Action to this Court based on diversity jurisdiction, as it has become apparent that Plaintiffs fraudulently joined ZHL as a defendant solely to defeat diversity with no intention of pursuing their claim against ZHL. <u>See</u> Ophnet et al. v. Lamensdorf et al., Civ. A. No. 05-10902-DPW. Hirsch and Zolla's filing and service of the Amended Complaint in the present action naming ZHL as plaintiff was one indicator, among others, of the fraudulent joinder. First, Hirsch and Zolla now seek to sell ZHL's sole asset, an ambulatory surgery center, notwithstanding that Hirsch and Zolla, through their company Ophnet, are supposedly pursuing a claim for "substantial damages" against ZHL for breach of contract in the Ophnet Action. Plaintiffs offer no explanation as to how they can recover their "substantial damages" once ZHL is divested of all assets. Second, plaintiffs' counsel in the Ophnet Action pursuing a claim against ZHL now purports to represent ZHL in the present action. No explanation has been offered as to how this apparent conflict of interest may be reconciled, but it seems clear that the same counsel may not simultaneously pursue claims on behalf of and against the same client.

contradictory representations submitted to this Court and signed pursuant to Rule 11 of the

Federal Rules of Civil Procedure.[3]

Plaintiffs' allegations demonstrating that ZHL's principal place of business is in

Massachusetts do not end with the Ophnet Action.  In the present action, Plaintiffs filed their

Amended Complaint for Declaratory Judgment ("Amended Complaint") naming ZHL as

plaintiff, and alleging that "ZHL, Inc., is a Massachusetts corporation that maintains its principal

office at 17 Hawkes Street, Marblehead, Essex County, Massachusetts 01945."  See Amended

Complaint, ¶4.  Plaintiffs do not contend that a substantive distinction exists due to their use of

the phrase "principal office" rather than "principal place of business" in the Amended

Complaint.  In any event, it seems likely that plaintiffs employed the phrase "principal office"

due to the fact that ZHL presently conducts no "business" in Florida, but rather merely manages

its financial affairs from its office in Massachusetts.

Plaintiffs originally brought this action and purported to comply with the General Laws

of Massachusetts by asserting their jurisdictional basis for bringing this action in the

Commonwealth of Massachusetts as existing under Mass. Gen. L. ch. 223A, § 3(a)-(d).

Specifically, Plaintiffs alleged that jurisdiction over the defendants was proper as the "defendants

have established a persistent course of dealing with Massachusetts domicilaries and have

willingly assumed fiduciary duties to the plaintiffs through their ownership of stock in ZHL, a

Massachusetts business corporation."  See Plaintiffs Amended Complaint, ¶6.  While Plaintiffs

affirmatively represented that ZHL was domiciled in Massachusetts, Plaintiffs now allege for the

first time that ZHL's principal place of business is in Florida even though Plaintiffs clearly

---

[3]  Plaintiffs' counsel signing the Motion to Amend and Second Amended Complaint filed in the Ophnet Action,
Edward Foye of the firm Todd & Weld, LLP, currently represents Plaintiffs in the present action.  Thus, at a
minimum, Plaintiffs and their counsel were aware of their prior representations concerning ZHL's principal place of
business when filing their present Motion to Remand.

represented otherwise and made contradictory representations in their prior pleadings and dealings in this matter.  While Plaintiffs seemingly attempt to try and pursue any possible method for depriving the Defendants of their right to litigate this matter before this Court, the fact remains that ZHL's principal place of business was and continues to be in Massachusetts.

First, the present action is a request for declaratory relief brought by the majority shareholders of ZHL, Messrs. Hirsch and Zolla, as well as ZHL, the only Plaintiff with any interest or standing to bring such an action.  Per the pleaded allegations of the Plaintiffs, this suit requests a declaration that ZHL's intent to sell its only real asset and pay off its outstanding debts be deemed valid.  The injury complained of is one belonging to ZHL, the corporate entity, and not to the individually named shareholders.  As a general rule, "an action to redress an injury to a corporation must be brought as a derivative suit and may not be maintained by shareholders acting in their individual capacities."  See Aamax Corp. v. New England Telephone & Telegraph Co., 62 F.Supp.2d 327 (1st Cir. 1999).  Plaintiffs presumably recognized same since the only relief sought in the Amended Complaint is requested by ZHL.

Plaintiffs' asserted basis for venue in the county in which the matter was originally filed, described by the Plaintiffs as appropriate under Mass. Gen. L. ch. 223 §1, can only apply to Plaintiff ZHL.  See Plaintiffs Amended Complaint, ¶6.  Mass. Gen. L. ch. 223 §1 specifically provides that a "transitory action shall,…if any of the parties thereto lives in the commonwealth, be brought in the county where one of them lives or has its usual place of business."  In the instant matter, Hirsch and Zolla sought no relief from the Court and have no standing to bring the action asserted in the Amended Complaint, accordingly the only proper party Plaintiff remains as ZHL.  For ZHL to allege that venue is proper in Essex County where this matter was originally filed and brought, suggests that ZHL either lives or maintains its usual place of business there.

Since a corporation resides or lives in a county where it has its usual place of business, ZHL and the Plaintiffs clearly alleged that ZHL's principal place of business is in Massachusetts.

Thus, prior to their efforts to have the present action remanded to state court, Plaintiffs have represented and alleged in their signed pleadings to this Court and the Massachusetts Superior Court that ZHL's principal place of business is located in Massachusetts. Plaintiffs have now seemingly changed their minds regarding ZHL's principal place of business to suit their present and continuing desire to avoid federal court. This Court, however, should not countenance such gamesmanship.

