UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN A. HIRSCH AND RONALD W. ZOLLA, Individually and as officers, directors, and shareholders of ZHL, Inc. and ZHL, Inc. <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL LAMENSDORF and KATHY LAMENSDORF, Individually and as shareholders of ZHL, INC., <br><br> Defendants. | Civil Action No. 05-10902-DPW |

## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO STAY ACTION

The defendants Michael Lamensdorf and Kathy Lamensdorf ("the Lamensdorfs") have moved "pursuant to Rule 12(b)" (they are no more specific than that) to dismiss the Amended Complaint in this matter.[1] The plaintiffs John A. Hirsch ("Mr. Hirsch"), Ronald W. Zolla ("Mr. Zolla") and ZHL, Inc. ("ZHL") (collectively, "the plaintiffs") herewith oppose that motion.

As discussed below, this Court as a threshold matter lacks diversity jurisdiction. ZHL, the corporation whose internal business affairs are at issue in this case, is a

---

[1] The original complaint in this matter was filed in December, 2004, when the business transaction at issue was still under discussion. Subsequently, after a letter of understanding had been signed, the complaint was amended. The Amended Complaint includes ZHL, Inc., as a party plaintiff. Since the Amended Complaint was the pleading that was served upon the Lamensdorf and is currently the operative legal document, the plaintiffs assume that the Amended Complaint is the document that the Lamensdorfs intended to move to dismiss despite the repeated references to 'complaint' in their memorandum.

Massachusetts corporation with its principal place of business in Florida. It is therefore non-diverse as to both Mr. Hirsch and Mr. Zolla (who are Massachusetts residents) on the one hand and as to Dr. and Mrs. Lamensdorf (who are Florida residents) on the other hand. The plaintiffs have already filed a motion to remand this case. Thus, the Court should decline to decide the Lamensdorfs' motion on jurisdictional grounds.

If the Court should reach the merits, the Lamensdorf allege two, or perhaps three, grounds for dismissal. None are meritorious.

First, it is of no consequence whether this Court has in rem jurisdiction because this is not an in rem action. Rather, the Amended Complaint requests a declaratory judgment concerning the propriety of ZHL's sale of its sole asset, an ambulatory surgery center ("ASC") in Sarasota, Florida. As a Massachusetts business corporation, ZHL seeks to ascertain whether Mr. Hirsch and Mr. Zolla, who together own almost ninety percent (90%) of ZHL's shares, may validly sell the ASC over the Lamensdorfs' objection. The Amended Complaint also seeks to ascertain whether ZHL must make liquidating distributions with the sale proceeds. Since even the Lamensdorfs do not appear to dispute that title to the ASC lies with ZHL (and always has laid with ZHL), in rem jurisdiction has nothing to do with the matter.

Secondly, there is no basis for this Court to abstain. The case upon which the Lamensdorf heavily rely, <u>Colorado River Water Conservation District v. United States</u>, 424 U.S. 800 (1976), decisively undercuts the Lamensdorfs' argument.[2] The

---

[2] <u>Colorado River</u>, of course, does <u>not</u> supply the correct standard of decision. <u>Infra</u>, part III. The Lamensdorfs, however, are represented by competent counsel, and if they wish to argue for the stricter "exceptional circumstances" standard rather than the discretionary standard that should apply to this declaratory judgment action, there is no reason the Court should not exercise its discretion to apply the standard that the Lamensdorfs urge.

Lamensdorfs for example, allege the existence of a parallel state court action in Florida but do not attach it to their moving papers. When that complaint is consulted, it becomes clear <u>why</u> the Lamensdorfs have not attached it: the Florida state court action seeks only <u>temporary</u> relief pending a resolution of the main damages case between the parties.[3] Since the <u>Ophnet</u> case is also before this Court, however, the Lamensdorfs essentially ask this Court to defer to another court on the issue of interlocutory relief. The non-exclusive eight-factor test employed in this circuit under <u>Colorado River</u> does not permit such a strange outcome, and the fact that the Lamensdorfs even ask this Court to reach such a result verges on the sanctionable.

Even if this Court uses the correct standard of decision (rather than using the standard that the Lamensdorfs urge), it should not exercise its discretion to stay this case in favor of the Florida action. The Florida case itself amounts to a declaratory judgment action; there are no substantive grounds for relief alleged. The policies which favor staying a declaratory judgment action when the issues have been joined in a full-fledged action for damages therefore have no application here. Allowing another court to decide whether to stay the sale of ZHL's assets while the main case remains pending before this Court would create the very procedural complexities, unnecessary waste of party resources, and risk of inconsistent verdicts that the cases invariably warn against.

---

[3] That case is *Ophnet, Inc., A Massachusetts Corporation and John A. Hirsch and Ronald W. Zolla Individually and as Shareholders of ZHL, Inc., A Massachusetts Corporation, and Kenneth Cram v. Michael Lamensdorf, Individually and as a Shareholder of ZHL, Inc.; Michael Lamensdorf, M.D., P.C., A Florida Professional Corporation; Bayou JennKay, Inc., a Florida Corporation, and Kathy Lamensdorf, Individually and as an officer of Bayou JennKay, Inc.; and ZHL, Inc., a Massachusetts Corporation*, Civil Action 05-10970-DPW, formerly Essex Superior Court No. B 2 0419 ("the <u>Ophnet</u> case").

Accordingly, under any possible standard of decision, this Court should decline to stay this action.

Finally, the Lamensdorfs' motion seems to suggest that the Amended Complaint should be dismissed for failure to effect timely service while the case was still in the Superior Court. The memorandum of law that the Lamensdorfs submit concurrently with their motion, however, says absolutely nothing about the point, and it should be deemed waived. Even if it is not considered waived, the fact that the Massachusetts court briefly dismissed the original complaint for failure to effect service (apparently as a result of a clerical error) is of no consequence. In fact, the *Lamensdorfs' own motion* acknowledges that the Massachusetts Court reinstated the complaint and permitted an Amended Complaint to be filed, and the Amended Complaint was the pleading served. There is nothing on the record that even remotely suggests that the Lamensdorfs have been prejudiced in any way by that decision, and the Lamensdorfs have adduced not a single case suggesting that this Court has the authority to reverse the Superior Court's decision to permit the case to go forward. This Court also cannot (or if it can, should not) dismiss service as untimely; under Fed. R. Civ. P. 4(i) the plaintiffs would have had 120 days to effect service, and under that standard service was timely. Thus, on that basis as well the motion should be denied.

## I. FACTS

### A.      The Ophnet Damages Case

The Ophnet case was filed in February 2002. As the Second Amended Complaint ("SAC") now pending alleges, in 1995 Ophnet after protracted negotiations entered into a contract with Dr. Lamensdorf and his medical practice to provide management and

strategic planning services. See Exhibit A (SAC) at ¶ 13.[4] In the Management

Agreement, Ophnet agreed that it would be compensated for its services through, *inter*

*alia*, bonus income in the form of 50% of the medical practice's Net Income, a defined

term roughly equivalent to profits. The Management Agreement also provided for

deferred income to Ophnet at the termination of the contract. Id. at ¶ 14.

As the practice grew and prospered, the parties agreed jointly to construct an

ambulatory surgery center ("ASC") specializing in eye surgeries. Ex. A at ¶¶ 17-20. The

parties jointly formed ZHL, Inc., a Massachusetts corporation, for that purpose. Id. at

¶ 19. ZHL, in turn, contracted with Ophnet to operate the ASC. Id. Under the ZHL-

Ophnet Management Agreement, attached hereto as Exhibit B, Ophnet's compensation

varied according to the services provided. Id. at ¶ 17.

While the ASC was under construction, the Lamensdorfs claimed, falsely, that

they did not have sufficient funds to make the agreed upon capital contributions

necessary for the construction of the surgery center and to provide operating funds for

ZHL's business activities. As Ophnet would subsequently discover, the Lamensdorfs'

alleged financial distress derived not from a lack of income from the medical practice,

since the Lamensdorfs' personal tax returns from this period show income of almost

$600,000 annually. Rather, the financial distress derived from an opulent renovation of

their home on Siesta Key, which was apparently funded by siphoning off funds from the

medical practice rather than paying Ophnet its bonus income. See Ex. A at ¶¶ 22-24.

---

[4] The plaintiffs have omitted the voluminous exhibits to the SAC, but will provide copies to the
Court on request. By the time this Court considers the motion to dismiss, it is likely that the
Lamensdorfs will have filed the full Superior Court record with this Court, since the thirty (30)
days provided under the removal statute for filing certified copies will shortly run.

In January 2002, Dr. Lamensdorf purported to terminate Ophnet's services both to his medical practice and to the ASC. Id. at ¶ 24. Approximately four months later, Dr. Lamensdorf pulled his cases from the ASC, even though he was a part owner of it, and brought them to a competing facility in Sarasota.

Since the parties ended their business relationship, discovery has shown that the Lamensdorfs apparently engaged in a two-year pattern of deceit concerning practice expenditures, including funneling tens and possibly hundreds of thousands of dollars to Bayou JennKay, a company established by Dr. Lamensdorfs's wife, Kathy Lamensdorf. Id. at ¶¶ 18, 24

## B.    The Second Massachusetts Action.

In November, 2004, Dr. Lamensdorf at deposition suggested that he would object to any potential sale of the ASC, even though he long since had pulled his cases from it and even though the ASC was then running at a deficit of over $20,000 per month that Mr. Hirsch and Mr. Zolla were financing from their own resources. Accordingly, Mr. Hirsch and Mr. Zolla filed this case in the Massachusetts Superior Court seeking approval for ZHL's sale of its primary asset, the ASC. In early April 2005, the complaint was amended. One day after accepting the Amended Complaint for filing, the Superior Court, apparently as a result of a clerical error, ordered the original complaint dismissed. See "Verified Motion to Vacate Dismissal For Failing To Effect Process," April 15, 2005, part of the certified copies of state court pleadings which the Lamensdorfs have filed pursuant to L.R. 81.1(a). A few days later, the Superior Court vacated its dismissal. Id. at 1 (endorsement order of Fahey, J.). Soon after removal to this Court, the Lamensdorfs brought the motion to dismiss at bar.

## C.    The Florida Action

On or about March 28, 2005, the Lamensdorfs, both ostensibly acting in their capacity as shareholders of ZHL, filed a complaint in the Circuit Court for Sarasota County. See Exhibit C hereto.[5] The Florida complaint contentiously details the history of the ASC's business affairs from the Lamensdorfs' perspective, and recounts in detail the Lamensdorf's grievances with the way the Ophnet case has been litigated. Ex. C at ¶¶ 17-49; ¶¶ 50-55. The Florida complaint also discusses the Lamensdorfs' first attempt to remove the Ophnet case to federal court based on diversity. Id. at ¶ 59. As the complaint notes, Ophnet amended its complaint after removal to assert a breach of contract action against ZHL for breach of the ZHL Management Agreement. Id. at ¶¶ 59-63. The Lamensdorfs allege that the breach of contract claim was "frivolous," id. at ¶ 64, even thought the complaint itself acknowledged that Dr. Lamensdorf "constructively terminated," i.e., breached, the terms of the ZHL Management Agreement.[6] The amendment had the affect of destroying diversity and requiring a remand to state court. See id. at ¶¶ 70, 92.

Finally, the Florida complaint recites that Mr. Hirsch and Mr. Zolla on behalf of ZHL executed a letter of intent to sell the ASC. Ex. C at ¶¶ 84-86. The complaint proclaims that as shareholders in ZHL, the Lamensdorfs have a "protectable interest in the [ASC]," even though their own complaint effectively acknowledges that title to the ASC lies in ZHL and not in the shareholders. Id. at ¶ 91.

---

[5] The exhibit attached to the Lamensdorfs' Florida Complaint is omitted as irrelevant but will be submitted to the Court on request.

[6] Ophnet will shortly move to remand the Ophnet case to state court, and will submit with that motion Judge Lindsey's decision rejecting the contention that ZHL was fraudulently named and allowing amendment to the complaint.)

Count I seeks to enjoin ZHL "from taking any action that would affect title to the property . . . until such time as the pending state court proceeding in the Commonwealth of Massachusetts [i.e., the Ophnet case] is resolved." Ex. C at ¶ 98. See also id. at ¶ 102, stating that the public interest "favors the issuance of an injunction pending the resolution of the pending state court proceeding in the Commonwealth of Massachusetts."

Count II asks for the appointment of a receiver for ZHL, even though (as the Lamensdorfs well know) ZHL effectively has had no ongoing business operations since Dr. Lamensdorf pulled his cases from the ASC in 2002. Ex. C at ¶¶ 103-108. The complaint asks that the receiver be appointed for the Massachusetts corporation to "preserve the value of the subject property until such time as a resolution is had in the ongoing state [now federal] litigation in the Commonwealth of Massachusetts." Id. at ¶ 108.

Count III demands the imposition of a "constructive trust" on any funds ZHL receives from the prospective purchasers based on the fiduciary relationship that Massachusetts implies among shareholders in a closed corporation. Ex. C at ¶¶ 108-117.

## II. ARGUMENT

### I. THE AMENDED COMPLAINT DOES NOT ALLEGE ANY IN REM CLAIMS, NOR DOES THE LAMENSDORFS' FLORIDA COMPLAINT

In a two paragraph argument that relies solely upon an intermediate Florida appellate case, the Lamensdorfs claim that the Amended Complaint seeks an order "affecting title to realty in the State of Florida [that] require[s] a court to have in rem jurisdiction over the subject property." "Memorandum of Law In Support of . . . Motion to [Dismiss or] Stay Action," May 9, 2005 (hereafter, "Lamensdorf Memo"), at 2.

The Lamensdorfs, however, are wrong both in their reading of the Amended Complaint and in their reading of the law. The Amended Complaint does not seek a determination that ZHL as opposed to some other person or entity has title to the ASC. No one doubts that ZHL has title to the ASC, and to the plaintiffs' knowledge no one ever has doubted it. Rather, the issue presented in the Amended Complaint is whether the proposed sale of the ASC is lawful from the perspective of internal corporate governance, i.e., whether it is a valid exercise of business judgment by the majority shareholders. In rem jurisdiction "arises when the court adjudicates the property rights corresponding to a particular *res* or thing, for every potential rights holder, whether named in the proceeding or not." Fleetboston Fin. Corp. v. fleetbostonfin.com, 138 F. Supp. 2d 121, 132 (D. Mass. 2001). Nothing remotely like that relief is sought in the Amended Complaint nor, for that matter, is in rem relief sought in the Lamensdorfs' Florida complaint.[7] See Ex. C, the Florida complaint that the Lamensdorfs liberally reference but do not attach to their papers. Thus, because the Amended Complaint does not in any sense constitute an in rem proceeding, it cannot be dismissed for lack of jurisdiction.

## II.    THERE ARE NO CIRCUMSTANCES WHICH WOULD JUSTIFY THIS COURT IN ABSTAINING FROM EXERCISING ITS JURISDICTION.

By far the largest part of the Lamensdorfs' memorandum is devoted to arguing that this Court should stay its hand in deference to the Florida state court action the Lamensdorfs filed. Although the Lamensdorfs cite Brillhart v. Excess Ins. Co., 316 U.S.

---

[7] The Lamensdorfs' Florida Complaint vaguely resembles what has been called a "quasi in rem type II" action, sometimes referred to as an "attachment" or "sequestration proceeding." See FleetBoston at 132. If so characterized, this Court would still have jurisdiction over the claims. Even the Lamensdorfs do not doubt that they have sufficient minimum contacts with Massachusetts to be subject to this Court's in personam jurisdiction. Id.

491, 494 (1942), where the Supreme Court held that a district court has discretion to stay

a declaratory judgment action when a parallel proceeding is pending in a state court, the

Lamensdorfs thereafter argue that this case should be stayed under the more exacting

"exceptional circumstances" test of Colorado River, 424 U.S. at 818-820.  See

Lamensdorf Memo at 4.  To insure that there is no confusion, the Lamensdorfs also cite

and discuss the exposition of Colorado River's exceptional circumstances test contained

in Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983).

In fact, as the Supreme Court has made clear in a case incontrovertibly on point,

Brillhart and not Colorado River controls where the underlying complaint is a declaratory

judgment action.  See Wilton v. Seven Falls Co., 515 U.S. 277, 285-286 (1995).  Since

the Lamensdorfs argue for Colorado River, however, there is no reason for this Court not

to apply its discretion by consulting the abstention doctrine that the Lamensdorfs' urge.[8]

Under either standard, these proceedings should not be stayed in deference to the

Lamensdorfs' Florida action.

**A.    There Are No "Exceptional Circumstances" Permitting Abstention
Under Colorado River**

Colorado River abstention is a narrow exception to "virtually unflagging

obligation of the federal courts to exercise the jurisdiction given them."  424 U.S. at 817.

Thus, a federal court may not dismiss or stay a case solely based upon the existence of a

concurrent state suit implicating the same or similar issues.  Rio Grande Community

Health Center, Inc. v. Rullan, 397 F.3d 56, 71 (1st Cir. 2005).

---

[8]  The factors considered under both tests are essentially the same factors; in fact, the Colorado
River factors derive from the considerations that courts had evolved under Brillhart for the
exercise of their discretion.  See Rivera-Puig v. Garcia-Rosario, 983 F.2d 311, 1992 U.S. App.
LEXIS 38448 at *29 (1st Cir.)