Plaintiffs improperly suggest that Defendants intended to deceive this Court through a clerical error which resulted in the omission of ZHL from the caption of its filed papers. Plaintiffs' further suggest Defendants acted in bad faith in removing this case because they did not expressly set forth ZHL's residence in its Notice of Removal or Memorandum in Support. Plaintiffs' request for fees and call for sanctions is a red herring and an unfortunate attempt to unjustly cast a shadow of impropriety on Defendants. First, Plaintiffs have assented to Defendants' Motion to Correct Clerical Error in Caption in Papers Submitted by Defendants, accepting the explanation for the honest mistake which resulted in the omission of ZHL from the caption. Second, Plaintiffs' suggestion of deceitful intent owing to the fact that Defendants do not address each Plaintiffs' residence individually in the Notice of Removal is a non-starter. In removing this case, Defendants asserted that all Plaintiffs were residents of Massachusetts for purposes of diversity jurisdiction, and attached a copy of the Amended Complaint containing Plaintiffs' own allegations as to the residence of each party, including the location of ZHL's "principal office at 17 Hawkes Street, Marblehead, Essex County, Massachusetts." See Amended Complaint, ¶4. Plaintiffs' suggestion of bad faith and call for sanctions is particularly

troublesome given their election to represent to this Court one set of jurisdictional facts, and subsequently reverse their position and represent a contradictory set of facts solely to avoid federal court. In response, Defendants will, as Plaintiffs themselves suggest, "leave the issue of whether there has been a violation of Fed. R. Civ. P. 11 to the Court." Plaintiffs' Memorandum at 10, n.4.

## II.    At the Time of Removal ZHL's Principal Place of Business Was and Continues to be Massachusetts

Even ignoring Plaintiffs' representations to this Court that ZHL's principal place of business is in Massachusetts, the Motion to Remand must be denied because Plaintiffs' argument that under the three tests for determining corporate residency ZHL's principal place of business can be viewed to be in Florida is without merit. Plaintiffs assert that the appropriate test for determining ZHL's residency is the "locus of operations model," instead of the "center of corporate activity model" and the "nerve center model" described in their Motion to Remand. Plaintiffs' reasoning is inexact and fails under the laws of this Circuit.

Plaintiffs filed an Amended Complaint in this matter and alleged that in mid-February 2002, over three years ago, Dr. Lamensdorf purported to terminate the management services provided to his medical practice by Ophnet, Inc. at the property owned by ZHL, the subject of this lawsuit. See Plaintiffs Amended Complaint, ¶12. "A few months later, Dr. Lamensdorf abruptly removed his cases from the [surgery center owned by ZHL], thereby causing ZHL substantial financial distress." Id. Plaintiffs claimed that as a result of Dr. Lamensdorf pulling his cases from ZHL's surgery center, the facility has not turned a profit. [See Plaintiffs Amended Complaint, Paragraph 14].

Interestingly, no surgeries have been performed at the surgery center since that time and as a result, Plaintiffs, along with other related entities, brought suit against these Defendants for

damages.  Plaintiffs rely on the "locus of operations model" for determining corporate residency and filed the affidavit of Hirsch in support of same.  In his affidavit, Hirsch fails to establish that the locus of ZHL's business operations exist in Florida.  At the same time, his references are misleading since he claims that  ZHL's business operations have been located in Florida even though he brought an action against these Defendants wherein he states that ZHL is a Massachusetts business corporation.  Regardless, the references made by Hirsh to ZHL's business dealings all relate to the past tense, since ZHL no longer conducts regular business in Florida and has not done so for over three years.  Furthermore, as an officer of ZHL, Hirsch recently filed or approved for filing, the 2005 annual report for foreign corporations doing business in the State of Florida, asserted that ZHL's principal place of business is located at 17 Hawkes Street, Marblehead, MA.  A copy of the 2005 Annual Report is attached hereto as Ex. B. While attempting to establish a record showing operations in Florida, Hirsch's affidavit merely provides a recount of the type of business ZHL once conducted.  As evidenced by Hirsch's own allegations, surgeries are no longer being performed at the facility owned by ZHL.  See Hirsch Affidavit, ¶10.  Further, as noted by the Plaintiffs in their Motion for Remand, the only physical operations ZHL has relate to the surgery center.  ZHL has no assets of significance other than the surgery center.  See Plaintiffs Motion for Remand at 6.  And any and all activities at the surgery center occurred in the past.

Since ZHL is not performing any operations and ceased conducting any business in the State of Florida, it functions as a holding company whose sole asset is the vacant surgery center, the property it seeks to sell.  As such, the locus of operations model is inapplicable and should be ignored.  As noted in Topp v. Compare Inc., 814 F.3d 830 (1st Cir. 1987), tests which tend to focus upon the location of physical operations are not helpful when a company has no

manufacturing, purchasing or sales facilities.  In said cases, courts find the nerve center test to be more appropriate since companies with no such facilities generally provide administrative and financial services.  See id. at 835.  In that regard, the place where such companies control and direct their corporation's activities serves as the best indication of the corporation's place of business.

At the same time, courts have even combined the nerve center test and the center of corporate activity test when a company has no physical operations.  As noted in Aamax Corp., courts go on to determine principal place of business based on the location of the day to day management of companies, "combining both the nerve center test and the corporate activity test, and noting that because the corporation at issue had no physical operations, the locus of operations test would not be helpful."  See id. at 332 (citing Taber Partners, I v. Merit Builders, Inc., 987 F.2d 57 (1st Cir. 1993).  In the instant matter, Plaintiffs established in both their Motion for Remand and the affidavit of Hirsch, that the day to day management of the company is run in Massachusetts.  As ZHL no longer has physical operations in Florida, and ZHL had no physical operations at the time of the removal, the principal place of business of ZHL was Massachusetts since that is both the nerve center of the corporation and the location where the corporate activity is directed.  The only business conducted by ZHL at the present time and at the time of removal remains ZHL's efforts, through its majority shareholders Hirsch and Zolla, to sell its only remaining asset.  ZHL continues to conduct such activity from its principal place of business in Massachusetts.

WHEREFORE, Defendants respectfully request that the Court deny Plaintiffs' Motion to Remand.