In this circuit, a non-exclusive set of eight factors has been consulted to determine whether to apply <u>Colorado River</u> abstention. <u>Rio Grande</u> at 71-72; <u>Currie v. Group Ins. Comm'n</u>, 290 F.3d 1, 10 (1st Cir. 2002). Here, neither Florida nor Massachusetts has assumed *jurisdiction over a res*, and there is no significant *inconvenience to the federal forum*, which the Lamensdorfs themselves chose by removing this case.[9] Thus, the first two factors are neutral.

The *desirability of avoiding piecemeal litigation*, the third and perhaps most important factor, will not be advanced by staying this case. "[D]ismissal is not warranted simply because related issues would be decided by different courts, or even because two courts would be deciding the same issues," but should "focus on the implications and practical effect of litigating suits deriving from the same transaction in different fora." <u>KPS & Assocs. v. Designs by FMC, Inc.</u>, 318 F.3d 1, 10 (1st Cir. 2003) (internal quotations and citations omitted). The Lamensdorfs' Florida complaint states a diffuse set of grievances that primarily relate to the way in which the <u>Ophnet</u> case has been litigated, and concludes with 3 'counts' that are actually three prayers for relief: a request for an injunction *pendente lite*, the appointment of a receiver *pendente lite*, and the imposition of a "constructive trust" – really, a sequestration order against the sale proceeds of the ASC. The risk of inconsistent adjudication – the primary rationale for avoiding piecemeal litigation – would therefore be substantially *enhanced* by a stay of

---

[9] The Lamensdorfs do suggest that this Court is an inconvenient forum because "the subject property is located in the county where the Florida state court proceeding is taking place." Lamensdorf Memo at 5. That, however, is a *non sequitur*; convenience applies to people, not property. There is no reasonable suggestion in the Lamensdorfs' papers that there are more than four witnesses who would have any insight into the corporate doings of ZHL, two of whom are in Sarasota, Florida and two of whom are in Essex County Massachusetts. The Lamensdorfs' failure to move to dismiss on grounds of *forum non conveniens* seems to concede the point that there is no particular inconvenience to litigating in this Court.

this matter, since the Florida complaint explicitly requests interlocutory relief pending the resolution of the Ophnet case.[10]  At present, however, the Ophnet case is pending before this very Court.  The notion that this Court should leave the issue of interlocutory relief in a case that is already before it to a court in another state verges upon the irrational.

The fourth factor, *the order in which the forums obtain jurisdiction*, also cuts against a stay.  The issue of timing does not depend upon the relative filing dates (although this case was filed about three months before the Lamensdorfs filed their case), but rather the relative development of the two suits.  See Villa Marina Yacht Sails, Inc. v. Hatteras Yachts (Villa Marina II), 947 F.2d 539, 535 (1st Cir. 1991).  Here, there has been no discovery whatsoever conducted in either the Massachusetts or the Florida proceeding, and in fact a substantial motion to dismiss or stay the Florida action is currently pending before that court.  See Exhibit D, a true and accurate copy of the "Motion to Abate or Stay and to Dismiss" now pending before the Sarasota County Circuit Court.  This Court does, however, have the benefit of the full and complete record in the Ophnet matter to consult, or at least it will have that record before it when the Lamensdorfs eventually comply with 28 U.S.C. § 1446 and L.R. 81.1(a) by filing certified copes of the state court pleadings.  Since the Lamensdorfs' Florida claims relate in large part to the conduct of the Ophnet litigation, that consideration is entitled to substantial weight.  Thus, there is no question that the record before this Court is vastly more developed than the record before the Florida Court.

The fifth factor, *whether federal or state law controls*, is neutral here; although state law will undoubtedly control the decision in this matter, it is the state law of

---

[10]  As is typical with the Lamensdorfs, they do not even acknowledge that this peculiar result is the one that they are seeking, and indeed they do not even provide the Court with a copy of the Florida complaint so that it could see that this is what they are doing.

Massachusetts and not of Florida which must be applied to the Amended Complaint. See Harrison v. NetCentric, Inc., 744 N.E.2d 622, 627-628 (Mass. 2001). This Court has undoubtedly has far more expertise in applying Massachusetts close corporation law than its Florida counterpart.

The final three factors also do not counsel in favor of a stay. Although the Circuit Court for Sarasota County is undoubtedly an equally *fair and impartial tribunal*, there is no reason to stay this case on that basis. There is nothing *vexatious or contrived* about the declaratory judgment action the plaintiffs filed. See Rio Grande at 72. The Lamensdorfs' own Florida complaint attests to the existence of a controversy. Since the original complaint in this matter antedates the Florida complaint, there is no possible argument that this suit was filed in response to some adverse action by the Florida court. See id. The final factor, *respect for principles of removal jurisdiction*, counts heavily in favor of letting this case go forward. The Lamensdorfs do not even attempt to argue that the Massachusetts state court would have stayed its hand in deference to the second-filed Florida action, and it is difficult to see why the Lamensdorfs should obtain a more favorable result through removal.

In summary, none of the abstention factors favors Florida, and many of them directly counsel against a stay. The Lamensdorfs' arguments about judicial economy and the inconvenience of the Massachusetts forum at most amounts to the sort of routine overlap between parallel proceedings which has consistently been rejected as a sufficient basis for a federal court to stay its hand. See Rivera-Puig v. Garcia-Rosario, 983 F.2d 311, 1992 U.S. App. LEXIS 38448, *26-*27 (citing cases). Accordingly, there is no basis for this Court to abstain from hearing this suit.

13

**B.    Even Under The Discretionary Standard Of <u>Brillhart</u>, This Case Should Not Be Stayed**

Although a court has greater discretion to stay a declaratory judgment action than it does to stay other proceedings, that discretion is far from unlimited.  <u>See</u> <u>Hartford Fire Ins. Co. v. Rhode Island Pub. Transit Auth.</u>, 233 F.3d 127, 130 (1st Cir. 2000) (refusal to entertain a suit for declaratory relief will be reversed for "either an outright mistake of law or a serious misjudgment in the weighing of pertinent considerations" and reversing the district court where the reason for its "refusal to entertain the action does not persuade.").  The factors which the court should consider "run substantially parallel to the criteria that historically have been deemed relevant in determining whether to accept or decline jurisdiction" under <u>Colorado River</u>.  <u>Rivera-Puig</u>, 983 F.2d 311, 1992 U.S. App. LEXIS 38448, *29 at n. 14, <u>quoting</u> <u>Fuller Co. v. Ramon I. Gill, Inc.</u>, 782 F.2d 306, 308-09 n. 3 (1st Cir. 1986)).  Thus, the analysis appropriately follows that set forth above. There is no need to repeat that analysis, but it should be emphasized that there is nothing "contrived or vexatious" about the declaratory judgment action that Mr. Hirsch and Mr. Zolla filed.  Indeed, the Lamensdorfs themselves ran to court once the proposed sale terms were known.  Moreover, this case does <u>not</u> present the typical scenario found in stays of a declaratory judgment action where there is a tort action which is pending in the state court, and a parallel declaratory judgment action pending in the federal court, where the federal court cannot give complete relief to the parties.  Rather, the Florida case is itself a declaratory judgment action, or at least appears to be the equivalent of one.  In fact, the Florida case does not state <u>any</u> substantive claims for relief along the lines of 'fraud' or 'breach of contract.'  <u>See</u> Ex. C at ¶¶ 98-117.

In summary, whether based on overriding considerations of judicial economy, party economy, avoidance of possibly inconsistent adjudication, or any of the other recognized criteria or determining whether to permit a declaratory judgment action to proceed or stay, this one should be allowed to go forward. Thus, even if the Court chooses to decide the Lamensdorfs' motion under the Brillhart standard, staying this matter would be inappropriate.

## III.    THERE IS NO BASIS TO DISMISS THE PLAINTIFFS' COMPLAINT FOR FAILURE TO EFFECT PROCESS

The Lamensdorfs' motion seems to assert[11] that the plaintiffs failed to effect timely service of their original under Mass. R. Civ. P. 4(j). Because the Lamensdorfs do not even argue the point in their memorandum of law and do not cite even a single case supporting their position in their motion, the issue should be deemed waived.

Even if the issue is not waived, Mr. Hirsch and Mr. Zolla's motion to reinstate the Complaint after the apparent clerical error in dismissing it specifically requested that the Superior Court in effect annul the Clerk's erroneous dismissal order. "Verified Motion to Vacate Dismissal for Failing to Effect Process," April 15, 2005, contained within the record of state court proceedings which the Lamensdorfs have filed. The Superior Court allowed that motion. Under 28 U.S.C. § 1450, all orders in a removed action prior to removal remain in full force and effect unless dissolved or modified. See Granny Goose Foods, Inc., et al. v. Brotherhood of Teamsters & Auto Truck Drivers, 415 U.S. 423, 435-

---

[11] The plaintiffs use the term 'seems to assert' because the Lamensdorfs' motion could also be read as simply arguing that this Court should consider the Florida action as the first filed. To the extent that the Lamensdorfs raise the issue of the dismissal and subsequent reinstatement of the Massachusetts action to suggest that the Florida case should take priority because was the first filed, the issue is essentially irrelevant. It is well settled that timing is not conclusive lest abstention be deemed to depend upon a race to the courthouse. See Rio Grande, 397 F.3d at 72. Rather, what matters is not the filing date, but rather the relative development of both suits. See Moses H. Cone, 460 U.S. at 21; Currie, 290 F.3d 1, 10 (1st Cir. 2002).

436 (1974). There is no ground for this Court to disregard the state court order nor to sit as an appellate court upon the wisdom of that order when it was entered.

There is also no basis for this Court now to revisit the issue. Since the case is now in federal court at the Lamensdorfs' own behest, Fed. R. Civ. P. 4(m) provides one hundred and twenty (120) days after the filing of complaint for service rather than the ninety (90) days provided for under the Massachusetts Rule 4(j). Accordingly, by federal standards service <u>was</u> timely. Notably, the Lamensdorfs have not even attempted to argue that they were in any manner prejudiced by the delay in effecting service. Accordingly, there is no basis now for this Court to revisit the Massachusetts Court's actions reinstating the complaint.

## CONCLUSION

For each of the foregoing reasons, the Court should refuse to dismiss or stay the Plaintiffs' Amended Complaint and instead should permit this case to go forward.

Respectfully submitted,

JOHN A. HIRSCH, RONALD W. ZOLLA, and ZHL, INC.

By their Attorneys,

/s/Edward Foye
J. Owen Todd (BBO # 499480)
Edward Foye (BBO #562375)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA  02109
Dated:  June 6, 2005                617-720-2626

16

COMMONWEALTH OF MASSACHUSETTS

ESSEX, s.s.

SUPERIOR COURT
CIVIL ACTION NO. B 2 0419

---

OPHNET, INC., A Massachusetts Corporation )
and JOHN A. HIRSCH and RONALD W. ZOLLA, )
Individually and as Shareholders of )
ZHL, INC., A Massachusetts Corporation, and )
KENNETH CRAM, )
                      )
              Plaintiffs, )
                       )
v. )
                       )
MICHAEL LAMENSDORF, Individually and )
as a Shareholder of ZHL, INC.; )
MICHAEL LAMENSDORF, M.D., P.C., )
A Florida Professional Corporation; )
BAYOU JENNKAY, INC., a Florida Corporation; )
and KATHY LAMENSDORF, Individually and )
as an officer of Bayou JennKay, Inc.; and )
ZHL, INC., a Massachusetts Corporation, )
                       )
              Defendants. )

---

## SECOND AMENDED COMPLAINT

### Introduction

1.      This complaint seeks to recover for breach of contract, breach of fiduciary duty, fraud, and tortious interference with economic relations in connection with certain written agreements between the plaintiffs and the defendants. Specifically, the plaintiffs and defendants entered into written agreements whereby the plaintiffs agreed to and did (i) provide management services to the ophthalmology practice of Michael Lamensdorf, M.D. ("Dr. Lamensdorf") and (ii) construct an ambulatory surgery center specializing in ophthalmic (eye) surgeries. Dr.

Lamensdorf has now terminated the plaintiffs' management services to the practice, as is his right under the contract, but has failed and refused to pay the deferred compensation which the parties' written integrated contract requires him to pay. Moreover, beginning some two years ago, Dr. Lamensdorf clandestinely began artificially depressing the profitability of the practice by excessive payment of salary to himself and excessive payments to Bayou JennKay, Inc., a corporation owned and controlled by his wife, Kathy Lamensdorf, in derogation of the parties' written agreements, thereby depriving the plaintiffs of earned compensation based on practice net income while he and Mrs. Lamensdorf falsely represented that the practice had become unprofitable. Dr. Lamensdorf has also now purported to terminate Ophnet, Inc. ("Ophnet") as the manager of the business affairs of the ambulatory surgery center which the parties jointly own through ZHL, Inc. ("ZHL"), a Massachusetts business corporation. Ophnet's termination is the latest in a series of concerted actions by Dr. Lamensdorf to obtain disproportionate financial benefits for himself and for Bayou JennKay from ZHL's business, in derogation of the parties' written agreements and Dr. Lamensdorf's fiduciary duties to his fellow shareholders.

Parties

2.      The plaintiff, John A. Hirsch ("Mr. Hirsch"), is an individual residing at 20 Schooner Ridge, Marblehead, Essex County, Massachusetts 01945. Mr. Hirsch is an officer, a director, and a one-third (33%) shareholder of ZHL, a Massachusetts business corporation whose assets include, inter alia, the Lantz Surgery Center ("Lantz") located in Sarasota, Florida.

3.      The plaintiff, Ronald W. Zolla ("Mr. Zolla"), is an individual residing at 15 Brookside Road, Topsfield, Essex County, Massachusetts 01983. Mr. Zolla is an officer, a director, and a one-third (33%) shareholder of ZHL, Inc.

2

4.      The plaintiff, Ophnet, Inc. ("Ophnet"), is a Massachusetts business corporation which maintains a principal place of business at 17 Hawkes Street, Marblehead, Massachusetts 01945.

5.      The plaintiff, Kenneth Cram, is an individual residing in Sanbornville, New Hampshire who maintains a place of business c/o Ophnet, Inc., 17 Hawkes Street, Marblehead, Massachusetts. Mr. Cram maintains a consulting relationship with Ophnet but is neither an employee nor an officer or shareholder of the corporation. He is a party plaintiff only as to Count IX.

6.      Michael Lamensdorf, M.D. ("Dr. Lamensdorf") is a licensed ophthalmologist who maintains a regular place of business at 1428 South Tamiami Trail, Sarasota, Florida, 34239. Dr. Lamensdorf is a one-sixth (16.66%) shareholder in ZHL.

7.      Michael Lamensdorf, M.D. P.C. ("the P.C.") is, upon information and belief, a professional corporation duly formed and registered under the laws of the State of Florida. It maintains a principle place of business at 1428 South Tamiami Trail, Sarasota, Florida 34239. Upon information and belief, Dr. Lamensdorf is the sole shareholder of the P.C.

8.      Kathy Lamensdorf (Mrs. Lamensdorf) is the wife of Dr. Lamensdorf, and maintains a regular place of business at 1428 South Tamiami Trail, Sarasota, Florida 34239. Mrs. Lamensdorf is a one-sixth (16.66%) shareholder in ZHL. She is also, upon information and belief, the controlling shareholder and an officer and director of Bayou JennKay, Inc.

9.      Bayou JennKay, Inc. is, upon information and belief, a Florida business corporation, whose principal place of business is, upon information and belief, 1428 South Tamiami Trail, Sarasota, Florida 34239.

10.     ZHL is a Massachusetts business corporation duly formed and registered under the laws of the Commonwealth, and maintains its principal place of business at 17 Hawkes Street, Marblehead, Massachusetts. The Chairman of ZHL's Board of Directors is Michael Lamensdorf, M.D.

## Jurisdiction and Venue

11.     Jurisdiction over the defendants exists under Mass. Gen. L. ch. 223A, § 3(a)-(d), inclusive, insofar as the defendants have established a persistent course of dealing with Massachusetts domiciliaries who have rendered services in Massachusetts for the defendants' benefit. The defendants have also caused Massachusetts domiciliaries to make loans through misrepresentation, and have caused tortious injury in the Commonwealth through fraud, tortious interference and breaches of fiduciary duties to Massachusetts residents. Additional bases for jurisdiction as to those counts relating to the business affairs of ZHL is that the dispute concerns the internal business affairs of a Massachusetts business corporation. As to the Lamenscram partnership, the parties thereto, including Dr. Lamensdorf and Mrs. Lamensdorf, consented to Massachusetts jurisdiction and venue in the Partnership Agreement itself. Venue is appropriate under Mass. Gen. L. ch. 223, § 1.

## Facts Applicable to All Counts

12.     Mr. Hirsch and Mr. Zolla are management consultants who have for nearly 20 years specialized exclusively in the management of ophthalmology practices. Typically, they work on a fee-for-services basis, in which they observe a practice's operations and recommend improvements in those operations. Through Ophnet, a company which they own and operate, and assisted by Kenneth Cram, a consultant who frequently works for Ophnet, they have helped

hundreds of ophthalmology practices around the country to improve operating systems, to increase revenues and profits, and to enhance the quality of patient care.