MICHAEL LAMENSDORF and  KATHY LAMENSDORF

By their attorneys,


/s/ Matthew E. Miller
Brandon F. White, BBO# 525020
Matthew E. Miller, BBO# 655544
FOLEY HOAG, LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

OF COUNSEL:
ABEL, BAND, RUSSELL, COLLIER,
PITCHFORD & GORDON, CHARTERED
Michael S. Taaffe (Fla. Bar No. 490318)
240 South Pineapple Avenue
Sarasota, Florida  34230-6948
(941)  366-6660
(941)  366-3999 (fax)

Dated: June 6, 2005

*7/31*

COMMONWEALTH OF MASSACHUSETTS

ESSEX, s.s.                                          SUPERIOR COURT
                                                    CIVIL ACTION NO. B 2 0419

———————————————————————  )
                                                )
OPHNET, INC., A Massachusetts Corporation       )
and JOHN A. HIRSCH and RONALD W. ZOLLA,         )
Individually and as Shareholders of             )
ZHL, INC., A Massachusetts Corporation, and     )
KENNETH CRAM,                                   )
                                                )
                              Plaintiffs,        )
                                                )
v.                                              )
                                                )
MICHAEL LAMENSDORF, Individually and            )
as a Shareholder of ZHL, INC.;                  )
MICHAEL LAMENSDORF, M.D., P.C.,                 )
A Florida Professional Corporation;             )
BAYOU JENNKAY, INC., a Florida Corporation;     )
and KATHY LAMENSDORF, Individually and          )
as an officer of Bayou JennKay, Inc.; and       )
ZHL, INC., a Massachusetts Corporation,         )
                                                )
                              Defendants.        )
———————————————————————  )

## SECOND AMENDED COMPLAINT

### Introduction

1.      This complaint seeks to recover for breach of contract, breach of fiduciary duty,

fraud, and tortious interference with economic relations in connection with certain written

agreements between the plaintiffs and the defendants.  Specifically, the plaintiffs and defendants

entered into written agreements whereby the plaintiffs agreed to and did (i) provide management

services to the ophthalmology practice of Michael Lamensdorf, M.D. ("Dr. Lamensdorf") and

(ii) construct an ambulatory surgery center specializing in ophthalmic (eye) surgeries.  Dr.

Lamensdorf has now terminated the plaintiffs' management services to the practice, as is his right under the contract, but has failed and refused to pay the deferred compensation which the parties' written integrated contract requires him to pay. Moreover, beginning some two years ago, Dr. Lamensdorf clandestinely began artificially depressing the profitability of the practice by excessive payment of salary to himself and excessive payments to Bayou JennKay, Inc., a corporation owned and controlled by his wife, Kathy Lamensdorf, in derogation of the parties' written agreements, thereby depriving the plaintiffs of earned compensation based on practice net income while he and Mrs. Lamensdorf falsely represented that the practice had become unprofitable. Dr. Lamensdorf has also now purported to terminate Ophnet, Inc. ("Ophnet") as the manager of the business affairs of the ambulatory surgery center which the parties jointly own through ZHL, Inc. ("ZHL"), a Massachusetts business corporation. Ophnet's termination is the latest in a series of concerted actions by Dr. Lamensdorf to obtain disproportionate financial benefits for himself and for Bayou JennKay from ZHL's business, in derogation of the parties' written agreements and Dr. Lamensdorf's fiduciary duties to his fellow shareholders.

<u>Parties</u>

2.      The plaintiff, John A. Hirsch ("Mr. Hirsch"), is an individual residing at 20 Schooner Ridge, Marblehead, Essex County, Massachusetts 01945. Mr. Hirsch is an officer, a director, and a one-third (33%) shareholder of ZHL, a Massachusetts business corporation whose assets include, <u>inter alia</u>, the Lantz Surgery Center ("Lantz") located in Sarasota, Florida.

3.      The plaintiff, Ronald W. Zolla ("Mr. Zolla"), is an individual residing at 15 Brookside Road, Topsfield, Essex County, Massachusetts 01983. Mr. Zolla is an officer, a director, and a one-third (33%) shareholder of ZHL, Inc.

2

4.      The plaintiff, Ophnet, Inc. ("Ophnet"), is a Massachusetts business corporation which maintains a principal place of business at 17 Hawkes Street, Marblehead, Massachusetts 01945.

5.      The plaintiff, Kenneth Cram, is an individual residing in Sanbornville, New Hampshire who maintains a place of business c/o Ophnet, Inc., 17 Hawkes Street, Marblehead, Massachusetts.  Mr. Cram maintains a consulting relationship with Ophnet but is neither an employee nor an officer or shareholder of the corporation.  He is a party plaintiff only as to Count IX.

6.      Michael Lamensdorf, M.D. ("Dr. Lamensdorf") is a licensed ophthalmologist who maintains a regular place of business at 1428 South Tamiami Trail, Sarasota, Florida, 34239.  Dr. Lamensdorf is a one-sixth (16.66%) shareholder in ZHL.

7.      Michael Lamensdorf, M.D. P.C. ("the P.C.") is, upon information and belief, a professional corporation duly formed and registered under the laws of the State of Florida.  It maintains a principle place of business at 1428 South Tamiami Trail, Sarasota, Florida 34239.  Upon information and belief, Dr. Lamensdorf is the sole shareholder of the P.C.

8.      Kathy Lamensdorf (Mrs. Lamensdorf) is the wife of Dr. Lamensdorf, and maintains a regular place of business at 1428 South Tamiami Trail, Sarasota, Florida 34239.  Mrs. Lamensdorf is a one-sixth (16.66%) shareholder in ZHL.  She is also, upon information and belief, the controlling shareholder and an officer and director of Bayou JennKay, Inc.

9.      Bayou JennKay, Inc. is, upon information and belief, a Florida business corporation, whose principal place of business is, upon information and belief, 1428 South Tamiami Trail, Sarasota, Florida 34239.

3

10.    ZHL is a Massachusetts business corporation duly formed and registered under the laws of the Commonwealth, and maintains its principal place of business at 17 Hawkes Street, Marblehead, Massachusetts.  The Chairman of ZHL's Board of Directors is Michael Lamensdorf, M.D.

Jurisdiction and Venue

11.    Jurisdiction over the defendants exists under Mass. Gen. L. ch. 223A, § 3(a)-(d), inclusive, insofar as the defendants have established a persistent course of dealing with Massachusetts domiciliaries who have rendered services in Massachusetts for the defendants' benefit.  The defendants have also caused Massachusetts domiciliaries to make loans through misrepresentation, and have caused tortious injury in the Commonwealth through fraud, tortious interference and breaches of fiduciary duties to Massachusetts residents.  Additional bases for jurisdiction as to those counts relating to the business affairs of ZHL is that the dispute concerns the internal business affairs of a Massachusetts business corporation.  As to the Lamenscram partnership, the parties thereto, including Dr. Lamensdorf and Mrs. Lamensdorf, consented to Massachusetts jurisdiction and venue in the Partnership Agreement itself.  Venue is appropriate under Mass. Gen. L. ch. 223, § 1.