13.    In 1995, Ophnet entered into a contract with Dr. Lamensdorf and the P.C. to provide management and strategic planning services to Dr. Lamensdorf and the P.C. After protracted negotiations, Dr. Lamensdorf and the P.C. on the one hand and Ophnet on the other entered into a written, integrated Management Agreement on or about September 12, 1995 (hereafter, "the P.C. Management Agreement"). A true and accurate copy of the P.C. Management Agreement, is attached hereto as Exhibit 1. Subsequently, the parties entered into an Addendum to the P.C. Management Agreement on or about March 19, 1997, a true and accurate copy of which is attached hereto as Exhibit 2. On or about January 20, 2000 and September 19, 2000, the parties further amended the P.C. Management Agreement. True and accurate copies of those amendments are collectively attached hereto as Exhibit 3. The Initial Term of the agreement was from September 12, 1995 through December 31, 1996. The agreement provided on its terms that it would automatically renew for successive five year periods unless terminated by one of the parties in accordance with its provisions.

14.    Among other things, Ophnet in the P.C. Management Agreement agreed that it would provide management guidance to the practice, including personnel management, internal systems recommendations, guidance on training of new personnel, and other such expertise. Because Dr. Lamensdorf's practice was in difficult financial straits, Ophnet agreed that it would be compensated for its services through, inter alia, a guaranteed hourly income for time spent in managing the practice at sharply reduced hourly rates from Ophnet's standard $195/hour charges  Ophnet also became entitled to bonus income in the form of 50% of the practice's net income, as defined in § 11 of the management agreement. Ex. 1 at § 11; Ex. 3 at § 4. The

5

formula for determining net income was complex and precise, but in substance the determination involved subtracting from practice revenues (1) a substantial base salary of $250,000 for Dr. Lamensdorf, which represented a more than 20% increase from his 1994 compensation; (2) miscellaneous expenses including auto, travel, and lodging for Dr. Lamensdorf of up to $19,000, and (3) ordinary and usual operating expenses, including Ophnet's consulting compensation. Ex. 1 at §§ 5, 6, 11, and 13; Ex. 3 at § 4. In essence, therefore, Ophnet was entitled to 50% of the P.C.'s profits subject to the definitions contained in the agreement itself. As a further commitment to the practice and in a show of good faith, Ophnet further agreed that in any year in which net operating income was not sufficient to pay Dr. Lamensdorf's $250,000 base salary that Ophnet would, in substance, loan the practice sufficient funds to ensure that Dr. Lamensdorf's compensation never fell below that level. In 1995, Ophnet did in fact loan funds to the practice to provide Dr. Lamensdorf with the agreed-upon compensation.

15.    Ophnet's deferred compensation was set forth in the termination clauses of the agreement. Medical practices tend to be resilient businesses, insofar as once proper operating procedures are established and appropriate training and management systems are in place, the practice will enjoy the benefits of those systems for many years to come. Hence, the deferred compensation clauses effectively provided Dr. Lamensdorf and the P.C. would pay Ophnet for its services through revenue generated after Ophnet's termination.

16.    In essence, the P. C. Management Agreement provided that either party could terminate for cause if the practice's net income was negative for two successive years. In that case, Dr. Lamensdorf's only obligation was to pay Ophnet's outstanding consulting expenses and consulting compensation. Ex. 1, § 17(A). If Dr. Lamensdorf chose to terminate the agreement after the first renewal term, an accounting would occur to determine practice net income for the

6

two previous years. Ophnet would then be entitled to receive an additional payment equal to four times the annual practice net income generated over the previous two years. If Ophnet terminated the Management Agreement, there would be an accounting and its severance payment would equal two times average total practice net income over the previous two years. Ex. 1 at §§ 11, 17(B).

17.     With Ophnet's assistance, Dr. Lamensdorf's practice grew and prospered. Cataract surgeries -- by far the most profitable procedure for an ophthalmology practice -- increased by approximately 400% between 1995 and 2002. In 1997 Dr. Lamensdorf and Ophnet agreed to purchase the Sarasota ophthalmology practice of Dr. Richard Baise ("Dr. Baise"). Ex. 2. The practice paid $220,000 for the purchase of charts and files of Dr. Baise from the profits of the practice. Since those payments had the effect of reducing practice net operating income (and therefore reducing substantially Ophnet's bonus compensation), the parties agreed in the Addendum attached as Ex. 2 that if Dr. Lamensdorf terminated the agreement with Ophnet at any time Dr. Lamensdorf would owe Ophnet $110,000 plus 7% interest up to the date of the termination and payment. In connection with the purchase of Dr. Baise's practice, the Addendum further recited that the hard assets of the practice would be held not by the P.C. but rather the Lamenscram Partnership, an entity in which Mr. Hirsch, Mr. Zolla, Dr. Lamensdorf and Mrs. Lamensdorf were partners.

18.     As part of the original P.C. Management Agreement, the parties agreed that Mrs. Lamensdorf would be paid a salary of $20,000 per year once practice net income as defined in the agreement exceeded $100,000 per year. Mrs. Lamensdorf at that time had been assisting in various tasks for the practice, including such clerical matters as billing and collection work. Through the "Second Amendment to Management Agreement dated September 12, 1995" the

parties agreed that as of October 11, 2000, Mrs. Lamensdorf would be compensated for her

practice services. In particular, the Second Amendment recited that the parties

> have been informed by Kathy Lamensdorf that she has formed her own company Bayou
> JennKay, Inc. Furthermore, Bayou JennKay, Inc. has offered to contract to provide
> certain services to Eye Specialists [the P.C.] and Eye Specialists desires to receive such
> services as described and according to the compensation specified as follows:
>
> A.    Clerical services to be provided to Eye Specialists at a rate of eight ($8.00) dollars
>       per hour.
>
> B.    Management services to include Marketing and Strategic Planning advice to be
>       provided by Kathy Lamensdorf of Bayou JennKay, Inc. to Eye Specialists at a
>       rate of twenty-two and 50/100 ($22.50) dollars per hour.

The parties further agree that Mrs. Lamensdorf would provide time sheets and an invoice for all

such services. Because practice expenses may under certain circumstances constitute a

deduction from net operating income, the P.C.'s and Dr. Lamensdorf's agreement that the P.C.

would not pay Bayou JennKay or Mrs. Lamensdorf at rates above those specified was of critical

importance to Ophnet due to the impact it could have both on its bonus income and deferred

compensation.

### The Construction of the ASC

19.    In 1998, Dr. Lamensdorf, Mrs. Lamensdorf, Mr. Hirsch, and Mr. Zolla jointly

agreed to build an ambulatory surgery center ("ASC") which would specialize in eye surgeries.

To that end, they formed ZHL, Inc., a Massachusetts corporation. On or about September 8,

1998, the parties entered into a Shareholders Agreement concerning the business affairs of ZHL.

Under the Shareholders Agreement, the officers of the corporation included Mr. Hirsch as

president and Mr. Zolla as vice president; neither Dr. Lamensdorf nor Mrs. Lamensdorf was or is

an officer. Then and now, Mr. Hirsch owns one-third of the shares in ZHL, Mr. Zolla owns one-

third of the shares in ZHL, and Dr. Lamensdorf and Mrs. Lamensdorf each own one-sixth of the

shares. A true and accurate copy of the Shareholders Agreement, as amended on or about August 19, 1999, is attached hereto as Exhibit 4.

20.    Because Ophnet had experience in the construction and operation of ambulatory surgery centers, ZHL effective January 15, 1999, entered into a Management Agreement (hereafter, "the ZHL Management Agreement") with Ophnet whereby Ophnet would oversee the construction and provide management services to the ASC. A true and accurate copy of the ZHL Management Agreement is attached hereto as Exhibit 5. Ophnet's compensation varied according to the services provided and the stage of construction of the ASC. Under § 4(c) of the ZHL Management Agreement, captioned Strategic Management and Marketing Services, Ophnet was to provide, inter alia, assistance in preparing the non-medical policies and procedures of the ASC. Ex. 5 at pp. 9-10. Under § 4(d), captioned "Operational Phase", Ophnet was, inter alia, to ensure that the ASC was staffed by an on-site manager and other non-physician and administrative support staff, ensure sufficient supplies and equipment for the ASC, monitor the day to day operations of the ASC, and be responsible for billings and collections. Ex. 5 at pp. 10-11. For Ophnet's strategic marketing and management services under § 4(c), it was to receive $30,000 per year in quarterly installments and under § 4(d) it was to receive $75 per hour up to an annual maximum amount of $50,000. Ex. 5 at § 7(a)(ii) and (iii), pp. 12-13.

21.    The ZHL Management Agreement also set forth the circumstances under which Ophnet's services could be terminated. Operational services under § 4(d) could be terminated without cause only upon 120 days written notice by owner to Ophnet or for good cause only after written notice of perceived deficiencies and Ophnet's failure to cure those perceived deficiencies within thirty days. By contract, Dr. Lamensdorf had sole discretion on behalf of ZHL to make the decision concerning termination. Ex. 5 at § 11. Under the strategic management and

marketing provisions of the contract, however, Ophnet's services could only be terminated by ZHL upon a majority vote of its shareholders and 120 days written notice from owner (ZHL) to project manager (Ophnet). Ex. 5 at § 11, p. 15.

22.    During the construction phase of the ASC, Dr. and Mrs. Lamensdorf each claimed, falsely, that they did not have sufficient funds to make the capital contributions necessary for the construction of the surgery center and to provide operating funds to permit ZHL to conduct its business activities. Accordingly, Mr. Hirsch and Mr. Zolla each individually agreed to and did loan ZHL $400,000 pursuant to a "Shareholder Resolution" dated and effective December 22, 2000. A true and accurate copy of the Shareholder Resolution is attached hereto as Exhibit 6. Under the Shareholder Resolution, Dr. Lamensdorf and Mrs. Lamensdorf were each obliged to make, beginning January 2001, monthly capital contributions of no less than $1,000 per month and upon receipt of those capital contributions, Mr. Hirsch's and Mr. Zolla's loan would be recharacterized as an equity contribution to ZHL on a dollar for dollar basis with capital contributed by the Lamensdorfs. Without Mr. Hirsch's and Mr. Zolla's infusion of much-needed funds, the surgery center could not have been constructed.

23.    The ASC recently opened for business in Sarasota as the Lantz Surgery Center. Dr. Lamensdorf and Mrs. Lamensdorf, however, have not been making their required capital contributions. Furthermore, Dr. Lamensdorf and Mrs. Lamensdorf have engaged in a protracted campaign of attempting to interfere in the non-medical aspects of the management of the ASC by demanding financial information on essentially each and every expense of the surgery center, and have attempted to interfere with the hiring, firing, and salary levels of administrative personnel hired. More recently, they have purported to negotiate with and/or to contract

unilaterally with Bayou JennKay and with unrelated third-party vendors for the provision of goods and services on behalf of ZHL.

24.    In mid-February 2002, Dr. Lamensdorf purported to terminate Ophnet's services for both his medical practice under the P.C. Management Agreement and purported to terminate Ophnet's management contract with the ASC under the ZHL Management Agreement. A true and accurate copy of relevant correspondence is attached hereto as <u>Exhibit 7</u>. Prior to the termination of the P.C. Management Agreement, Dr. Lamensdorf and Mrs. Lamensdorf in correspondence to Mr. Hirsch and Mr. Zolla claimed that the practice had not yet turned a profit. The fragmentary financial records of the P.C. available to Mr. Hirsch and Mr. Zolla lead them to believe and lead them to believe that after discovery they will be able to prove at trial, that these statements were knowingly false and made with an intent to deceive. In fact, it now appears that through September 2001 Dr. Lamensdorf had already paid himself in excess of $380,000 in salary, and had paid Bayou JennKay an exorbitant amount of fees in light of the caps on Bayou JennKay's hourly rate. Furthermore, prior to purporting to terminate Ophnet's management contract with the ASC Dr. Lamensdorf threatened to refuse to bring his surgical patients to the ASC as an economic lever against his fellow shareholders, insisted that Mr. Hirsch and Mr. Zolla sell them their full ownership interest in the ASC for the sum of $1, and endeavored to appoint Bayou JennKay, Inc. as the manager for the ASC. At the same time, Dr. Lamensdorf and Mrs. Lamensdorf were refusing to make capital contributions required by the Shareholder Resolution, thereby further attempting to exert economic pressure upon Mr. Hirsch and Mr. Zolla. This economic pressure was accompanied by a relentless series of unfounded complaints concerning Ophnet's management of the ASC and of the medical practice. Upon information and belief, Dr. Lamensdorf's and Mrs. Lamensdorf's purpose in undertaking this relentless campaign of

11

interference is an attempt to convert the proceeds and profits of the ASC to themselves in a manner disproportionate to their ownership interest in ZHL, and to provide them with a pretextual basis to terminate Ophnet and thereby deprive Mr. Hirsch and Mr. Zolla of a reasonable share of the profits of the business which they worked to create for over three years.

## COUNT I
### (Breach of Contract -- P.C. Management Agreement)

25.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-24 above as if set forth here in full.

26.    Under the P.C. Management Agreement, Dr. Lamensdorf and the P.C. are jointly and severally obligated to pay a substantial amount of money upon termination of the agreement. This is so regardless of whether (as Ophnet believes) Dr. Lamensdorf has actually terminated the agreement through his letter of January 16, 2002, or whether he has constructively terminated the agreement by making it impossible for Ophnet to perform its obligations. Dr. Lamensdorf and the P.C. jointly and severally owe Ophnet a substantial amount of money under the termination clauses of the agreement, including but not limited to four times the amount of average net income of the P.C. over the last two years.

27.    Dr. Lamensdorf and the P.C. have (i) refused to pay the correct amounts due for Ophnet's annual bonus for at least 2000 and 2001, and (ii) failed altogether to pay amounts due at termination. Furthermore, Dr. Lamensdorf in 2000 and 2001, in breach of the terms of the agreement, apparently paid himself a salary in excess of that permitted by the parties' contract and otherwise misstated the P.C.'s expenses thereby depriving Ophnet of earned bonus income and artificially depressing the amounts due under the deferred compensation clauses. Ophnet has been harmed thereby.

## COUNT II
### (Accounting)

28.     Ophnet herewith incorporates by reference the allegations of paragraphs 1-27 above as if set forth here in full.

29.     The P.C. Management Agreement specifically requires that an accounting take place in order to establish practice net income for purposes of calculating Ophnet's deferred compensation.

30.     Dr. Lamensdorf and the P.C. have thus far failed to provide Mr. Hirsch and Mr. Zolla with the necessary financial information, despite requests, to calculate amounts due.

31.     This court should order and hold an accounting of the practice's net income.

## COUNT III
### (Breach of Fiduciary Duty – Medical Practice)

32.     Ophnet herewith incorporates by reference the allegations of paragraphs 1-31 above as if set forth here in full.

33.     By virtue of its entitlement on an annual basis to 50% of all net practice income, Ophnet is the equitable 50% owner of the P.C. As such, Dr. Lamensdorf owes Ophnet fiduciary duties of loyalty, care, and full disclosure in addition to implied duties of good faith and fair dealing.

34.     In derogation of those duties, Dr. Lamensdorf has engaged in questionable accounting practices overstating the practice's expenses as by paying himself as much as $350,000 in salary, despite the fact that his base salary under the P.C. Management Agreement is capped at $250,000. No equivalent profit distributions were made to Ophnet.

35.    The plaintiff has been harmed by these actions insofar as Dr. Lamensdorf's improper accounting practices have significantly reduced Ophnet's payout for the last two years and reduced amounts owed under the termination clauses.

## COUNT IV
### (Breach of Duty of Good Faith and Fair Dealing -- P.C. Management Agreement)

36.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-35 above as if set forth here in full.

37.    In the alternative or in addition to Count III, Dr. Lamensdorf and the P.C. owe Ophnet a duty of good faith and fair dealing so as not to deprive Ophnet of the fruits of the contract for which it bargained.

38.    Through the mechanism of, inter alia, paying himself an excessive salary, Dr. Lamensdorf has substantially reduced the appropriate incentive payment to Ophnet for calendar years 2000 and 2001 under the P.C. Management Agreement and artificially depressed the amount that would otherwise be due under the termination clauses, thus causing Ophnet harm.

## COUNT V
### (Fraud -- Medical Practice)

39.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-38 above as if set forth here in full.

40.    Through, inter alia, the excess payment of salary to himself, Dr. Lamensdorf and the P.C. have defrauded Ophnet of monies which otherwise would be due both as to Ophnet's incentive payments (i.e., 50% of net operating income) and as to the termination clauses.

41.    Ophnet has been harmed thereby.

## COUNT VI
### (Fraud -- Receipt of Proceeds)

42.    Ophnet, Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-41 above as if set forth here in full.

43.    Upon information and belief, the basis of which is set forth in ¶ 24 above and reflected in the correspondence attached hereto as Ex. 7, Mrs. Lamensdorf and Bayou JennKay participated in a plan to defraud Ophnet of earned compensation due under the P.C. Management Agreement through the submission of false and inflated invoices and/or claiming compensation for work not performed. Upon information and belief, this scheme ante-dated the Second Amendment to the P.C. Management Agreement and continued through at least December 2001. Ophnet, Mr. Hirsch and Mr. Zolla were harmed thereby.

## COUNT VII
### (Deceit)

44.    Ophnet, Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-43 above as if set forth here in full.

45.    In late 2001 and early 2002, Mrs. Lamensdorf stated to Mr. Hirsch and Mr. Zolla that the P.C. would not be profitable (and so unable to pay bonus income). Those statements include those made in some of the correspondence attached as Ex. 7, and they were knowingly false when made. These statements were also made with the knowledge that as a result of a relationship of trust and confidence that had evolved over the years, Mr. Hirsch and Mr. Zolla would rely upon those statements to their detriment. They did, in fact rely upon those statements to their detriment.