Facts Applicable to All Counts

12.    Mr. Hirsch and Mr. Zolla are management consultants who have for nearly 20 years specialized exclusively in the management of ophthalmology practices.  Typically, they work on a fee-for-services basis, in which they observe a practice's operations and recommend improvements in those operations.  Through Ophnet, a company which they own and operate, and assisted by Kenneth Cram, a consultant who frequently works for Ophnet, they have helped

4

hundreds of ophthalmology practices around the country to improve operating systems, to increase revenues and profits, and to enhance the quality of patient care.

13.    In 1995, Ophnet entered into a contract with Dr. Lamensdorf and the P.C. to provide management and strategic planning services to Dr. Lamensdorf and the P.C. After protracted negotiations, Dr. Lamensdorf and the P.C. on the one hand and Ophnet on the other entered into a written, integrated Management Agreement on or about September 12, 1995 (hereafter, "the P.C. Management Agreement"). A true and accurate copy of the P.C. Management Agreement, is attached hereto as Exhibit 1. Subsequently, the parties entered into an Addendum to the P.C. Management Agreement on or about March 19, 1997, a true and accurate copy of which is attached hereto as Exhibit 2. On or about January 20, 2000 and September 19, 2000, the parties further amended the P.C. Management Agreement. True and accurate copies of those amendments are collectively attached hereto as Exhibit 3. The Initial Term of the agreement was from September 12, 1995 through December 31, 1996. The agreement provided on its terms that it would automatically renew for successive five year periods unless terminated by one of the parties in accordance with its provisions.

14.    Among other things, Ophnet in the P.C. Management Agreement agreed that it would provide management guidance to the practice, including personnel management, internal systems recommendations, guidance on training of new personnel, and other such expertise. Because Dr. Lamensdorf's practice was in difficult financial straits, Ophnet agreed that it would be compensated for its services through, inter alia, a guaranteed hourly income for time spent in managing the practice at sharply reduced hourly rates from Ophnet's standard $195/hour charges. Ophnet also became entitled to bonus income in the form of 50% of the practice's net income, as defined in § 11 of the management agreement. Ex. 1 at § 11; Ex. 3 at § 4. The

formula for determining net income was complex and precise, but in substance the determination

involved subtracting from practice revenues (1) a substantial base salary of $250,000 for Dr.

Lamensdorf, which represented a more than 20% increase from his 1994 compensation;

(2) miscellaneous expenses including auto, travel, and lodging for Dr. Lamensdorf of up to

$19,000, and (3) ordinary and usual operating expenses, including Ophnet's consulting

compensation.  Ex. 1 at §§ 5, 6, 11, and 13; Ex. 3 at § 4.  In essence, therefore, Ophnet was

entitled to 50% of the P.C.'s profits subject to the definitions contained in the agreement itself.

As a further commitment to the practice and in a show of good faith, Ophnet further agreed that

in any year in which net operating income was not sufficient to pay Dr. Lamensdorf's $250,000

base salary that Ophnet would, in substance, loan the practice sufficient funds to ensure that Dr.

Lamensdorf's compensation never fell below that level.  In 1995, Ophnet did in fact loan funds

to the practice to provide Dr. Lamensdorf with the agreed-upon compensation.

     15.    Ophnet's deferred compensation was set forth in the termination clauses of the

agreement.  Medical practices tend to be resilient businesses, insofar as once proper operating

procedures are established and appropriate training and management systems are in place, the

practice will enjoy the benefits of those systems for many years to come.  Hence, the deferred

compensation clauses effectively provided Dr. Lamensdorf and the P.C. would pay Ophnet for

its services through revenue generated after Ophnet's termination.

     16.    In essence, the P. C. Management Agreement provided that either party could

terminate for cause if the practice's net income was negative for two successive years.  In that

case, Dr. Lamensdorf's only obligation was to pay Ophnet's outstanding consulting expenses and

consulting compensation.  Ex. 1, § 17(A).  If Dr. Lamensdorf chose to terminate the agreement

after the first renewal term, an accounting would occur to determine practice net income for the

two previous years. Ophnet would then be entitled to receive an additional payment equal to four times the annual practice net income generated over the previous two years. If Ophnet terminated the Management Agreement, there would be an accounting and its severance payment would equal two times average total practice net income over the previous two years. Ex. 1 at §§ 11, 17(B).

17.    With Ophnet's assistance, Dr. Lamensdorf's practice grew and prospered. Cataract surgeries -- by far the most profitable procedure for an ophthalmology practice -- increased by approximately 400% between 1995 and 2002. In 1997 Dr. Lamensdorf and Ophnet agreed to purchase the Sarasota ophthalmology practice of Dr. Richard Baise ("Dr. Baise"). Ex. 2. The practice paid $220,000 for the purchase of charts and files of Dr. Baise from the profits of the practice. Since those payments had the effect of reducing practice net operating income (and therefore reducing substantially Ophnet's bonus compensation), the parties agreed in the Addendum attached as Ex. 2 that if Dr. Lamensdorf terminated the agreement with Ophnet at any time Dr. Lamensdorf would owe Ophnet $110,000 plus 7% interest up to the date of the termination and payment. In connection with the purchase of Dr. Baise's practice, the Addendum further recited that the hard assets of the practice would be held not by the P.C. but rather the Lamenscram Partnership, an entity in which Mr. Hirsch, Mr. Zolla, Dr. Lamensdorf and Mrs. Lamensdorf were partners.

18.    As part of the original P.C. Management Agreement, the parties agreed that Mrs. Lamensdorf would be paid a salary of $20,000 per year once practice net income as defined in the agreement exceeded $100,000 per year. Mrs. Lamensdorf at that time had been assisting in various tasks for the practice, including such clerical matters as billing and collection work. Through the "Second Amendment to Management Agreement dated September 12, 1995" the

parties agreed that as of October 11, 2000, Mrs. Lamensdorf would be compensated for her

practice services. In particular, the Second Amendment recited that the parties

> have been informed by Kathy Lamensdorf that she has formed her own company Bayou
> JennKay, Inc. Furthermore, Bayou JennKay, Inc. has offered to contract to provide
> certain services to Eye Specialists [the P.C.] and Eye Specialists desires to receive such
> services as described and according to the compensation specified as follows:
>
> A.    Clerical services to be provided to Eye Specialists at a rate of eight ($8.00) dollars
>       per hour.
>
> B.    Management services to include Marketing and Strategic Planning advice to be
>       provided by Kathy Lamensdorf of Bayou JennKay, Inc. to Eye Specialists at a
>       rate of twenty-two and 50/100 ($22.50) dollars per hour.