46.    Ophnet, Mr. Hirsch, and Mr. Zolla have been harmed thereby.

## COUNT VIII
### (Tortious Interference with Economic Relations -- Bayou JennKay, Inc.)

47.    Ophnet, Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-46 above as if set forth here in full.

48.    Ophnet had a contractual relationship with Dr. Lamensdorf and the P.C. that was of economic benefit to it. Mr. Hirsch and Mr. Zolla had an economically advantageous relationship with the medical practice through their ownership of Ophnet.

49.    Bayou JennKay, Inc., through improper motive and means, including but not limited to the siphoning of funds from the medical practice described above and through a series of false statements made to Dr. Lamensdorf and the P.C. concerning Ophnet's management of the medical practice (many of which are reflected in the correspondence attached hereto as Exhibit 7) caused the P.C. and Dr. Lamensdorf to terminate the P.C. Management Agreement. Ophnet has been harmed thereby.

## COUNT IX
### (Breach of Contract -- ZHL Management Agreement)

50.    Ophnet herewith incorporates by reference the allegations of paragraphs 1-49 above as if set forth here in full.

51.    Dr. Lamensdorf and ZHL have breached the ZHL Management Agreement by, among other things, (i) purporting to terminate the strategic management services that Mr. Hirsch, Mr. Zolla and Ophnet were to provide under § 4(c), a power which the contract does not confer upon them and (ii) purporting to terminate Ophnet's duties under the operational phase of the contract in bad faith.

52.    Ophnet has been harmed thereby.

## COUNT X
### (Interference with Economic Relations -- ZHL Management Agreement)

53. Ophnet herewith incorporates by reference the allegations of paragraphs 1-52 above as if set forth here in full.

54. As a result of the Ophnet-ZHL Management agreement, Ophnet had a contractual relationship with ZHL that was of economic benefit.

55. Bayou JennKay, Inc., through its agents, interfered with this contractual relationship by improper motive and means, specifically through (i) attempting to assume Ophnet's management duties without Ophnet's prior consent or the consent of the majority of the ZHL shareholders and (ii) knowingly and falsely claiming that Ophnet had failed to perform its contractual duties. Bayou JennKay's purpose in doing so was to obtain for itself the financial benefits of managing the ASC even though it was aware at the time of its interference that a valid and binding contract existed between Ophnet and ZHL for the management of the ASC.

56. Ophnet has been harmed thereby.

## COUNT XI
### (Fraudulent Inducement)

57. Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-56 above as if set forth here in full.

58. Dr. Lamensdorf and Kathy Lamensdorf induced Mr. Hirsch and Mr. Zolla individually to make substantial loans to ZHL based upon their representations that they could not afford to make the capital contributions which they were required to make to ZHL.

59. These representations were made both telephonically to Mr. Hirsch and Mr. Zolla to their offices in Marblehead and Topsfield, respectively, as well as in person to Mr. Cram,

Ophnet's agent, shortly before the parties signed the Shareholder Resolution on or about December 22, 2000.

60.    Mr. Hirsch and Mr. Zolla acted in reasonable reliance upon Dr. Lamensdorf's and Mrs. Lamensdorf's statements, and were harmed thereby.

## COUNT XII
### (Breach of Fiduciary Duty)

61.    Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-60 above as if set forth here in full.

62.    As shareholders in ZHL, Dr. Lamensdorf and Mrs. Lamensdorf each owe fiduciary duties of loyalty, care, and full disclosure to Mr. Hirsch and Mr. Zolla.

63.    They have breached those duties by, inter alia, (i) the purported termination of the ZHL Management Agreement with Ophnet, (ii) failing to make full and accurate disclosure of their financial circumstances prior to Mr. Hirsch's and Mr. Zolla's agreeing to loan some $400,000 to ZHL, (iii) interfering with and attempting to usurp Ophnet's management authority and Mr. Hirsch's and Mr. Zolla's authority as majority shareholders by unwarranted interference in the business affairs and management of the ASC, (iv) further interfering with the business affairs of the ASC by, among other things, constant hectoring of employees regarding the performance of their duties and persistent bad faith inquiries requiring Mr. Hirsch and Mr. Zolla to document in minute detail expenditures made from the ASC's business account, and (v) keeping for themselves business opportunities which properly belong to the corporation. Among the actions they have undertaken in the latter category is a refusal to rent a Yag laser to ZHL which would permit it to expand its business unless ZHL agreed to rent the laser from the P.C. at a rate far above its fair market value. The effect of that refusal is that the corporation has been obliged to forego fees that would otherwise go to it, despite the absence of any financial

benefit to Dr. Lamensdorf from his actions. Dr. Lamensdorf and Mrs. Lamensdorf have more recently begun entering into contracts for ZHL or negotiating with vendors for such contracts without consultation with Mr. Hirsch or Mr. Zolla, even though they have no actual authority to bind the corporation.

64.     Mr. Hirsch and Mr. Zolla were harmed thereby.

## COUNT XIII
### (Partnership Dissolution -- Lamenscram Partnership)

50.     Mr. Hirsch, Mr. Zolla and Mr. Cram herewith incorporate by reference the allegations of paragraphs 1-64 as if set forth here in full.

51.     After the purchase of Dr. Baise's practice, described in paragraph 17 above, the parties agreed in an amendment to the Practice Management Agreement (Ex. 2) that the hard assets of the practice would be held by the Lamenscram Partnership. Subsequently, the parties entered into a written partnership agreement, a true and accurate copy of which is attached hereto as Exhibit 8. Among other things, the Lamenscram Partnership Agreement in Article X, § 2, p. 6 provided that "all of the parties consent to personal jurisdiction and venue in Massachusetts and Florida."

52.     The business relationship among the parties is currently such that Mr. Hirsch, Mr. Zolla, and Mr. Cram, who collectively hold one-half of the Partnership interests (with Dr. Lamensdorf and Mrs. Lamensdorf collectively holding the other one-half) now wish to dissolve the partnership, which may be terminated pursuant to articles VII and IX of the Partnership Agreement.

53.     The Court should now declare the termination of the partnership, value the respective partners' interests, and require an equitable distribution of partnership property.

## COUNT XIV
### (ZHL Restraints on Competition)

54.   Mr. Hirsch and Mr. Zolla herewith incorporate by reference the allegations of paragraphs 1-53 above as if set forth here in full.

55.   The ZHL Shareholders Agreement (Ex. 4) contains within it at § 9.4(a) a restrictive covenant on competition. Specifically, the covenant provides:

> (a) <u>Competitive Business</u>. Each Shareholder hereby agrees that during the term of this Agreement, he or she will not, within a fifteen (15) mile radius of any place of business of the Corporation, including, but not limited to, the Center, (i) render services, or (ii) become a proprietor, partner, agent, trustee, director, officer, shareholder or member, directly or indirectly, of, or be employed by, or render aid or advice to, or perform any services of any nature whatsoever for, any organization that renders services or which is engaged or proposes to engage in any business or activity which renders services that are substantially similar to the business conducted by the Corporation, unless as otherwise specifically permitted elsewhere in this Agreement (the "Restrictive Covenant").

The covenant also states (at ¶ 9.4(d)) that it is independent of and divisible from the remainder of the contract, thus assuring that Dr. Lamensdorf cannot relieve himself of his obligations under it merely by declaring a breach of the Shareholders Agreement.

56.   The restrictive covenant does <u>not</u> in any manner require that Dr. Lamensdorf perform surgeries at the ASC, nor does it in any manner restrain or even purport to restrain his medical judgment. Rather, the effect of the restrictive covenant is to preclude Dr. Lamensdorf from taking a paid position with a competing ASC for as long as Mr. Hirsch and Mr. Zolla remain shareholders of ZHL, and to forbid him from taking an ownership interest in another ASC while Mr. Hirsch and Mr. Zolla remain shareholders in ZHL. As such, the covenant effectively does little more than articulate Dr. Lamensdorf's common law duty of loyalty and care.

57.   Notwithstanding the reasonableness of the covenant, Dr. Lamensdorf has directly and indirectly threatened not only to cease performing operations at the surgery center (which is

his right) <u>but also</u> to take an interest in a competing surgery center or to assume a paid position with a competing surgery center, or even to construct a competitive surgery center of his own -- conduct which the Restrictive Covenant expressly forbids.

58.    Because of Dr. Lamensdorf's threats, an actual controversy has arisen over the scope and validity of § 9.4(a), and this Court should declare the rights of the parties with respect to that provision of the contract.

WHEREFORE, Mr. Hirsch and Mr. Zolla herewith request that this Honorable Court:

A.    Enter damages on Counts I-VIII above in an amount to be determined at trial;

B.    Order, pursuant to Count II, an accounting of the P.C.;

C.    Award Mr. Hirsch and Mr. Zolla punitive damages under Counts III, V, VII and VIII, if Florida law is deemed to apply to those counts;

D.    Award Mr. Hirsch and Mr. Zolla prejudgment interest on all counts;

E.    Award Mr. Hirsch and Mr. Zolla attorney's fees on Counts II, III and VIII;

F.    Declare the dissolution of the Lamenscram Partnership pursuant to Count IX and conduct an accounting of the parties' entitlements to the partnership's assets;

G.    Declare, pursuant to Count X, the rights of the parties concerning the restrictive covenant contained in § 9.4(a) of the ZHL Shareholders Agreement; and

H.    Award whatever other or additional relief this Honorable Court deems just under the circumstances.

## Jury Claim

Plaintiffs claim a trial by jury on all claims and issues so triable.

Respectfully submitted,

OPHNET, INC., JOHN A. HIRSCH,
RONALD W. ZOLLA, and
KENNETH CRAM,

By their Attorneys,

J. Owen Todd (BBO # 499480)
Edward Foye (BBO #562375)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
617-720-2626

Dated July 31, 2002

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the
above document was served upon the
attorney of record for each other party
by mail-hand on July 31, 2002

I:\DATA\WPDOCS\HIRSCH\LAMENSDORF\Pleadings\Second Amended Complaint.doc

22

# MANAGEMENT AGREEMENT FOR ZHL, INCORPORATED AMBULATORY SURGERY CENTER PROJECT

THIS AGREEMENT is effective as of the 15th day of January, 1999, by and between

**ZHL, INCORPORATED**, a Massachusetts corporation (the "Owner"), and **OPHNET, INC.**, a

Massachusetts corporation ("Project Manager").

## WITNESSETH:

A.      Owner desires to employ the Project Manager to perform certain management

services in connection with the design, planning, permitting and construction of an ambulatory

surgical center (the "ASC") to be situated on a tract of land in Sarasota, Florida (the "Site"):

B.      The Project Manager agrees to perform such management services for Owner,

subject to the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual covenants and benefits contained

herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of

which are hereby acknowledged, the Project Manager and Owner hereby agree as follows:

1.      RECITALS. The foregoing recitals are true and correct and the recitals and

instruments referred to therein are hereby incorporated herein by reference.

2.      DEFINITIONS.

(a)      Architect. "Architect" means the Architect who is responsible for the

design of the ASC and any other vertical structures constructed on the Site.

(b)    Construction Manager. "Construction Manager" means any person or entity retained by Owner to coordinate and manage the construction of the ASC and any other improvements which may be constructed on the Site.

(c)    Contractor. "Contractor" means any person or entity who enters into an agreement with Owner, Construction Manager or another Contractor for the purpose of improving the Site in any respect.

(d)    Ambulatory Surgical Center. "Ambulatory Surgical Center" means a facility licensed as an ambulatory surgical center pursuant to Section 395.003, *Florida Statutes*.

(e)    Engineer. "Engineer" means any person or entity who provides engineering services to the Project.

(f)    Project. "Project" means the design, construction and operation of the ASC.

(g)    Project Consultant. "Project Consultant" means any person or entity rendering professional and/or development consulting services to the Project and shall include, without limitation, the Architect, Construction Manager, attorneys, environmental consultants, and transportation consultants.

3.    ENGAGEMENT. Owner hereby retains and engages the Project Manager to provide certain business administration and management services described herein and to assist the Owner in completing the Project. In consideration of the services to be provided by the Project Manager, Owner shall pay the Project Manager in accordance with Paragraph 7 below.

-2-

4.     **PROJECT MANAGER'S SERVICES AND RESPONSIBILITY.** The Project

Manager covenants with the Owner to further the interest of the Owner by furnishing the Project

Manager's skills and judgment in furtherance of completion of the Project. The Project Manager

agrees to furnish business administration and management services and to perform in an

expeditious and economical manner consistent with the interests of the Owner. The Project

Manager's basic services consist of the three phases described below:

(a)     Pre-Construction Phase.

(i)  Assist the Owner in achieving a mutually agreed upon program for

completing the Project and identifying the Project budget requirements and other design

parameters;

(ii)     Assist the Owner in acquiring a suitable parcel of land for the Site of the

ASC,

(iii)  Review the ASC master plan and construction drawings and other design

documents prepared by the Architect and provide recommendations to Owner concerning

among other things, governmental requirements, aesthetics, and maintenance practicality

viewpoint;

(iv)  Provide recommendations on feasibility of construction methods and

availability of materials and labor, time requirements for procurement, installation and

construction and factors relating to cost including, but not limjted to, costs of alternative

designs or materials, preliminary budgets and possible economics;

(v)  Prepare and periodically update progress schedules that coordinate and integrate the services of the project team and the Owner's responsibilities with anticipated construction schedules;

(vi)  Make recommendations to the Owner and Architect regarding safety precautions and programs;

(vii) In consultation with the Architect, coordinate the contract documents regarding drawings and specifications as they are being prepared and advise on separation of the Project;

(viii) Prepare contracts for the various categories of work necessary to complete the Project;

(ix)  Advise on the method to be used for selecting contractors and awarding contracts and make recommendations, as required, to provide that work of separate contractors is coordinated, and the likelihood of jurisdictional disputes has been minimized;

(x)  Periodically update cost evaluations and the Project Budget;

(xi)  Prepare a project construction schedule providing for all major elements such as phasing of construction and times of commencement and completion required of each separate contractor;

-4-

(xii)  Recommend a schedule for the Owner's purchase of medical equipment, machinery and other items requiring long lead time procurement and expedite and coordinate delivery of such purchases;

(xiii)  Provide an analysis of the types and quantities of labor required for the Project and review the availability of appropriate categories of labor for critical phases;

(xiv)  Assist the Owner in preparing construction contracts, and advise the Owner on the acceptability of subcontractors, materials and supplies proposed by contractors;

(xv)  Prepare for the Owner's approval a more detailed estimate of Construction Cost developed by using estimating techniques which anticipate the various elements of the Project, and based on Schematic Design Documents prepared by the Architect. Update and refine this estimate periodically as the Architect prepares Design Development and Construction Documents;

(xvi)  Make recommendations for pre-qualification criteria for bidders and develop bidders' interest in the Project. Establish bidding schedules. Assist the Architect in issuing bidding documents to bidders. Conduct pre-bid conferences to familiarize bidders with the bidding documents and management techniques and with any special systems, materials or methods; and

-5-

(xvii) With the Architect's assistance, receive bids, prepare bid analyses and make

recommendations to the Owner for award of Contracts or rejection of bids.

(b)    Construction Phase.

(i)    Administer in cooperation with the Architect each of the contracts;

(ii)    Provide administrative, management and related services as required to

coordinate the work of the contractors with each other and with the activities and

responsibilities of the Project Manager, the Owner and the Architect to complete the

Project in accordance with the Owner's objectives for cost, time and quality. Provide

sufficient organization, personnel and management to carry out the requirements of this

Agreement;

(iii) Update cost estimates, maintain cost accounting records, identify variances

between actual and estimated costs and advise the Owner and the Architect whenever

projected costs exceed such estimates;

(iv)  Update and revise the construction schedule, as required, to show current

conditions and revisions required by actual experience;

(v)    Endeavor to achieve satisfactory performance by contractors and

recommend courses of action to Owner when contract requirements are not being met

and the non-performing contractor will not take corrective actions;

-6-

(vi)  Review and coordinate the safety programs developed by each contractor;

(vii)  Assist Owner in obtaining, in a timely fashion, all licenses, certificates, accreditations, permits and other governmental approvals necessary for the construction and operation of the Project;

(viii)  Determine, in general, if the work is being performed by the contractors in accordance with the requirements of the contract documents and endeavor to guard the Owner against defects or deficiencies in the work;

(ix)  Receive and review contractor's insurance certificates and forward them to Owner;

(x)  Receive the contractors' shop drawings, review them to ascertain if they are properly coordinated with related documents and forward them to the Architect for its approval;

(xi)  Review the progress of the work and submit progress reports to the Owner showing percentages of completion;

(xii)  Develop and implement procedures for processing the contractors' requisitions and make recommendations to the Architects for certifications for payments;

(xiii)  Maintain records;

(xiv)  Schedule and conduct meetings;

-7-

(xv) Arrange for delivery and storage of materials pre-purchased by the Owner;

(xvi) Observe the contractors' check-out of the operational system and equipment and assist in their initial start-up and testing;

(xvii) When a given contractor's work reaches the stage of substantial completion, prepare for the Architect's review a punchlist of incomplete or unsatisfactory work, as well as a schedule for their completion and assist the Architect in conducting inspections to determine if the work has reached substantial and final completion;

(xviii) Assist the Owner and Architect in the close-out of the Project by securing and transmitting to the Owner guarantees, affidavits, waivers of lien and other similar documents;

(xix) Schedule and conduct pre-construction, construction and progress meetings to discuss such matters as procedures, progress, problems and scheduling. Prepare and promptly distribute minutes;

(xx) Revise and refine the approved estimate of construction cost, incorporate approved changes as they occur, and develop cash flow reports and forecasts as needed;

(xxi) Provide regular monitoring of the approved estimate of Construction Cost, showing actual costs for activities in progress and estimates for uncompleted tasks. Identify variances between actual and budgeted or

-8-

estimated costs, and advise the Owner and the Architect whenever projected costs exceed budgets or estimates;

(xxii) Recommend necessary or desirable changes to the Architect and the Owner, review requests for changes, assist in negotiating contractors' proposals, submit recommendations to the Architect and the Owner, and if they are accepted, prepare and sign Change Orders for the Architect's signature and the Owner's authorization;

(xxiii) Develop and implement procedures for the review and processing of applications by contractors for progress and final payments;

(xxiv) Record the progress of the Project. Submit written progress reports to the Owner and the Architect including information on each contractor and each contractor's work, as well as the entire Project, showing percentages of completion and the number and amounts of change orders; and

(xxv) Maintain at the Project site, on a current basis, a record copy of all contracts, drawings, specifications, addenda, change orders and other modifications, in good order and marked to record all changes made during construction.