The parties further agree that Mrs. Lamensdorf would provide time sheets and an invoice for all

such services. Because practice expenses may under certain circumstances constitute a

deduction from net operating income, the P.C.'s and Dr. Lamensdorf's agreement that the P.C.

would not pay Bayou JennKay or Mrs. Lamensdorf at rates above those specified was of critical

importance to Ophnet due to the impact it could have both on its bonus income and deferred

compensation.

### The Construction of the ASC

19.    In 1998, Dr. Lamensdorf, Mrs. Lamensdorf, Mr. Hirsch, and Mr. Zolla jointly

agreed to build an ambulatory surgery center ("ASC") which would specialize in eye surgeries.

To that end, they formed ZHL, Inc., a Massachusetts corporation. On or about September 8,

1998, the parties entered into a Shareholders Agreement concerning the business affairs of ZHL.

Under the Shareholders Agreement, the officers of the corporation included Mr. Hirsch as

president and Mr. Zolla as vice president; neither Dr. Lamensdorf nor Mrs. Lamensdorf was or is

an officer. Then and now, Mr. Hirsch owns one-third of the shares in ZHL, Mr. Zolla owns one-

third of the shares in ZHL, and Dr. Lamensdorf and Mrs. Lamensdorf each own one-sixth of the

shares. A true and accurate copy of the Shareholders Agreement, as amended on or about

August 19, 1999, is attached hereto as <u>Exhibit 4</u>.

20.    Because Ophnet had experience in the construction and operation of ambulatory

surgery centers, ZHL effective January 15, 1999, entered into a Management Agreement

(hereafter, "the ZHL Management Agreement") with Ophnet whereby Ophnet would oversee the

construction and provide management services to the ASC. A true and accurate copy of the ZHL

Management Agreement is attached hereto as <u>Exhibit 5</u>. Ophnet's compensation varied

according to the services provided and the stage of construction of the ASC. Under § 4(c) of the

ZHL Management Agreement, captioned Strategic Management and Marketing Services, Ophnet

was to provide, <u>inter alia</u>, assistance in preparing the non-medical policies and procedures of the

ASC. Ex. 5 at pp. 9-10. Under § 4(d), captioned "Operational Phase", Ophnet was, <u>inter alia</u>, to

ensure that the ASC was staffed by an on-site manager and other non-physician and

administrative support staff, ensure sufficient supplies and equipment for the ASC, monitor the

day to day operations of the ASC, and be responsible for billings and collections. Ex. 5 at pp.

10-11. For Ophnet's strategic marketing and management services under § 4(c), it was to

receive $30,000 per year in quarterly installments and under § 4(d) it was to receive $75 per hour

up to an annual maximum amount of $50,000. Ex. 5 at § 7(a)(ii) and (iii), pp. 12-13.

21.    The ZHL Management Agreement also set forth the circumstances under which

Ophnet's services could be terminated. Operational services under § 4(d) could be terminated

without cause only upon 120 days written notice by owner to Ophnet or for good cause only after

written notice of perceived deficiencies and Ophnet's failure to cure those perceived deficiencies

within thirty days. By contract, Dr. Lamensdorf had sole discretion on behalf of ZHL to make

the decision concerning termination. Ex. 5 at § 11. Under the strategic management and

marketing provisions of the contract, however, Ophnet's services could only be terminated by

ZHL upon a majority vote of its shareholders and 120 days written notice from owner (ZHL) to

project manager (Ophnet). Ex. 5 at § 11, p. 15.

22.     During the construction phase of the ASC, Dr. and Mrs. Lamensdorf each

claimed, falsely, that they did not have sufficient funds to make the capital contributions

necessary for the construction of the surgery center and to provide operating funds to permit

ZHL to conduct its business activities. Accordingly, Mr. Hirsch and Mr. Zolla each individually

agreed to and did loan ZHL $400,000 pursuant to a "Shareholder Resolution" dated and effective

December 22, 2000. A true and accurate copy of the Shareholder Resolution is attached hereto

as Exhibit 6. Under the Shareholder Resolution, Dr. Lamensdorf and Mrs. Lamensdorf were

each obliged to make, beginning January 2001, monthly capital contributions of no less than

$1,000 per month and upon receipt of those capital contributions, Mr. Hirsch's and Mr. Zolla's

loan would be recharacterized as an equity contribution to ZHL on a dollar for dollar basis with

capital contributed by the Lamensdorfs. Without Mr. Hirsch's and Mr. Zolla's infusion of much-

needed funds, the surgery center could not have been constructed.

23.     The ASC recently opened for business in Sarasota as the Lantz Surgery Center.

Dr. Lamensdorf and Mrs. Lamensdorf, however, have not been making their required capital

contributions. Furthermore, Dr. Lamensdorf and Mrs. Lamensdorf have engaged in a protracted

campaign of attempting to interfere in the non-medical aspects of the management of the ASC by

demanding financial information on essentially each and every expense of the surgery center,

and have attempted to interfere with the hiring, firing, and salary levels of administrative

personnel hired. More recently, they have purported to negotiate with and/or to contract

10

unilaterally with Bayou JennKay and with unrelated third-party vendors for the provision of goods and services on behalf of ZHL.