(c)    Strategic Management and Marketing Services.

(i)    Ensure that John A. Hirsch and Ronald W. Zolla are personally involved in the strategic management and marketing phase;

-9-

(ii)  Assist the Owner in devising and completing a marketing plan for the Project;

(iii)  Assist the Owner in pursuing eye surgeons and other surgeons who have the ability to use the ASC;

(iv)  Pursue managed care contracts for the ASC;

(v)  Provide annual financial performance assessments;

(vi)  In consultation with the Owner, create sales brochures, advertising materials and promotional materials; and

(vii)  Assist the Owner in preparing and formulating the ASC structure and its policies and procedures.

(d)  Operational Phase.

(i)  Ensure that the ASC is properly and efficiently staffed by an on-site manager and by other non-physician and administrative support staff;

(ii)  Monitor the day to day operation of the ASC;

(iii)  Ensure that the ASC has appropriate and sufficient supplies and equipment;

(iv)  Ensure that all regulatory requirements for the operation of the ASC are met on an on-going basis;

(v)  Ensure that appropriate accreditation standards are met;

-10-

(vi)  Ensure that the ASC operates in a cost-effective and efficient manner;

(vii)  Oversee the management of the non-physician and administrative staff of the ASC;

(viii)  Assist the Owner in meeting all federal, state, and local medical waste laws, rules, and regulations; and

(ix)  Ensure that billings and collections for services provided by the ASC are performed in a timely, efficient, and cost-effective manner.

5.      **TERM.**      Project Manager will provide services to the Owner for a period commencing on the effective date of this Agreement and terminating one (1) year after the effective date of this Agreement; provided, however, that the Agreement shall automatically be renewed for successive one (1) year terms thereafter, unless either party gives the other notice to terminate the Agreement at the expiration of the initial term or any one (1) year renewal term.

6.      **BEST EFFORTS.**      Project Manager agrees that he shall devote his best efforts, energies and skills to the discharge of his duties and responsibilities hereunder.

-11-

7.    **COMPENSATION TO THE PROJECT MANAGER.**

(a)    <u>Fee</u>.    As compensation for the services to be provided by the Project Manager to Owner hereunder, Owner shall pay the Project Manager as follows:

(i)    For services performed during the Pre-Construction Phase and the Construction Phase, the Project Manager shall receive Fifty Dollars and No/100 ($50) per hour of service; provided, however, that the maximum total amount that the Project Manager shall receive for such services shall be Fifty Thousand Dollars and No/100 ($50,000.00).  Owner agrees to promptly pay the compensation one month in arrears by the fifth (5th) day of the following month.

(ii)    For services performed during the Operational Phase, the Project Manager shall receive Seventy-five Dollars and No/100 ($75) per hour of service; provided, however, that the maximum annual amount that the Project Manager shall receive for such services shall be Fifty Thousand Dollars and No/100 ($50,000.00) per year. The hourly rate and the maximum annual amount shall be adjusted at the beginning of each year by an amount equal to the change in the Consumer Price Index.

(iii)  For services performed during the Strategic Management and Marketing Phase, the Project Manager shall receive Thirty-Thousand and No/i 00 ($30,000.00) per year, payable in quarterly installments; provided, however, that such payments are authorized to be paid by the Owner only if, and to the extent that, the Owner's profits are available. Otherwise such payment obligations will

-12-

be maintained as an Owner liability to be paid when profits become available to cover the liability.

(b)     Out-of-Pocket Expenses.  Owner also agrees to reimburse Project Manager for all "Reimbursable Expenses" incurred in fulfillment of Project Manager's services. "Reimbursable Expenses" shall mean costs necessarily incurred in the proper performance of services and paid by the Construction Manager. Such costs shall be at rates not higher than the standard paid in the locality of the Project. The Project Manager shall submit an application for payment each month for all such Reimbursable Expenses incurred by the Project Manager during the prior month and said payment shall be due within ten (10) days of said application for payment. Notwithstanding anything to the contrary herein, Project Manager must obtain Owner's consent before incurring any Reimbursable Expenses exceeding $1,000.00.

8.     RESPONSIBILITIES OF OWNER.

(a)     Cooperation.  Owner shall work with the Project Manager in an expeditious and consistent manner in order to insure the continued progress and completion of the work, and promptly perform all obligations of Owner set forth in this Agreement. Further, the Owner shall render decisions in a timely manner pertaining to all documents and plans submitted by the Project Manager in order to avoid unreasonable delay in the orderly and sequential progress of the Project Manager's service.

(b)     Availability. Owner shall be available to meet or consult with the Project Manager upon reasonable notice on all matters pertaining to the management services provided and performed by the Project Manager under this Agreement.

-13-

9.     **LIABILITY**. Each party agrees to indemnify and save harmless the other party against and from any and all claims, liabilities, losses, costs, expenses, or damages arising in relation to the indemnifying party's (and its employees, agents and representatives) actions or omissions, including without limitation any legal fees or expenses incurred in connection therewith. In any case in which indemnification is sought hereunder, the party seeking indemnification shall promptly notify the other of any claim or litigation to which the indemnification relates and the party seeking indemnification shall afford the other the opportunity to participate and at the other party's option, fully control any compromise, settlement, litigation or other resolution or disposition of such claim or litigation.

10.     **TERMINATION BY THE PROJECT MANAGER**. The Project Manager's obligation or duty to perform the services under the Operational Phase set forth in Section 4(d) of this Agreement may be terminated without cause by the Project Manager upon one hundred eighty (180) days written notice by Project Manager to Owner. Upon such termination by the Project Manager as set forth above, the Project Manager shall be paid, or if already paid, shall retain, the portion of the fee set forth in Paragraph 7(a) above through the stage of the work which is then being performed by the Project Manager and Owner shall retain the exclusive right to all work product produced by the Project Manager prior to such termination. Thereafter neither the Project Manager nor Owner shall have any further rights or obligations under this Agreement, except that the indemnity provisions of Paragraph 9 hereof shall remain in full force and effect.

11.     **TERMINATION BY OWNER**. The services to be performed by the Project Manager under the Pre-Construction Phase and the Construction Phase set forth in Sections 4(a) and (b) of this Agreement may be terminated by Owner for good cause and the continuation

-14-

thereof for thirty (30) days after written notice from Owner to the Project Manager and its failure to so cure within the thirty (30) day cure period. The Owner may terminate the Project Manager's obligation or duty to perform the services under the Operational Phase set forth in Section 4(d) of this Agreement, without cause, upon one hundred twenty (120) days written notice by Owner to Project Manager, or, with good cause and the continuation thereof for thirty (30) days after written notice from Owner to Project Manager and its failure to so cure within the thirty (30) day cure period. The decision by Owner to terminate the above services shall be made in the sole discretion of Michael Lamensdor{ M.D. However, the services to be performed by Project Manager under the Strategic Management and Marketing Phase set forth in Section 4(c) may only be terminated by Owner upon a majority vote of its shareholders and one hundred twenty (120) days written notice from Owner to Project Manager. Upon termination of any section of this Agreement by Owner as set forth above, Owner shall pay to the Project Manager the portion of its fee set forth in Paragraph 7(a) above for all services provided through the stage of the work which is then being performed by the Project Manager and Owner shall retain the exclusive right to all work product produced by the Project Manager prior to such termination. Thereafter, neither Owner nor the Project Manager shall have any further rights or obligations under this Agreement, except that the indemnity provisions of Paragraph 9 shall remain in full force and effect.

### 12.    CONSTRUCTION MANAGER.

Notwithstanding anything herein to the contrary, the Owner reserves the right to hire an actual construction manager to oversee the Project at any time and in its sole and absolute discretion.

**13., MISCELLANEOUS.**

(a)    <u>Entire Agreement</u>. This Agreement represents the entire integrated agreement between the Project Manager and Owner and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument executed by both the Project Manager and Owner.

(b)    <u>Assignment</u>. This Agreement may not be assigned by either party without the prior written consent of the other party and any assignment made without such prior consent shall be deemed null and void.

(c)    <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the laws of Florida.

(d)    <u>Time of the Essence</u>. Time is of the essence of this Agreement.

(e)    <u>Notice</u>. Any notice required or permitted to be delivered hereunder shall be in writing and shall be deemed to have been duly given on receipt, if delivered personally, or sent by Air Mail, postage prepaid, and at the time of such mailing, a copy of the notice or demand to be sent by facsimile to the parties at their address and facsimile number as set forth below:

<u>To the Owner</u>:

ZHL, Incorporated
17 Hawkes Street
Marblehead, MA 01945
Attention: John A. Hirsch

Telephone: 781-631-8278

Facsimile: 781-639-1271

-16-

To the Project Manager:

Ophnet, Inc.
17 Hawkes Street
Marblehead, MA 01945
Attention: Ronald W. Zolla, Ph.D.

Telephone: 781-631-8278

Facsimile: 781-639-1271

(f)     Authority. The Project Manager and Owner represent and warrant to each other that the other party has full right, power and authority t~ enter into this Agreement and fully perform hereunder, and the persons executing this Agreement on behalf of the Project Manager or Owner have the full power and authority to bind such party to this contract.

(g)     Waiver of Breach. Waiver by either party of a breach of any provision of this Agreement shall not be deemed to be a waiver of any other breach and shall not be construed to be a modification of the terms of this Agreement.

(h)     No Partnership. The parties acknowledge and agree that they do not intend to create a partnership, joint venture, co-tenancy or agency relationship by virtue of this Agreement.

(i)     Interpretation. The terms of this Agreement shall be construed in accordance with the meaning of the language used and shall not be construed for or against either party by reason of the authorship of this Agreement or rules of construction which might otherwise apply.

j)     Integration. It is understood that there are no oral agreements between the parties hereto affecting this Agreement.

-17-

(k)    Severability. In the event that any part of this Agreement is construed as illegal or unenforceable by valid judgment or decree by a court of competent jurisdiction, the remaining part of this Agreement will be in full force and effect as though any illegal or unenforceable part or parts are not written into this Agreement.

(1)    Captions. Headings used herein are for convenience only and shall not be construed as controlling the scope of any provision hereof.

(m)    Binding on Parties. This Agreement shall inure to the benefit of and shall be fully, unconditionally, jointly and severally binding on the parties and their respective successors, heirs and assigns.

IN WITNESS WHEREOF, the Project Manager and Owner execute this Agreement the day and year first above written.

OWNER:

ZHL, INCORPORATED, a Massachusetts corporation

Date: _8/24/99_

By _[signature]_

Name: _Michael Lamensdorf_
      Michael Lamensdorf, M.D.
Title:  Chairman of the Board

PROJECT MANAGER:

OPHNET, INC., a Massachusetts corporation

Date: _2/1/99_

By: _[signature]_

Name: _John A. Hirsch_
      John A. Hirsch
Title:  President

-18-

IN THE CIRCUIT COURT FOR THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

DR. MICHAEL LAMENSDORF, in his capacity
as shareholder of ZHL, INC., a Massachusetts
corporation, and KATHY LAMENSDORF,
in her capacity as shareholder of ZHL, INC.,

      Plaintiffs,

v.                                                        CASE NO.: *2005 CA 2997 NC*

ZHL, INC., a Massachusetts corporation,
RONALD W. ZOLLA, in his capacity as
shareholder of ZHL, INC., JOHN A. HIRSCH,
in his capacity as shareholder of ZHL, INC.,
and GLOBAL SURGICAL PARTNERS, INC.,
a Florida corporation,

      Defendants.

_____/

## COMPLAINT

COME NOW, Plaintiffs, Dr. Michael Lamensdorf, in his capacity as shareholder of ZHL,

Inc., and Kathy Lamensdorf, in her capacity as shareholder of ZHL, Inc. (hereafter collectively

referred to as the "Lamensdorfs" or the "Plaintiffs"), by and through their undersigned counsel,

and hereby sue Defendants, ZHL, Inc., a Massachusetts corporation, Ronald W. Zolla, in his

capacity as shareholder of ZHL, Inc., John A. Hirsch, in his capacity as shareholder of ZHL, Inc.,

and Global Surgical Partners, Inc., a Florida corporation, and allege as follows:

### JURISDICTIONAL ALLEGATIONS

1      This is an action in equity in which Plaintiffs seek relief from this Court for: (i)

injunctive relief; (ii) the appointment of a receiver to preserve the value of property located

within Sarasota County; and (iii) the imposition of a constructive trust.

2.    Plaintiff, Dr. Michael Lamensdorf, is a resident of Sarasota County, Florida and a practicing ophthalmologist whose professional address is 1428 South Tamiami Trail, Sarasota, Florida 34239.

3.    Plaintiff, Kathy Lamensdorf, is a resident of Sarasota County, Florida.

4.    Defendant, ZHL, Inc. ("ZHL"), is a Massachusetts corporation authorized to conduct business in the State of Florida. ZHL is registered with the Florida Department of State, Division of Corporations, and its registered agent authorized to accept service of process is William Hirsch, CPA.

5.    William Hirsch, CPA's professional address is listed with the Florida Department of State, Division of Corporations, as 608 West Horatio Street, Tampa. FL 33606

6.    Defendant, Ronald W. Zolla ("Zolla"), is a resident of the State of Massachusetts and resides at 20 Schooner Ridge, Marblehead, Essex County, Massachusetts 01945.

7.    Defendant, John A. Hirsch ("Hirsch"), is a resident of the State of Massachusetts and resides at 15 Brookside Road, Topsfield, Essex County, Massachusetts 01983.

8.    Defendant, Global Surgical Partners, Inc. ("GSP"), is a duly licensed Florida corporation authorized to conduct business in the State of Florida. GSP's principal address is listed with the Florida Department of State, Division of Corporations, as 3059 Grand Avenue, Suite 300, Miami, Florida 33133.

9.    GSP's registered agent is Ziskind & Arvin, P.A., located at 3059 Grand Avenue, Suite 300, Miami, Florida 33133.

10.    All conditions precedent to the maintenance of this action, if any, have been performed and/or waived.

11.    This Court has jurisdiction of this matter pursuant to Sections 26.012(2)(e) and 26.012(3), Florida Statutes.

12.    Venue is proper in Sarasota County since the property Plaintiffs are seeking to protect is located in Sarasota County, Florida.

### GENERAL ALLEGATIONS

13.    Dr. Lamensdorf is a board-certified, fellowship trained ophthalmologist.

14.    Dr. Lamensdorf has dedicated his professional life to helping people achieve their best possible vision by providing them with the latest in eyecare technology. As a practicing ophthalmologist, he specializes in cataract surgery and the eyecare needs unique to seniors. He developed Rapid Recovery Cataract Surgery, an advanced, no-stitch procedure that allows patients to resume life's normal activities almost immediately following surgery.

15.    In addition to his medical practice, Dr. Lamensdorf remains very active in the local Sarasota community and has founded several service and charitable organizations.

16.    As a board-certified ophthalmologist, Dr. Lamensdorf also maintains memberships and affiliations with: (i) Phi Beta Kappa; (ii) the American Academy of Ophthalmology; (iii) American College of Surgeons; (iv) American Society of Cataract and Retractive Surgery; (v) American Society of Ophthalmic Administrators; (vi) Sarasota County Medical Society; (vii) Sarasota Memorial Hospital; and (viii) the Doctor's Hospital.

17.    In addition, Dr. Lamensdorf maintains an affiliation with the Lantz Eye Surgery Center ("LESC").

18.    The Lantz Eye Surgery Center is an ambulatory eye surgery center located at 2821 Proctor Road, Sarasota, Florida 34231.

The Creation of the Lantz Eye Surgery Center ("LESC")

19.   Dr. Lamensdorf practices medicine and performs ophthalmic surgery under Michael Lamensdorf, M.D., P.A., a Florida professional association (the "Practice").

20.   Defendants Zolla and Hirsch are shareholders and principals in a Massachusetts corporation named Ophnet, Inc ("Ophnet").

21.   Zolla and Hirsch marketed Ophnet as a management and marketing company whose principals (Zolla and Hirsch) allegedly have 20 years of experience managing and marketing ophthalmology practices.

22.   Encouraged and induced by Ophnet's marketing scheme, Dr. Lamensdorf hired Ophnet in 1995 to provide marketing and management services to the Practice and as a result, the parties entered into a Management Agreement entitled Management Agreement, Michael Lamensdorf, M.D. (the "Management Agreement").