24.    In mid-February 2002, Dr. Lamensdorf purported to terminate Ophnet's services for both his medical practice under the P.C. Management Agreement and purported to terminate Ophnet's management contract with the ASC under the ZHL Management Agreement.  A true and accurate copy of relevant correspondence is attached hereto as Exhibit 7.  Prior to the termination of the P.C. Management Agreement, Dr. Lamensdorf and Mrs. Lamensdorf in correspondence to Mr. Hirsch and Mr. Zolla claimed that the practice had not yet turned a profit. The fragmentary financial records of the P.C. available to Mr. Hirsch and Mr. Zolla lead them to believe and lead them to believe that after discovery they will be able to prove at trial, that these statements were knowingly false and made with an intent to deceive.  In fact, it now appears that through September 2001 Dr. Lamensdorf had already paid himself in excess of $380,000 in salary, and had paid Bayou JennKay an exorbitant amount of fees in light of the caps on Bayou JennKay's hourly rate.  Furthermore, prior to purporting to terminate Ophnet's management contract with the ASC Dr. Lamensdorf threatened to refuse to bring his surgical patients to the ASC as an economic lever against his fellow shareholders, insisted that Mr. Hirsch and Mr. Zolla sell them their full ownership interest in the ASC for the sum of $1, and endeavored to appoint Bayou JennKay, Inc. as the manager for the ASC.  At the same time, Dr. Lamensdorf and Mrs. Lamensdorf were refusing to make capital contributions required by the Shareholder Resolution, thereby further attempting to exert economic pressure upon Mr. Hirsch and Mr. Zolla.  This economic pressure was accompanied by a relentless series of unfounded complaints concerning Ophnet's management of the ASC and of the medical practice.  Upon information and belief, Dr. Lamensdorf's and Mrs. Lamensdorf's purpose in undertaking this relentless campaign of

11

interference is an attempt to convert the proceeds and profits of the ASC to themselves in a manner disproportionate to their ownership interest in ZHL, and to provide them with a pretextual basis to terminate Ophnet and thereby deprive Mr. Hirsch and Mr. Zolla of a reasonable share of the profits of the business which they worked to create for over three years.

### COUNT I
**(Breach of Contract -- P.C. Management Agreement)**

25.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-24 above as if set forth here in full.

26.    Under the P.C. Management Agreement, Dr. Lamensdorf and the P.C. are jointly and severally obligated to pay a substantial amount of money upon termination of the agreement. This is so regardless of whether (as Ophnet believes) Dr. Lamensdorf has actually terminated the agreement through his letter of January 16, 2002, or whether he has constructively terminated the agreement by making it impossible for Ophnet to perform its obligations. Dr. Lamensdorf and the P.C. jointly and severally owe Ophnet a substantial amount of money under the termination clauses of the agreement, including but not limited to four times the amount of average net income of the P.C. over the last two years.

27.    Dr. Lamensdorf and the P.C. have (i) refused to pay the correct amounts due for Ophnet's annual bonus for at least 2000 and 2001, and (ii) failed altogether to pay amounts due at termination. Furthermore, Dr. Lamensdorf in 2000 and 2001, in breach of the terms of the agreement, apparently paid himself a salary in excess of that permitted by the parties' contract and otherwise misstated the P.C.'s expenses thereby depriving Ophnet of earned bonus income and artificially depressing the amounts due under the deferred compensation clauses. Ophnet has been harmed thereby.

12

## COUNT II
**(Accounting)**

28.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-27 above as if set forth here in full.

29.    The P.C. Management Agreement specifically requires that an accounting take place in order to establish practice net income for purposes of calculating Ophnet's deferred compensation.

30.    Dr. Lamensdorf and the P.C. have thus far failed to provide Mr. Hirsch and Mr. Zolla with the necessary financial information, despite requests, to calculate amounts due.

31.    This court should order and hold an accounting of the practice's net income.

## COUNT III
**(Breach of Fiduciary Duty -- Medical Practice)**

32.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-31 above as if set forth here in full.

33.    By virtue of its entitlement on an annual basis to 50% of all net practice income, Ophnet is the equitable 50% owner of the P.C.  As such, Dr. Lamensdorf owes Ophnet fiduciary duties of loyalty, care, and full disclosure in addition to implied duties of good faith and fair dealing.

34.    In derogation of those duties, Dr. Lamensdorf has engaged in questionable accounting practices overstating the practice's expenses as by paying himself as much as $350,000 in salary, despite the fact that his base salary under the P.C. Management Agreement is capped at $250,000.  No equivalent profit distributions were made to Ophnet.

35.    The plaintiff has been harmed by these actions insofar as Dr. Lamensdorf's improper accounting practices have significantly reduced Ophnet's payout for the last two years and reduced amounts owed under the termination clauses.

## COUNT IV
**(Breach of Duty of Good Faith and Fair Dealing -- P.C. Management Agreement)**

36.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-35 above as if set forth here in full.

37.    In the alternative or in addition to Count III, Dr. Lamensdorf and the P.C. owe Ophnet a duty of good faith and fair dealing so as not to deprive Ophnet of the fruits of the contract for which it bargained.

38.    Through the mechanism of, inter alia, paying himself an excessive salary, Dr. Lamensdorf has substantially reduced the appropriate incentive payment to Ophnet for calendar years 2000 and 2001 under the P.C. Management Agreement and artificially depressed the amount that would otherwise be due under the termination clauses, thus causing Ophnet harm.

## COUNT V
**(Fraud -- Medical Practice)**

39.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-38 above as if set forth here in full.

40.    Through, inter alia, the excess payment of salary to himself, Dr. Lamensdorf and the P.C. have defrauded Ophnet of monies which otherwise would be due both as to Ophnet's incentive payments (i.e., 50% of net operating income) and as to the termination clauses.

41.    Ophnet has been harmed thereby.

## COUNT VI
### (Fraud -- Receipt of Proceeds)

42.    Ophnet, Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-41 above as if set forth here in full.

43.    Upon information and belief, the basis of which is set forth in ¶ 24 above and reflected in the correspondence attached hereto as Ex. 7, Mrs. Lamensdorf and Bayou JennKay participated in a plan to defraud Ophnet of earned compensation due under the P.C. Management Agreement through the submission of false and inflated invoices and/or claiming compensation for work not performed.  Upon information and belief, this scheme ante-dated the Second Amendment to the P.C. Management Agreement and continued through at least December 2001. Ophnet, Mr. Hirsch and Mr. Zolla were harmed thereby.

## COUNT VII
### (Deceit)

44.    Ophnet, Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-43 above as if set forth here in full.

45.    In late 2001 and early 2002, Mrs. Lamensdorf stated to Mr. Hirsch and Mr. Zolla that the P.C. would not be profitable (and so unable to pay bonus income).  Those statements include those made in some of the correspondence attached as Ex. 7, and they were knowingly false when made.  These statements were also made with the knowledge that as a result of a relationship of trust and confidence that had evolved over the years, Mr. Hirsch and Mr. Zolla would rely upon those statements to their detriment.  They did, in fact rely upon those statements to their detriment.