23.   Subsequently, in 1998, the Lamensdorfs, Zolla, and Hirsch agreed to build an ambulatory eye surgery center in Sarasota, Florida and formed ZHL, a closely held Massachusetts corporation, to perform such function.

24.   To induce the Lamensdorfs to become investors and shareholders in ZHL, Defendants Zolla and Hirsch assured the Lamensdorfs that they were experienced with the construction and operation of ambulatory service centers, that they were licensed attorneys who could handle the majority of legal issues faced by such a surgery center, that Dr. Lamensdorf's involvement in the center would be limited to performing surgeries and providing ophthalmic services for patients at the center, that Ophnet was experienced in managing surgery centers, and that if Dr. Lamensdorf did not like Ophnet's management of the surgery center he could object and a new management company would be hired.

25.     Based on these representations, the Lamensdorfs agreed to invest in and become shareholders of ZHL.

26.     As a result, the Lamensdorfs, Zolla, and Hirsch, formed ZHL and executed a Shareholders' Agreement which memorialized the terms of ownership of ZHL. A true and correct copy of the Shareholders' Agreement is attached hereto as Exhibit "A".

27.     On the basis of Ophnet's alleged experience in the construction and operation of ambulatory surgery centers, ZHL contracted with Ophnet and as a result, the parties entered into the Management Agreement for ZHL Incorporated Ambulatory Surgery Center Project (the "ZHL Management Agreement").

28.     Pursuant to the ZHL Management Agreement, Ophnet was to perform management services for the Ambulatory Surgery Center (LESC) throughout the construction process and thereafter.

29.     During the construction of the Ambulatory Surgery Center, Ophnet provided insufficient management, and inspection and licensing oversight, thereby delaying the opening of the center for approximately six weeks and significantly increasing the costs of construction.

30.     The Ambulatory Surgery Center finally opened for business on November 27, 2001, as the Walter P. Lantz Outpatient Surgery Center, or the LESC, as previously identified.

Ophnet's Mismanagement of the LESC and the Subsequent Litigation

31.     In violation of the ZHL Management Agreement, Ophnet grossly mismanaged the LESC.

32.     Despite Ophnet's mismanagement of the LESC, Zolla and Hirsch failed to take any affirmative action on behalf of ZHL to protect its interests or that of its shareholders

33.    To the contrary, since Zolla and Hirsch were the sole shareholders and principals in Ophnet, they stood to benefit by Ophnet's continued management, or mismanagement of the LESC, and took no action to ensure Ophnet's compliance with the terms of the ZHL Management Agreement.

34.    Ophnet failed to perform its obligations at the LESC and constructively terminated its relationship with the LESC pursuant to the terms of the ZHL Management Agreement. Due to Ophnet's failure to perform its management responsibilities and obligations under the agreement, the Lamensdorfs were compelled to assume all management responsibilities for the LESC and subsequently Dr. Lamensdorf notified Ophnet of same by letter dated February 15, 2002.

35.    Following Ophnet's constructive termination as the management company of the LESC, Ophnet's Vice President, Zolla, directed correspondence to the attention of Dr. Lamensdorf indicating that effective February 15, 2002, Ophnet ended its performance of management services to Michael Lamensdorf M.D. and Michael Lamensdorf M.D., P.A. A copy of the correspondence is attached hereto as Exhibit "B".

36.    The notice delivered to Dr. Lamensdorf was printed on Ophnet letterhead from its principal office located at 17 Hawkes Street, Marblehead, MA 01945.

37.    At the same time, fellow Ophnet principal, Hirsch, acting on behalf of ZHL, directed correspondence to Dr. Lamensdorf and advised Dr. Lamensdorf to accept the communication as a formal letter from Hirsch as "President of ZHL, Inc." A copy of the correspondence is attached hereto as Exhibit "C"

38.    In his correspondence to Dr. Lamensdorf, Hirsch advised Dr. Lamensdorf that all LESC shareholder and contractual communications should be directed to Hirsch.

39.    The communication delivered to Dr. Lamensdorf by Hirsch was prepared on ZHL letterhead from its principal office located at 17 Hawkes Street, Marblehead, MA 01945. Hirsch delivered a copy of the correspondence to Zolla as Vice President of ZHL, Inc. Interestingly, Zolla and Hirsch were operating both Ophnet and ZHL out of the same office yet purported to represent the individual interests of the separate entities.

40.    In response to the constructive termination of Ophnet as the management company for the LESC, Ophnet, Zolla and Hirsch brought suit against the Lamensdorfs and the Practice in state court in the Commonwealth of Massachusetts.

41.    Ophnet, Zolla and Hirsch named Dr. and Mrs. Lamensdorf and Michael Lamensdorf, M.D., P.A. as the defendants to the action.

42.    Subsequently, on or about March 20, 2002, Ophnet, Zolla and Hirsch amended their state court complaint in the Commonwealth of Massachusetts to add Kenneth Cram ("Cram") as a party plaintiff to the action

43.    Cram is a friend and long time colleague of Zolla and Hirsch who was hired by Zolla and Hirsch in 1985 to serve as a consultant for ophthalmology practices despite his lack of experience in that field.

44.    Prior to his employment with Zolla and Hirsch, Cram never received any formal education geared toward the management of ophthalmology practices.

45.    By his own admission, Cram never took any seminars or courses in management of medical practices prior to his employment with Zolla and Hirsch.

46.    Further, Cram never received any practice management training other than instruction from Zolla and Hirsch, the principals of both Ophnet and ZHL.

47.    Despite Cram's lack of formal practice management training, Ophnet engaged the services of Cram as a practice management consultant at the LESC.

48.    While clearly unable to manage the ophthalmology practice at the LESC which consequently resulted in the constructive termination of Ophnet's relationship with the LESC, Ophnet nonetheless filed the amended complaint in the state court in the Commonwealth of Massachusetts along with co-plaintiffs Zolla, Hirsch and Cram.

49.    The complaint and the amended complaint were filed by J. Owen Todd and Edward Foye of the law firm of Todd & Weld in Boston, MA, counsel for Ophnet, Zolla, Hirsch and Cram.

50.    As Mssrs. Todd and Foye filed the amended complaint alleging ten (10) counts against the above named defendants, Mr. Foye was simultaneously working to organize a Board of Directors Meeting for ZHL, Inc.

51.    By letter dated March 19, 2002, Mr. Foye notified the undersigned counsel to Dr. and Mrs. Lamensdorf, that he was requesting dates wherein Dr. Lamensdorf would be available for a meeting of the board of directors of ZHL. A copy of the correspondence is attached hereto as Exhibit "D".

52.    In his letter to the undersigned counsel, Mr. Foye indicated that if "Dr. Lamensdorf wishes to participate [in the Board of Directors Meeting] either in person or by conference call, he may inform Mr. Hirsch directly or [the undersigned counsel] may inform [Mr. Foye] of an acceptable time, and we will arrange to place a call to him." Mr. Foye further stated that "unless Dr. Lamensdorf expresses a willingness to attend in person, the meeting will be held telephonically and if we do not hear from [Dr. Lamensdorf] we will assume that he does not wish to participate."

53.    In addition to the foregoing, Mr. Foye prepared an agenda for the Board of Directors Meeting of ZHL and attached a copy of the agenda to the above mentioned correspondence. Mr. Foye also indicated that if Dr. Lamensdorf wished to add any items to the agenda, that same should be sent to either Mr. Foye or Mr. Hirsch.

54.    The actions of Mr. Foye identified in the preceding paragraphs represent affirmative steps taken on behalf of ZHL to organize a meeting of its board of directors.

55.    Subsequent to Mr. Foye's attempts in his apparent role as counsel to ZHL to organize a meeting of the board of directors of ZHL, the named defendants in the state court proceeding in the Commonwealth of Massachusetts exercised their right to remove the action to the Federal District Court in and for the State of Massachusetts pursuant to 28 U.S.C. § 1441(b).

56.    The basis for the removal of the action to the Federal District Court in Massachusetts was grounded upon the fact that the plaintiffs were all residents of the state of Massachusetts and that the defendants were all residents of the State of Florida; thus there existed a complete diversity of citizenship.

57.    Furthermore, the amount in controversy in the dispute exceeded the sum of Seventy Five Thousand Dollars ($75,000.00).

58.    Thus, the defendants removed the action to the Federal District Court on or about March 27, 2002.

59.    Realizing that they could no longer pursue their claims against the defendants in the state court in the Commonwealth of Massachusetts, the plaintiffs filed a motion to amend their complaint and attached a second amended complaint to their motion which named ZHL, a Massachusetts corporation, as a party defendant to the action.

60.     The naming of ZHL as a party defendant to the action was a transparent attempt to defeat diversity of citizenship and thus have the action remanded to state court so that the plaintiffs would not have to pursue their action before the Federal District Court in Massachusetts.

61.     The sole claim brought against ZHL in the second amended complaint which was remanded to the state court, is a claim brought by Ophnet against ZHL for breach of the ZHL Management Agreement.

62.     Presumably, since corporations can only act through their officers and agents, Zolla and Hirsch elected to have Ophnet pursue the claim against ZHL and thus instructed their counsel, Mr. Todd and Mr. Foye, to amend their amended complaint.

63.     Interestingly, Zolla and Hirsch decided to sue ZHL, an entity for which they are vice president and president, respectively.

64.     While Zolla and Hirsch brought a claim on behalf of Ophnet and against ZHL, an entity to which they owe a fiduciary duty, said claim was frivolous since by his own contention, Hirsch "instructed [Cram] to continue his performance as required under the management agreement between ZHL, Inc. and Ophnet, Inc."

65.     As such, since ZHL's President instructed Cram to continue acting on behalf of Ophnet to provide management consulting services to ZHL, ZHL presumably could not have been in breach of the management agreement.

66.     Nevertheless, at some point, Ophnet decided to cease performing management services and notified Dr. Lamensdorf of said decision as noted in the attached Exhibit "B".

67.     Curiously, the notification by Ophnet's President, Zolla, to Dr. Lamensdorf, was sent to Dr. Lamensdorf within days of Hirsch's, as acting President of ZHL, correspondence

delivered to Dr. Lamensdorf wherein Hirsch informed Dr. Lamensdorf that he instructed Cram and Ophnet to continue performing services for ZHL.

68.    In a disturbing sequence of events, Mr. Foye proceeded to file the second amended complaint and brought the action against ZHL, despite his obvious conflict of interest wherein he was acting as counsel to ZHL during the litigation some one month prior when he took affirmative steps to organize a meeting of the board of directors of ZHL.

69.    The agenda for the meeting of the board of directors prepared by Mr. Foye, even provides for the transitioning of operational phase management responsibilities of ZHL.

70.    Despite his obvious involvement in the management of ZHL, Mr. Foye nevertheless sued ZHL simply to attempt to defeat diversity of citizenship in the federal court action in Massachusetts.

71.    In addition, after Mr. Foye's service of the second amended complaint on ZHL, ZHL's president and vice president, Hirsch and Zolla respectively, failed to take any action to protect the interests of ZHL or its shareholders.

72.    While Zolla and Hirsch owe/owed a fiduciary duty to ZHL to protect its interests, Zolla and Hirsch sat idle as the time passed for ZHL's response to the second amended complaint brought by their company Ophnet.

73.    To date, Zolla and Hirsch failed to take any action on behalf of ZHL, as its vice president and president, and failed to engage counsel to respond to same or file any responsive pleading.

74.    The actions or inactions of Zolla and Hirsch are injurious in nature to ZHL and its shareholders since Zolla and Hirsch have subjected ZHL to a default against it in the state court proceeding in the Commonwealth of Massachusetts.

75.    While Hirsch previously notified Dr. Lamensdorf, as detailed in Exhibit "C", that all communications regarding ZHL shareholder or contractual issues should be directed to him, Hirsch neglected the contractual issue raised by Ophnet in the second amended complaint and dealt with the issue by ignoring same and failing to respond to the pleading.

76.    Similarly, Zolla, also aware of the cause of action initiated against ZHL, failed to take any action to serve the best interests of ZHL and its shareholders and ignored the second amended complaint by not engaging counsel or responding to same by filing any responsive pleading.

77.    Clearly, Zolla and Hirsch are more concerned with their own self interests then those of ZHL, for which they serve/served as vice president and president, and its shareholders, to whom they owe a fiduciary duty.

78.    Nevertheless, the second amended complaint brought against the Lamensdorfs, the Practice, and ZHL, by Ophnet, Zolla, Hirsch, and Cram, is an attempt to create liability where none exists, especially when Ophnet's multiple breaches of the ZHL Management Agreement led to its constructive termination for cause as the management company for the Practice.

79.    Specifically, Ophnet breached the ZHL Management Agreement by, without exclusion:

>    (a) failing to provide proper oversight during the inspection process, thereby delaying the opening of the LESC;
>
>    (b) failing to provide staff of suitable qualifications and abilities;

(c) failing to schedule staff in a cost-effective and efficient manner, thereby forcing Dr. Lamensdorf to schedule employees of his Practice to work at the LESC;

(d) failing to provide proper staff and equipment for sterilization and post-operative care;

(e) failing to follow ACHA guidelines;

(f) failing to provide a functioning and efficient system for billing procedures;

(g) failing to provide adequate anesthesia support for Dr. Lamensdorf;

(h) failing to collect accounts receivable in a timely fashion;

(i) failing to pay accounts receivable in a timely fashion;

(j) failing to develop a marketing schedule or engage in suitably proactive marketing activities;

(k) failing to provide suitable surgical equipment; and

(l) failing to provide cleaning services and pest control services for the LESC.

80.    Defendants Zolla and Hirsch, as well as Ophnet, further breached the Management Agreement, Michael Lamensdorf, M.D., P.A. by, without limitation:

(a) failing to follow through on clinical staff monitoring, staffing, and training;

(b) failing to manage the LASIK service and follow through on LASIK marketing strategies;

(c) effectively abandoning management of the Practice;

(d) ignoring their management responsibilities to the Englewood office in order to, on information and belief, protect Ophnet's competing interest in a Port Charlotte ophthalmology office;

(e) failing to develop another satellite office, as promised;

(f) failing to obtain an insurance provider for all doctors at the practice, and failing to provide staffing and scheduling oversight for all doctors at the practice;

(g) failing to manage doctors' patients' services;

(h) failing to provide proper oversight over the purchase of a new computer system, installation thereof, and software and hardware training thereon; and

(i) failing to successfully manage the Health On Site program.

81.    In addition, as fellow shareholders of ZHL, a closely held corporation, Zolla and Hirsch owe/owed a fiduciary duty to the Lamensdorfs.

82.    Nevertheless, Zolla and Hirsch breached their fiduciary duty to the Lamensdorfs by, without limitation:

(a) grossly misrepresenting the amount of money that would be required to construct the LESC;

(b) conspiring in bad faith to dilute and, ultimately, diluting Dr. Lamensdorf's and Mrs. Lamensdorf's ownership interest in ZHL in order to improperly gain control over ZHL;

(c) refusing to disclose the financial records of ZHL and the LESC to Dr. and Mrs. Lamensdorf despite their numerous requests;

(d) refusing in bad faith to pay Dr. Lamensdorf and Mrs. Lamensdorf the distributions due to them;

(e) engaging in self-dealing by, without limitation, failing to act in the best interests of ZHL and other shareholders by refraining from terminating Ophnet as soon as they became aware of Ophnet's inability to manage the LESC in a profitable, efficient, and safe manner;

(f) authorizing an unfounded lawsuit against ZHL by Ophnet simply to defeat diversity of citizenship in federal court and promote the self interests of Zolla and Hirsch; and

(g) failing to engage counsel to respond to the second amended complaint on behalf of ZHL.

83.    As a result, the Lamensdorfs and the Practice countersued Zolla, Hirsch and Ophnet in the state court in the Commonwealth of Massachusetts for the aforementioned

breaches and further sought relief against Zolla and Hirsch for fraudulent inducement, negligent misrepresentation and an accounting.

84. At the same time, ZHL, Zolla and Hirsch continue to engage in additional dealings to the detriment of the Lamensdorfs.

85. Upon information and belief, ZHL, through its majority shareholders, Zolla and Hirsch, has engaged in discussions and has taken affirmative steps with GSP for the sale and purchase of the LESC, which is located in Sarasota County.

86. ZHL, through its majority shareholders, Zolla and Hirsch, executed a Letter of Intent for the sale of the LESC to GSP and are expected to close the transaction within ninety (90) days.

87. ZHL, Zolla and Hirsch failed to make any disclosure to the Lamensdorf's about the pending transaction.

88. The real property known as LESC is an asset of ZHL and is located within the jurisdiction of this court.

89. ZHL, through its majority shareholders, Zolla and Hirsch, is not representing the best interests of the ZHL minority shareholders due to Zolla and Hirsch's ongoing litigation with the Lamensdorfs and the Practice.

90. As shareholders in ZHL, the Lamensdorfs have a protectable interest in the property known as the LESC.

91. ZHL's attempts, through its majority shareholders, Zolla and Hirsch, to sell the property known as the LESC and affect the title to that property, will detriment the interests of the Lamensdorfs.

92.    Furthermore, there is no assurance that Zolla and Hirsch will act in the best interests of ZHL or its shareholders, since Zolla and Hirsch authorized Ophnet to bring an unfounded cause of action against ZHL simply to defeat diversity of citizenship in the pending litigation in the state of Massachusetts.