46.    Ophnet, Mr. Hirsch, and Mr. Zolla have been harmed thereby.

## COUNT VIII
### (Tortious Interference with Economic Relations -- Bayou JennKay, Inc.)

47.     Ophnet, Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-46 above as if set forth here in full.

48.     Ophnet had a contractual relationship with Dr. Lamensdorf and the P.C. that was of economic benefit to it.  Mr. Hirsch and Mr. Zolla had an economically advantageous relationship with the medical practice through their ownership of Ophnet.

49.     Bayou JennKay, Inc., through improper motive and means, including but not limited to the siphoning of funds from the medical practice described above and through a series of false statements made to Dr. Lamensdorf and the P.C. concerning Ophnet's management of the medical practice (many of which are reflected in the correspondence attached hereto as Exhibit 7) caused the P.C. and Dr. Lamensdorf to terminate the P.C. Management Agreement. Ophnet has been harmed thereby.

## COUNT IX
### (Breach of Contract -- ZHL Management Agreement)

50.     Ophnet herewith incorporates by reference the allegations of paragraphs 1-49 above as if set forth here in full.

51.     Dr. Lamensdorf and ZHL have breached the ZHL Management Agreement by, among other things, (i) purporting to terminate the strategic management services that Mr. Hirsch, Mr. Zolla and Ophnet were to provide under § 4(c), a power which the contract does not confer upon them and (ii) purporting to terminate Ophnet's duties under the operational phase of the contract in bad faith.

52.     Ophnet has been harmed thereby.

16

## COUNT X
### (Interference with Economic Relations -- ZHL Management Agreement)

53.     Ophnet herewith incorporates by reference the allegations of paragraphs 1-52 above as if set forth here in full.

54.     As a result of the Ophnet-ZHL Management agreement, Ophnet had a contractual relationship with ZHL that was of economic benefit.

55.     Bayou JennKay, Inc., through its agents, interfered with this contractual relationship by improper motive and means, specifically through (i) attempting to assume Ophnet's management duties without Ophnet's prior consent or the consent of the majority of the ZHL shareholders and (ii) knowingly and falsely claiming that Ophnet had failed to perform its contractual duties.  Bayou JennKay's purpose in doing so was to obtain for itself the financial benefits of managing the ASC even though it was aware at the time of its interference that a valid and binding contract existed between Ophnet and ZHL for the management of the ASC.

56.     Ophnet has been harmed thereby.

## COUNT XI
### (Fraudulent Inducement)

57.     Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-56 above as if set forth here in full.

58.     Dr. Lamensdorf and Kathy Lamensdorf induced Mr. Hirsch and Mr. Zolla individually to make substantial loans to ZHL based upon their representations that they could not afford to make the capital contributions which they were required to make to ZHL.

59.     These representations were made both telephonically to Mr. Hirsch and Mr. Zolla to their offices in Marblehead and Topsfield, respectively, as well as in person to Mr. Cram,

17

Ophnet's agent, shortly before the parties signed the Shareholder Resolution on or about December 22, 2000.

60.    Mr. Hirsch and Mr. Zolla acted in reasonable reliance upon Dr. Lamensdorf's and Mrs. Lamensdorf's statements, and were harmed thereby.

## COUNT XII
### (Breach of Fiduciary Duty)

61.    Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-60 above as if set forth here in full.

62.    As shareholders in ZHL, Dr. Lamensdorf and Mrs. Lamensdorf each owe fiduciary duties of loyalty, care, and full disclosure to Mr. Hirsch and Mr. Zolla.

63.    They have breached those duties by, inter alia, (i) the purported termination of the ZHL Management Agreement with Ophnet, (ii) failing to make full and accurate disclosure of their financial circumstances prior to Mr. Hirsch's and Mr. Zolla's agreeing to loan some $400,000 to ZHL, (iii) interfering with and attempting to usurp Ophnet's management authority and Mr. Hirsch's and Mr. Zolla's authority as majority shareholders by unwarranted interference in the business affairs and management of the ASC, (iv) further interfering with the business affairs of the ASC by, among other things, constant hectoring of employees regarding the performance of their duties and persistent bad faith inquiries requiring Mr. Hirsch and Mr. Zolla to document in minute detail expenditures made from the ASC's business account, and (v) keeping for themselves business opportunities which properly belong to the corporation. Among the actions they have undertaken in the latter category is a refusal to rent a Yag laser to ZHL which would permit it to expand its business unless ZHL agreed to rent the laser from the P.C. at a rate far above its fair market value. The effect of that refusal is that the corporation has been obliged to forego fees that would otherwise go to it, despite the absence of any financial

benefit to Dr. Lamensdorf from his actions. Dr. Lamensdorf and Mrs. Lamensdorf have more recently begun entering into contracts for ZHL or negotiating with vendors for such contracts without consultation with Mr. Hirsch or Mr. Zolla, even though they have no actual authority to bind the corporation.

64.    Mr. Hirsch and Mr. Zolla were harmed thereby.

## COUNT XIII
**(Partnership Dissolution -- Lamenscram Partnership)**

50.    Mr. Hirsch, Mr. Zolla and Mr. Cram herewith incorporate by reference the allegations of paragraphs 1-64 as if set forth here in full.

51.    After the purchase of Dr. Baise's practice, described in paragraph 17 above, the parties agreed in an amendment to the Practice Management Agreement (Ex. 2) that the hard assets of the practice would be held by the Lamenscram Partnership. Subsequently, the parties entered into a written partnership agreement, a true and accurate copy of which is attached hereto as <u>Exhibit 8</u>. Among other things, the Lamenscram Partnership Agreement in Article X, § 2, p. 6 provided that "all of the parties consent to personal jurisdiction and venue in Massachusetts and Florida."

52.    The business relationship among the parties is currently such that Mr. Hirsch, Mr. Zolla, and Mr. Cram, who collectively hold one-half of the Partnership interests (with Dr. Lamensdorf and Mrs. Lamensdorf collectively holding the other one-half) now wish to dissolve the partnership, which may be terminated pursuant to articles VII and IX of the Partnership Agreement.

53.    The Court should now declare the termination of the partnership, value the respective partners' interests, and require an equitable distribution of partnership property.

## COUNT XIV
### (ZHL Restraints on Competition)

54.     Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of

paragraphs 1-53 above as if set forth here in full.