93.    Payments from GSP for the purchase of the LESC cannot be distributed to individuals engaged in inappropriate self dealings and who act in their own self interests and to the detriment of ZHL and its minority shareholders since there is no safeguard against the misappropriation of such funds other than the relief sought herein.

94.    Despite the ongoing litigation in the state court of the Commonwealth of Massachusetts, this Court has jurisdiction to entertain this suit since the property sought to be protected is located in Sarasota County, Florida.

95.    Further, the state court in the Commonwealth of Massachusetts is without jurisdiction to render a decree affecting realty in this state since such a decree would be an *in rem* judgment not entitled to full faith and credit pursuant to applicable law.

## COUNT I – INJUNCTIVE RELIEF
### (as to Defendants ZHL, Zolla, Hirsch, and Global Surgical Partners, Inc.)

96.    Plaintiffs incorporate by reference the allegations of paragraphs 1-95 as if fully set forth herein.

97.    Plaintiffs are entitled to injunctive relief.

98.    Plaintiffs are entitled to have Defendants enjoined from taking any action that would affect title to the property known as the LESC until such time as the pending state court proceeding in the Commonwealth of Massachusetts is resolved.

99.    Defendants' actions in affecting title to the property will likely result in irreparable harm to the Plaintiffs.

100.   There is no adequate remedy at law available to the Plaintiffs for the actions of the Defendants regarding the title to the property known as the LESC.

101.   The Plaintiffs have a substantial likelihood of success on the merits.

102.   The consideration of the public interest favors the issuance of an injunction pending the resolution of the pending state court proceeding in the Commonwealth of Massachusetts.

WHEREFORE, Plaintiffs respectfully request this Court enter an Order enjoining the Defendants from taking any action that would affect title to the property known as the LESC until such time that the state court proceeding in the Commonwealth of Massachusetts is resolved.

## COUNT II – APPOINTMENT OF A RECEIVER
### (as to Defendants ZHL, Zolla and Hirsch)

103.   Plaintiffs incorporate by reference the allegations of paragraphs 1-95 as if fully set forth herein.

104.   Plaintiffs are shareholders in ZHL, which is the legal owner of the subject property which is known as the LESC.

105.   Defendant, ZHL, through its majority shareholders, Zolla and Hirsch, has taken steps toward entering into a contract for the sale and purchase of the LESC property.

106.   Due to the ongoing litigation and dispute between the parties to this action, ZHL, through its majority shareholders, Zolla and Hirsch, is not protecting the interests of the shareholders of ZHL, but rather is engaging in acts to benefit the self interests of Zolla and Hirsch and the Defendants, ZHL, Zolla and Hirsch, are encumbering the rights and interests of the Plaintiffs herein; the Lamensdorfs.

107.    The actions of ZHL, Zolla and Hirsch are affecting the value of the subject property known as the LESC.

108.    The appointment of a receiver will preserve the value of the subject property until such time as a resolution is had in the ongoing state litigation in the Commonwealth of Massachusetts.

WHEREFORE, Plaintiffs respectfully request that this Court appoint a receiver to oversee the subject property and preserve its value pending a resolution of the state court litigation in the Commonwealth of Massachusetts.

## COUNT III – IMPOSITION OF A CONSTRUCTIVE TRUST
### (as to Defendants ZHL, Zolla and Hirsch)

109.    Plaintiffs incorporate by reference the allegations of paragraphs 1-95 as if fully set forth herein.

110.    Defendant ZHL, through its agents and majority shareholders, Zolla and Hirsch, has entered into an agreement for the purchase and sale of the LESC to GSP.

111.    Upon information and belief, and as part of the transaction with GSP for the sale and purchase of the LESC, ZHL has/will receive funds from GSP.

112.    ZHL, Zolla and Hirsch made a promise, express and implied, that they would serve the best interests of the corporation and its shareholders.

113.    ZHL, Zolla and Hirsch have/had a fiduciary relationship to the ZHL shareholders.

114.    A relation of trust and confidence existed between the shareholders of ZHL and ZHL, such that a fiduciary relationship was imposed between the parties to this litigation.

115.    Further, a confidential relationship existed between Zolla, Hirsch, the Lamensdorfs, and ZHL.

116.  ZHL, Zolla and Hirsch breached their fiduciary duties to the Lamensdorfs and have been unjustly enriched as a result.

117.  The Lamensdorfs are entitled to the imposition of a constructive trust on any funds received by ZHL, Zolla and Hirsch from GSP.

WHEREFORE, Plaintiffs respectfully request this Court impose a constructive trust on any funds received by Defendants ZHL, Zolla and Hirsch as same relate to the sale of the LESC to Global Surgical Partners, Inc.

Dated:  March 28 , 2005

ABEL, BAND, RUSSELL, COLLIER,
PITCHFORD & GORDON, CHARTERED
Post Office Box 49948
Sarasota, Florida 34230-6948
(941) 366-6660
(941) 366-3999 (fax)
Attorney for Plaintiffs

By:

Michael S. Taaffe
Florida Bar No. 490318
Joseph A. Tsombanidis
Florida Bar No. 196215

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

DR. MICHAEL LAMENSDORF, in his capacity
as shareholder of ZHL, INC., a Massachusetts
corporation, and KATHY LAMENSDORF, in her
capacity as shareholder of ZHL, INC.,,

       Plaintiffs,

       vs                        CASE NO. 2005 CA 2997 NC

ZHL, INC., a Massachusetts corporation,
RONALD W. ZOLLA, in his capacity as
Shareholder of ZHL, INC., JOHN A. HIRSCH,
in his capacity as shareholder of ZHL, INC.,
and GLOBAL SURGICAL PARTNERS, INC.,
a Florida corporation,

       Defendants.
_____/

## DEFENDANT, ZHL, INC.'S, MOTION TO ABATE OR STAY
## AND TO DISMISS

Defendant, ZHL, INC., a Massachusetts corporation, (hereinafter "ZHL"),

by and through the undersigned counsel, hereby moves this Honorable Court to

abate or stay this action, or to dismiss each count of the Complaint, and as

grounds therefore would state:

## I. FACTS

A.    The Allegations of the Complaint

The Complaint in this matter was filed on or about March 28, 2005 by DR.

MICHAEL LAMENSDORF and KATHY LAMENSDORF (collectively referred to

as "the LAMENSDORFS"), both ostensibly acting in their capacity as

shareholders of the ZHL, INC. Complaint at p. 1. ZHL is the owner of an

ambulatory surgery center ("ASC") in the Sarasota area. Id. at ¶¶ 18, 30.

ZHL's other shareholders are RONALD W. ZOLLA and JOHN A. HIRSCH who are also "shareholders and principals in a Massachusetts corporation named Ophnet, Inc." Complaint at ¶ 20. Dr. LAMENSDORF hired Ophnet in 1995 to provide marketing and management services to his Sarasota medical practice, "and as a result, the parties entered into a Management Agreement" whereby Ophnet provided marketing and management services to his medical practice. Id. at ¶ 22.

To induce the LAMENSDORFS to become investors and shareholders in ZHL, HIRSCH and ZOLLA allegedly assured the LAMENSDORFS (among other things) "that Ophnet was experienced in managing surgery centers, and that if Dr. LAMENSDORF did not like Ophnet's management at the surgery center he could object and a new management company would be hired." Complaint at ¶ 24. As a result, the parties formed ZHL, a Massachusetts corporation, and entered into the Shareholders Agreement, a copy of which is attached to the LAMENSDORFS' Complaint. Id. at ¶¶ 25-26 and Exhibit A thereto. The parties also entered into the written "Management Agreement for ZHL, Inc., Ambulatory Surgery Center Project." Id. at ¶ 27.

Thereafter Ophnet allegedly "provided insufficient management, and inspection and licensing oversight, thereby delaying the opening of the center for approximately six weeks". Complaint at ¶ 29. The Complaint further alleges that "Ophnet grossly mismanaged" the operations of ASC, and that HIRSCH and ZOLLA did nothing to remedy the situation, even though HIRSCH and ZOLLA are concededly the majority owners of ZHL's stock and had no financial incentive

2

that the Complaint can articulate for failing to manage the ASC profitably. Id. at ¶¶ 32-34. On or about February 15, 2002, the LAMENSDORFS claim that they "assume[d] all management responsibilities for the [ASC]." Id. at ¶ 34.

After Dr. LAMENSDORF purported to fire Ophnet from managing the ASC, Ophnet allegedly "ended its performance of management services" to Dr. LAMENSDORF's medical practice under the Management Agreement. Complaint at ¶ 35 and Ex. B thereto. Thereafter, "[i]n response to the constructive termination of Ophnet as the management company for the [ASC], Ophnet, Zolla and Hirsch brought suit against the Lamensdorfs and the Practice in state court in the Commonwealth of Massachusetts." Id. at ¶ 40. The LAMENSDORFS are both defendants in that lawsuit, which will be referred to throughout this motion as the "First Massachusetts Action." Id. at ¶ 41.

The Complaint further alleges that the same attorney for HIRSCH and ZOLLA in the Massachusetts action also at various times acted on HIRSCH and ZOLLA's behalf in regard to their participation in ZHL. Complaint at ¶ 50. Among other things, that attorney purportedly informed Dr. LAMENSDORF of the dates when HIRSCH and ZOLLA (who together comprise two-thirds of the Board of Directors of ZHL) intended to hold a directors' meeting. Id. at ¶¶ 51-55.

At the end of March 2002, the LAMENSDORFS removed the First Massachusetts Action to the federal court in Boston based on diversity jurisdiction. Complaint at ¶ 59. While in the U.S. District Court, Ophnet amended its complaint to assert a breach of contract action against ZHL for breach of the ZHL Management Agreement. Id. at ¶ 59-63. The LAMENSDORFS claim that

the breach of contract action was "frivolous," id. at ¶ 64, even though the Complaint itself acknowledges that Dr. LAMENSDORF "constructively terminated," i.e., breached, the terms of the ZHL Management Agreement. The amendment had the effect of destroying diversity and requiring a remand to the state court. See Complaint at ¶¶ 70, 92. See also Affidavit of Edward Foye, Esq. ("Foye Aff.") at Exhibit 1 (Second Amended Complaint now pending in First Massachusetts Action). Allegedly, ZHL's majority shareholders, HIRSCH and ZOLLA, thereafter permitted ZHL to default by failing to appear or defend ZHL. Id. at ¶ 71-77.

The LAMENSDORFS' Complaint goes on to list twelve ways in which Ophnet supposedly breached its Management Agreement with ZHL (¶ 79), nine ways in which Ophnet breached its Management Agreement with the medical practice (¶ 80) and various ways in which HIRSCH and ZOLLA alleged breached their fiduciary duty to the Lamensdorfs. Complaint at ¶ 82. "As a result, the Lamensdorfs and the practice countersued Zolla, Hirsch and Ophnet in the state court in the Commonwealth of Massachusetts [in the First Massachusetts Action] for the aforesaid breaches and further sought relief against Zolla and Hirsch for fraudulent inducement, negligent misrepresentation and an accounting." Id. at ¶ 83.

Finally, the LAMENSDORFS' Complaint recites that HIRSCH and ZOLLA have on behalf of ZHL executed a letter of intent to sell the ASC. Complaint at ¶¶ 84-86. Among other things, the Complaint claims that HIRSCH and ZOLLA failed to make any disclosures to the LAMENSDORFS about the pending

4

transaction, even thought the LAMENSDORFS were, through their attorney, in regular contact with the prospective purchasers of the ASC, who freely disclosed to them the terms of the proposed deal. Id. at ¶ 87. See also Foye Aff. at Exhibit 2 hereto (letter from the LAMENSDORFS' counsel acknowledging receipt of prior draft letter of understanding concerning the potential sale of the ASC). The LAMENSDORFS further claim that HIRSCH and ZOLLA cannot be trusted and "will detriment [sic] the interests of the Lamensdorfs" primarily based on the fact that "Zolla and Hirsch authorized Ophnet to bring an unfounded cause of action" against ZHL. The complaint proclaims that as shareholders in ZHL, the LAMENSDORFS "have a protectable interest in the [ASC]," even though their own complaint acknowledges that title to the ASC lies in ZHL and not in the shareholders. Id. at ¶ 91. The LAMENSDORFS also claim that there is "no safeguard against the misappropriation" of the potential sale proceeds, even though no sale has taken place, no funds have changed hands, and there is not so much a word in the complaint concerning what ZHL might do with such funds apart from the Lamensdorfs' speculation that ZHL would distribute it to the shareholders. Id. at ¶ 93.

COUNT I seeks to enjoin ZHL "from taking any action that would affect title to the property . . . until such time as the pending state court proceeding in the Commonwealth of Massachusetts is resolved." Complaint at ¶ 98. See also id. at ¶ 102, stating that the public interest "favors the issuance of an injunction pending the resolution of the pending state court proceeding in the Commonwealth of Massachusetts."

COUNT II asks for the appointment of a receiver for ZHL, even though (as the LAMENSDORFS well know) ZHL effectively has no ongoing business operations since Dr. LAMENSDORF long ago pulled his cases from the ASC without providing any prior notice to his fellow shareholders. Complaint at ¶¶ 103-108. See also Foye Aff. at Exhibit 3 (Supplemental Hirsch Affidavit filed in the First Massachusetts Action), ¶ 9. The Complaint asks that the receiver be appointed for the Massachusetts corporation to "preserve the value of the subject property until such time as a resolution is had in the ongoing state litigation in the Commonwealth of Massachusetts." Id. at ¶ 108.

COUNT III demands the imposition of a constructive trust on any funds received from the prospective purchasers based on the fiduciary relationship that Massachusetts implies among shareholders in a closed corporation. Complaint at ¶¶ 108-117.

**B.    Additional facts relating to the First Massachusetts Action.**

The First Massachusetts Action has been pending since February, 2002. During this bitterly litigated case, the parties have filed or served over 200 pleadings (not including deposition transcripts, which are not filed in Massachusetts). See Foye Aff. at Exhibit 4 (Court Index).

As the Second Amended Complaint ("SAC") (Foye Aff. Ex. 1) now pending in the First Massachusetts Action alleges, in 1995 Ophnet after protracted negotiations entered into a contract with Dr. LAMENSDORF and his medical

6

practice to provide management and strategic planning services.  SAC at ¶ 13.[1]
Between 1995 and 2001, the LAMENSDORFS' income from the medical practice
increased from less than $170,000 in 1995 to about $600,000 in 2001.  Foye Aff.
at Exhibit 6 (tax returns).

In the Management Agreement for the practice, Ophnet agreed that it
would be compensated for its services through, *inter alia*, bonus income in the
form of 50% of the practice's Net Income.  Although the formula set forth in the
contract is detailed, the essence of the matter was that in any given year Ophnet
was entitled to 50% of the practice's profits after customary and usual business
expenses and certain substantial payments to the LAMENSDORFS.  See SAC,
Ex. 1 at §§ 5, 6, 11, and 13.  The Management Agreement also provided for
deferred income to Ophnet.  SAC at ¶ 14.  Under the deferred income provisions,
if Dr. LAMENSDORF chose to terminate the Agreement, an accounting would
occur to determine Practice Net Income for the two previous years.  SAC Ex. 1 at
§§ 11, 17 (B).  Ophnet would then be entitled to receive an additional payment
equal to four (4) times the Practice Net Income generated over that time.  If
Ophnet terminated, the severance payment would equal two (2) times Practice
Net Income.  Id.

As the practice grew and prospered, the parties agreed jointly to construct
an ambulatory surgery center ("ASC") specializing in eye surgeries.  SAC at
¶¶ 17-20.  The parties jointly formed ZHL, Inc., a Massachusetts corporation, for

---

[1] The allegations of the Second Amended Complaint were verified in two affidavits
which John Hirsch submitted to the Massachusetts court.  These affidavits are attached,
without the voluminous exhibits, as Ex. 3 and Ex. 5 to the Foye Affidavit.  The exhibits
will be submitted to the Court on request.

that purpose. SAC at ¶ 19. ZHL, in turn, contracted with Ophnet to operate the ASC. Id. Under the ZHL-Ophnet Management Agreement, attached to the SAC as Ex. 5, Ophnet's compensation varied according to the services provided. Id. at ¶ 17 and Ex. 5 thereto at § 4.

While the ASC was under construction, the LAMENSDORFS claimed, falsely, that they did not have sufficient funds to make the agreed upon capital contributions necessary for the construction of the surgery center and to provide operating funds for ZHL's business activities. Consequently, John HIRSCH and Ronald ZOLLA, Ophnet's principals, were forced to and did loan ZHL over $800,000. Ex. 3 at ¶ 11, Ex. 5 at ¶ 22. As Ophnet would subsequently discover, the LAMENSDORFS' alleged financial distress derived not from a lack of income from the medical practice, since the LAMENSDORFS' personal tax returns from this period show income of almost $600,000 annually. See Ex. 6. Rather, the financial distress derived from an opulent renovation of their home on Siesta Key, which was apparently funded by siphoning off funds from the medical practice rather than paying Ophnet its bonus income. See SAC at ¶ 22; Ex. 5, at ¶¶ 21-22, 25-26.

In January 2002, Dr. LAMENSDORF purported to terminate Ophnet's services both to his medical practice under the Management Agreement and to the ASC under the Ophnet-ZHL Management Agreement. See SAC at ¶ 24 and Ex. 7 thereto (Termination Letter). Dr. LAMENSDORF apparently did so out of frustration when HIRSCH and ZOLLA refused to sell him a controlling interest in ZHL for $1.00 and would not pay his wife $50,000 to manage the ASC. See

8

Foye Aff. at Exhibit 7 (correspondence from Dr. LAMENSDORF). Approximately four months later, Dr. LAMENSDORF pulled his cases from the ASC, even though he was a part owner of it, and brought them to a competing facility in Sarasota. See Ex. 3 at ¶ 9.