55.     The ZHL Shareholders Agreement (Ex. 4) contains within it at § 9.4(a) a

restrictive covenant on competition.  Specifically, the covenant provides:

> (a)  <u>Competitive Business</u>.  Each Shareholder hereby agrees that during the term
> of this Agreement, he or she will not, within a fifteen (15) mile radius of any place of
> business of the Corporation, including, but not limited to, the Center, (i) render services,
> or (ii) become a proprietor, partner, agent, trustee, director, officer, shareholder or
> member, directly or indirectly, of, or be employed by, or render aid or advice to, or
> perform any services of any nature whatsoever for, any organization that renders services
> or which is engaged or proposes to engage in any business or activity which renders
> services that are substantially similar to the business conducted by the Corporation,
> unless as otherwise specifically permitted elsewhere in this Agreement (the "Restrictive
> Covenant").

The covenant also states (at ¶ 9.4(d)) that it is independent of and divisible from the remainder of

the contract, thus assuring that Dr. Lamensdorf cannot relieve himself of his obligations under it

merely by declaring a breach of the Shareholders Agreement.

56.     The restrictive covenant does <u>not</u> in any manner require that Dr. Lamensdorf

perform surgeries at the ASC, nor does it in any manner restrain or even purport to restrain his

medical judgment.  Rather, the effect of the restrictive covenant is to preclude Dr. Lamensdorf

from taking a paid position with a competing ASC for as long as Mr. Hirsch and Mr. Zolla

remain shareholders of ZHL, and to forbid him from taking an ownership interest in another

ASC while Mr. Hirsch and Mr. Zolla remain shareholders in ZHL.  As such, the covenant

effectively does little more than articulate Dr. Lamensdorf's common law duty of loyalty and

care.

57.     Notwithstanding the reasonableness of the covenant, Dr. Lamensdorf has directly

and indirectly threatened not only to cease performing operations at the surgery center (which is

his right) but also to take an interest in a competing surgery center or to assume a paid position with a competing surgery center, or even to construct a competitive surgery center of his own -- conduct which the Restrictive Covenant expressly forbids..

58.    Because of Dr. Lamensdorf's threats, an actual controversy has arisen over the scope and validity of § 9.4(a), and this Court should declare the rights of the parties with respect to that provision of the contract.

WHEREFORE, Mr. Hirsch and Mr. Zolla herewith request that this Honorable Court:

A.    Enter damages on Counts I-VIII above in an amount to be determined at trial;

B.    Order, pursuant to Count II, an accounting of the P.C.;

C.    Award Mr. Hirsch and Mr. Zolla punitive damages under Counts III, V, VII and VIII, if Florida law is deemed to apply to those counts;

D.    Award Mr. Hirsch and Mr. Zolla prejudgment interest on all counts;

E.    Award Mr. Hirsch and Mr. Zolla attorney's fees on Counts II, III and VIII;

F.    Declare the dissolution of the Lamenscram Partnership pursuant to Count IX and conduct an accounting of the parties' entitlements to the partnership's assets;

G.    Declare, pursuant to Count X, the rights of the parties concerning the restrictive covenant contained in § 9.4(a) of the ZHL Shareholders Agreement; and

H.    Award whatever other or additional relief this Honorable Court deems just under the circumstances.

<u>Jury Claim</u>

Plaintiffs claim a trial by jury on all claims and issues so triable.

21

Respectfully submitted,

OPHNET, INC., JOHN A. HIRSCH,
RONALD W. ZOLLA, and
KENNETH CRAM,

By their Attorneys,

J. Owen Todd (BBO # 499480)
Edward Foye (BBO #562375)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
617-720-2626

Dated: July 31, 2002

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the
above document was served upon the
attorney of record for each other party
by mail-hand on July 31, 2002

I:\DATA\WPDOCS\HIRSCH\LAMENSDORF\Pleadings\Second Amended Complaint.doc

22

# 2005 FOR PROFIT CORPORATION ANNUAL REPORT

**FILED**
**Jan 07, 2005**
**Secretary of State**

### DOCUMENT# F99000004733

**Entity Name:** ZHL, INCORPORATED

| **Current Principal Place of Business:** | **New Principal Place of Business:** |
|---|---|
| 17 HAWKES STREET<br>MARBLEHEAD, MA  01945 | |

| **Current Mailing Address:** | **New Mailing Address:** |
|---|---|
| 17 HAWKES STREET<br>MARBLEHEAD, MA  01945 | |

FEI Number: 04-3443526    FEI Number Applied For ( )    FEI Number Not Applicable ( )    Certificate of Status Desired ( )

| **Name and Address of Current Registered Agent:** | **Name and Address of New Registered Agent:** |
|---|---|
| HIRSCH, WILLIAM  CPA<br>608 WEST HORATIO STREET<br>TAMPA, FL  33606    US | |

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

                   Electronic Signature of Registered Agent                       Date

**Election Campaign Financing Trust Fund Contribution ( ).**

### OFFICERS AND DIRECTORS:

| | | ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS: | |
|---|---|---|---|
| Title: | DP    ( ) Delete | Title: | ( ) Change ( ) Addition |
| Name: | HIRSCH, JOHN A PH.D | Name: | |
| Address: | 20 SCHOONER RIDGE | Address: | |
| City-St-Zip: | MARBLEHEAD, MA  01945 | City-St-Zip: | |
| | | | |
| Title: | D    ( ) Delete | Title: | ( ) Change ( ) Addition |
| Name: | ZOLLA, RONALD W | Name: | |
| Address: | 15 BROOKSIDE DRIVE | Address: | |
| City-St-Zip: | TOPSFIELD, MA  01983 | City-St-Zip: | |
| | | | |
| Title: | CT    ( ) Delete | Title: | CT    (X) Change ( ) Addition |
| Name: | HIRSCH, ANUSIA | Name: | HIRSCH, ANUSIA J |
| Address: | 20 SCHOONER RIDGE | Address: | 20 SCHOONER RIDGE |
| City-St-Zip: | MARBLEHEAD, MA  01945 | City-St-Zip: | MARBLEHEAD, MA  01945 |

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Section 119.07(3)(i), Florida Statutes.  I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE:  ANUSIA J. HIRSCH                            CT              01/07/2005

                Electronic Signature of Signing Officer or Director                  Date