Since the parties ended their business relationship, discovery has shown that the LAMENSDORFS apparently engaged in a two-year pattern of deceit concerning practice expenditures, including funneling tens and possibly hundreds of thousands of dollars to Bayou JennKay, a company established by Dr. LAMENSDORFS's wife, KATHY LAMENSDORF.  SAC at ¶¶ 18, 24; Ex. 5 at ¶ 25.  Specifically, the practice seems to have classified checks to Bayou JennKay and Mrs. LAMENSDORF as expenses, thereby reducing Practice Net Income (and reducing Ophnet's profit distributions and deferred payments).  For example, Mrs. LAMENSDORF at the end of 2001 wrote to HIRSCH and ZOLLA that the medical practice was nearly out of cash and could not pay Ophnet's incentive payments for 2001.  See Foye Aff. at Exhibit 8 (letters).  In fact, as discovery in the First Massachusetts Action later showed, Mrs. LAMENSDORF wrote over $30,000 in checks to herself or her husband from the practice's account in December 2001 alone.  See Foye Aff. at Exhibit 9 (checks).

The First Massachusetts Action is now scheduled for trial on October 13, 2005. See Foye Aff. at Exhibit 10.

C.    **The Second Massachusetts Action.**

In November, 2004, Dr. LAMENSDORF at deposition suggested that he would object to any potential sale of the ASC, even though he long since had

pulled his cases from it and even though the ASC was then running at a deficit of over $20,000 per month that HIRSCH and ZOLLA were financing from their own resources. Accordingly, in early December, 2004, HIRSCH and ZOLLA filed a Complaint for Declaratory Judgment in the Massachusetts state court seeking approval for the Massachusetts' corporation's sale of its primary asset, the ASC. See Foye Aff. at Exhibit 11, the Complaint for Declaratory Judgment in what this motion will refer to as the "Second Massachusetts Action." That complaint was served on the LAMENSDORFS on or about April 7, 2005. Foye Aff. at Exhibit 12. The LAMENSDORFS have recently removed the Second Massachusetts Action to federal court. Id. at Exhibit 13.

## ARGUMENT

### Motion to Stay or Abate

I.    BECAUSE THERE IS A PRIOR ACTION PENDING BETWEEN THESE IDENTICAL PARTIES CONCERNING IDENTICAL CLAIMS IN THE COURTS OF ANOTHER STATE THIS COURT MUST ABATE OR STAY THIS SUIT.

"Generally, a state court will abate an action upon a showing that a prior action involving the same parties and cause of action is presently pending in the same court or another court of like jurisdiction." Koehlke Components, Inc. v. South East Connectors, Inc. 456 So.2d 554, 555 (Fla. 1st DCA 1984) (citing State ex. rel. Dos Amigos, Inc. v. Lehman, 100 Fla. 1313, 131 So. 533 (1930) and Wade v. Clower, 94 Fla. 817, 114 So. 548 (1927)). The "principle of priority" rests not only upon comity between courts of concurrent jurisdiction but also upon "wisdom and justice, including the prevention of unnecessary litigation and a multiplicity of suits." Bedingfield v. Bedingfield, 417 So.2d 1047, 1050 (Fla. 4th

DCA 1982).  Where a prior action is pending in the court of another state, the standard is essentially the same as the rule when two cases are pending <u>within</u> Florida: absent extraordinary circumstances not here present, the first filed action <u>must</u> go forward, and the second-filed case <u>must</u> be stayed.  <u>See</u> <u>Florida Crushed Stone v. Travelers Indem. Co.</u>, 632 So.2d 217, 220 (Fla. 5th DCA 1994).  <u>See also</u> <u>Robinson v. Royal Bank of Canada</u>, 462 So.2d 101, 102 (Fla. 4th DCA 1985);  <u>New Plan Realty Trust v. Towers Apartments, Inc.</u>, 350 So.2d 99, 99 (Fla. 1st DCA 1977) (per curiam); <u>National American Ins. Co. v. Charlotte County</u>, 611 So.2d 1284 (Fla. 2d DCA 1992); <u>Leslie Fay Retain Outlets, Inc. v. Gallery Mfg. Corp.</u>, 653 So.2d 1106, 1107 (Fla. 3d DCA 1995); all to the same effect.

There can be no doubt that the requirements for a stay have been met.  Each of the parties in this suit is a party to the First Massachusetts Action.  The paragraphs of the Complaint concerning Ophnet's breaches of the Management Agreement with the medical practice have been copied verbatim from the LAMENSDORFS' counterclaims in the First Massachusetts Action.  <u>Compare</u> Complaint at ¶ 7 with Counterclaims (Foye Aff. at <u>Exhibit 14</u>) at ¶ 37.  The paragraph regarding Ophnet's supposed breaches of the ZHL Management Agreement are also copied verbatim.  Complaint at ¶ 80; Ex. 14 at ¶ 32. HIRSCH and ZOLLA's alleged breaches of fiduciary duty are likewise identically pleaded.  Complaint at Ex. 82; Ex. 14 at 42.  The very same Shareholder Agreement which is attached to the Complaint is also attached to the Second Amended Complaint in the First Massachusetts Action, and whether the LAMENSDORFS or whether HIRSCH and ZOLLA breached that agreement is

11

directly at issue in both suits. See Complaint at Ex. A; SAC (Foye Aff., Ex. 1) at Ex. 4. The Florida Complaint also references the Management Agreement for Dr. LAMENSDORF'S medical practice and the Ophnet-ZHL Management Agreement, two contracts which are attached to and at issue in the Second Massachusetts Action. See SAC at Exs. 1-3 (practice Management Agreement with subsequent amendments); id. at Ex. 5 (ZHL Management Agreement). Indeed, much of the LAMENSDORFS' complaint amounts to one long philippic against the conduct of the Massachusetts litigation.[2] It is therefore clear that the issues raised in this lawsuit are inextricably intertwined with the issues presented in the First Massachusetts Action.

There can also be no reasonable doubt that exercising jurisdiction over the LAMENSDORFS' suit would violate the fundamental policy underlying the principle of priority. The long standing basis of the rule is that where two courts "have concurrent jurisdiction over the same parties or privies and the same subject matter, the tribunal where jurisdiction first attaches retains it exclusively and will be left to determine the controversy and to fully perform and exhaust its jurisdiction and to decide every issue or question properly arising in the case." Wade v. Clower, 94 Fla. 817, 114 So. 548, 551 (1927). The Complaint in this

---

[2] At various points, Dr. LAMENSDORF even goes so far as to seem to suggest that he had no knowledge that ZHL had been sued by Ophnet, even though Ophnet served Dr. LAMENSDORF with the Second Amended Complaint in his capacity as Chairman of ZHL's Board of Directors. See Foye Aff. at Exhibit 15 (Return of Service). Furthermore, HIRSCH AND ZOLLA tendered ZHL's defense of Ophnet's claims to Dr. LAMENSDORF based on their belief that there was no meritorious defenses to the claims, since Dr. LAMENSDORFS' exercise of his power of termination under the ZHL Management Agreement was obviously exercised in bad faith. The LAMENSDORFS have thus far refused to provide ZHL with a defense. See Foye Aff. at Exhibit 16.

matter essentially seeks to obtain appointment of a receiver *pendente lite* or to enjoin the sale of the property until the Massachusetts action is completed. It is difficult to think of a more egregious instance of interfering with another court's jurisdiction than to literally seize control of the subject matter of the dispute between the parties, as an injunction or the appointment of a receiver would effectively do. The appropriate court to request such relief from is plainly the court before which the underlying claims are pending. Parallel proceedings pose a risk of inconsistent rulings and orders (even on an interlocutory basis) as well as squandering scarce judicial and party resources. The Massachusetts court is therefore the only appropriate forum to decide whether the LAMENSDORFS have established a likelihood of success on the merits or irreparable harm (both requirements for an injunction or a receiver). Accordingly, for that reason as well, the Court should stay or abate this case in favor of the First Massachusetts Action.

Finally, if more were needed, the LAMENSDORFS are also defendants in the Second Massachusetts Action, which unquestionably raises precisely the same issues before this Court. That suit was filed months before the LAMENSDORFS filed this action, and although it was briefly dismissed in Massachusetts as the apparent result of a clerk's error, that error was corrected and the complaint was reinstated *nunc pro tunc*. See Foye Aff. at Exhibit 17 (Motion to Reinstate and Court Order thereon). Indeed, the LAMENSDORFS have apparently waived any claim that the suit was not properly reinstated by the removing it to the federal court. See Foye Aff. at Ex. 13 (Notice of Removal).

13

Thus, whether based on the First Massachusetts Action or the Second, this Court must abate or stay this suit until the Massachusetts court has disposed of the parties' claims and counterclaims.

II.     **THERE ARE NO EXCEPTIONS TO THE PRINCIPLE OF PRIORITY APPEARING ON THE RECORD WHICH WOULD JUSTIFY THIS COURT'S EXERCISE OF DISCRETION TO PERMIT THIS CASE TO GO FORWARD, EVEN IF SUCH DISCRETION EXISTED.**

In the context of the motion to stay for a prior pending action, the only circumstances recognized to justify the Court's exercise of discretion <u>not</u> to stay the second-filed case are "irreparabl[e] prejudice" or "<u>undue</u> delay". <u>Polaris Public Income Funds v. Einhorn</u>, 625 So.2d 128, 129 (Fla. 3d DCA 1993); <u>Merrill, Lynch, Pierce, Fenner, and Smith, Inc. v Ainsworth</u>, 630 So.2d 1145, 1147 (Fla. 2d DCA 1993) (emphasis supplied). Neither of these factors are present here.

There is no undue prejudice that can arise from permitting this case to continue to go forward in Massachusetts. The LAMENSDORFS voluntarily brought their counterclaims there rather than beginning a separate action in Florida in 2002. Certainly, there was nothing on the record which could lead this Court to conclude that the LAMENSDORFS will not get a fair trial in Massachusetts. Thus, there is no undue prejudice.

The LAMENSDORFS also cannot demonstrate prejudicial delay. The case is now scheduled for trial in October, 2005. Quite apart from the fact that the existence of two concurrent lawsuits in two jurisdictions would frustrate the ability of the Massachusetts court to manage its own docket by permitting the LAMENSDORFS to open discovery on a second front, the fact is that Massachusetts Court will likely have disposed of the First Massachusetts Action

14

before discovery is even half way done in this lawsuit. Any claim that the Second Massachusetts Action will be unnecessarily delayed because it is in federal court is no argument at all, since the LAMENSDORFS were the ones who removed the suit to federal court. See Koehlke Components, Inc. v. South East Connectors, Inc., 456 So. 2d 554, 555 (Fla. 3d DCA 1984) (holding that party who chose federal court "accepted the risk of delay"). See also City of Miami Beach v. Miami Beach Fraternal Order of Police, 619 So.2d 447, 448 (Fla. 3d DCA 1993).

Finally, it is of no consequence that Global Surgical Partners, the prospective purchaser of the ASC, is not a party to the Massachusetts litigation. The principle of priority does not now and never has required a complete identity of parties. See Wade v. Clower, supra. Rather, "[t]he pivotal question is whether the Florida action is so similar in parties and issues as to be unnecessarily duplicative of the prior filed [out of state] . . . proceedings." Polaris Public Income Funds v. Einhorn, 625 So.2d 128, 129 (Fla. 3d DCA 1993) (refusing to permit a second-filed Florida action to proceed even though parties were not identical to prior-filed New York action). See also Ricigliano v. Peat, Marwick, Main & Co., 585 So.2d 387, 387 (Fla. 4th DCA 1991) (approving stay of second-filed even though there was "a disparity in the parties to the two actions"); A.J. Armstrong Co., Inc. v. Romanach, 165 So.2d 817, 818-19 (Fla. 3d DCA 1964) (quashing the trial court's refusal to stay a case due to a prior pending action even though the prior action involved only "many" of the same issues as the first filed action). For example, in Florida Crushed Stone Co. v. Travelers Indemnity Co., 632 So.2d 217 (Fla. 5th DCA 1994), the plaintiff filed suit in April 1992 against the Travelers

*Insurance Company* in federal court alleging that it did not owe certain retrospective premiums under policies which the Travelers Insurance had issued. 632 So.2d at 218. In July 1992, *Travelers Indemnity Company* -- the real party in interest -- brought a separate state court action to collect the retrospective premiums and to recover under a promissory note. Id. Even though there were two different parties at issue, the <u>Florida Crushed Stone</u> court stayed the second action because the two suits would "involve a single set of facts and . . . [the] resolution of the one case will resolve many of the issues involved in the subsequently filed case." 632 So. 2d at 220 (citing many cases).

Here, too, the absence of Global Surgical Partners from the Massachusetts actions is of no significance. Indeed, it is difficult to see why they are parties in this Court. There are <u>no</u> factual recitations about them in the complaint: even the LAMENSDORFS do not suggest that the proposed sale is collusive or that the price is inadequate. The injunction the LAMENSDORFS seek would restrain only ZHL from selling; the sought-for receiver would manage only ZHL's property; the constructive trust would affect only ZHL's money. The only possible reasons that Global Surgical Partners has been brought in to this internal corporate controversy are (i) to evade the principle of priority or (ii) to intimidate and harass Global Surgical Partners into dropping the purchase.[3] At any rate, if the LAMENSDORFS believe that Global Surgical Partners should be

---

[3] The latter end has at least temporarily been accomplished; counsel is informed that Global Surgical Partners has declined to go forward under the parties' letter of intent, and has cited this litigation as the primary reason why.

16

a party, they may file third-party claims in the Second Massachusetts Action and make them parties.

In summary, the principle of priority serves important public policies, resting as it does upon the sound public policy of "prevent[ing] unnecessary litigation and a multiplicity of suits." <u>Bedingfield v. Bedingfield</u>, 417 So.2d 1047 (Fla. 4th DCA 1982). "[M]ultiple lawsuits arising out of a single incident are costly to litigants and an inefficient use of judicial resources." <u>Department of Agriculture and Consumer Servs. v. Mid-Florida Growers, Inc.</u>, 570 So.2d 892, 901 (Fla. 1990). It is all the same contracts, the same parties, the same <u>case</u>, and the Massachusetts cases both began first. Hence, the Florida action must be stayed in favor of the pending Massachusetts actions.

### Motion to Dismiss

Count I of the Complaint fails to sufficiently plead a cause of action for injunctive relief and should be dismissed. A complaint seeking an injunction must allege every fact necessary for relief. <u>American Fire & Casualty Co. v. Rader</u>, 36 So. 2d 270 (Fla. 1948). The allegation of opinions or legal conclusions is not sufficient. <u>Id</u>. A Complaint for injunctive relief must clearly, definitely and unequivocally allege sufficient facts to support the conclusion of irreparable injury. <u>Swensen v. Lofton</u>, 457 So.2d 1069 (Fla. 2d DCA 1984). General allegations of irreparable injury will not suffice. <u>The First National Bank in St. Petersburg v. Ferris</u>, 156 So.2d 421 (Fla. 2 DCA 1963). The Complaint fails to allege specific facts sufficient to establish irreparable injury, or a likelihood of success on the merits.

Count II of the Complaint fails to state a cause of action, and should be dismissed. The appointment of a receiver is a remedy ancillary to the main cause of action and not an independent remedy, and can only be resorted to in a pending action brought to obtain specific relief which the court has jurisdiction to grant. Akers v. Corbett 190 So. 28 (Fla. 1939). The appointment of a receiver is an auxiliary act to aid in the enforcement of a right granted to a party to the cause. Id.

Count III fails to state a cause of action, and should be dismissed. Count III fails to plead all necessary elements of a constructive trust. The necessary elements for a position of a constructive trust are:

1.    A promise, expressed or implied;

2.    A transfer of the property in reliance thereon;

3.    A confidential relationship, and

4.    Unjust enrichment.

Abele v. Sawyer, 750 So. 2d 70 (Fla. 4th DCA 1999), citing Provence v. Palm Beach Taverns, Inc., 676 So. 2d 1022, 1024 (Fla. 4th DCA 1996). A constructive trust is imposed by operation of law as an equitable remedy in a situation where there is a wrongful taking of the property of another. Id. There is no allegation in the Complaint that Defendant, ZHL, obtained by fraud or other wrongful means any property of the Plaintiffs. The Complaint further lacks any allegation that Defendant, ZHL, has been unjustly enriched by an inappropriate taking of property which belonged to the Plaintiffs.

WHEREFORE, Defendant, ZHL, respectfully moves this Honorable Court to abate or stay this action, or in the alternative, to dismiss each Count of the Complaint.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy hereof has been furnished by Facsimile and U. S. Mail to **Michael S. Taaffe, Esquire,** Abel, Band, Russell, Collier, Pitchford & Gordon, Chartered, P.O. Box 49948, Sarasota, Florida 34230-6948, Attorney for Plaintiff, this 6th day of May, 2005.

HARLLEE & BALD, P.A.

By:

CHARLES SNIFFEN
Florida Bar No. 0124907
ADAM MOHAMMADBHOY
Florida Bar No. 0137367
202 Old Main Street
Bradenton, Florida 34205
Telephone: 941/744-5537
Facsimile: 941/744-5547
Attorneys for Defendant, ZHL, Inc.